**David W. Silke** (OBN 914295)
Email:  dsilke@grsm.com
**Robert L. Gillette, II** (OBN 220903)
Email:  rgillette@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (206) 695-5112
Facsimile:  (503) 616-3600


**Thomas C. Koessl**, *Pro Hac Vice*
E-Mail: tkoessl@lgcounsel.com
**Ashleigh A. Stochel**, *Pro Hac Vice*
E-mail: astochel@lgcounsel.com
L&G LAW GROUP, LLP
Chicago, Illinois 60610
Telephone: (312) 364-2500


Of Attorneys for Defendant Tomahawk Manufacturing

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JAMES B. WOLFF, | No. 3:21-cv-00880-SI |
| Plaintiff, | |
| v. | **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| TOMAHAWK MANUFACTURING, a Wisconsin corporation, | |
| Defendant. | |

Defendant Tomahawk Manufacturing, Inc. ("Tomahawk") submits this Memorandum in

Support of Motion for Summary Judgment.

## I.    **INTRODUCTION**

James Wolff brings this action for violation of state whistleblower statutes, disability discrimination, and wrongful discharge under Oregon law. Plaintiff's claims are wholly without merit. Wolff had a long-standing business relationship with Tomahawk's owner and President Robert Tournour that turned sour after Wolff became a Tomahawk employee. From approximately March 2017 to March 2021, Wolff was employed in a Research and Development Engineering Support role that serviced customers around the United States and the world. Although Wolff never submitted any documentation to formally claim or substantiate a disability, Tomahawk paid for Wolff to fly first class on his business trips to accommodate his medical condition, which he now alleges was disabling. Wolff never sought medical treatment or advice regarding his medical condition and increased risk of serious illness if he contracted COVID-19, but he claims that Tomahawk did not provide reasonable accommodation beyond his first class airfare.

During the course of his employment, Wolff struggled to interact appropriately with customers and co-workers. Despite several years of support, coaching, and feedback from Tomahawk, Wolff became increasingly defensive and combative. He sought out opportunities to discredit or challenge his supervisor and other senior managers, who had repeatedly criticized Wolff's behavior, tone, and interpersonal interactions. As part of a campaign against his direct supervisor, Wolff made baseless allegations concerning COVID-19 protocols and attempted to portray his supervisor as dishonest and retaliatory. Wolff's time at Tomahawk ended when he personally insulted its Chief Operating Officer ("COO") in an email to senior management, including the owner, and accused the COO of running a "kangaroo court" as Tomahawk addressed Wolff's issues.

Wolff now claims that he was terminated not for his well-documented poor behavior, but because he had a disability or raised concerns regarding COVID-19 regulations. However, Wolff cannot identify any evidence to support his claims, nor can he provide any evidence to refute Tomahawk's legitimate justification for his termination.

Finally, Tomahawk seeks dismissal of Wolff's claim for breach of confidentiality agreement because Wolff's claims are precluded by *res judicata*. Wolff had a full and fair opportunity to litigate this claim in arbitration. Though Wolff's company raised counter claims in the arbitration, Wolff failed to raise any claims under the 2010 NDA. The arbitration panel ruled against Wolff's company on all counter claims. Therefore, Wolff's claims should be dismissed.

## II.    FACTS

### A.    Background

This case arises out of a longstanding business and employment relationship between Plaintiff James Wolff and Defendant Tomahawk Manufacturing and its owner Robert Tournour. On November 2, 2010, Wolff and Tomahawk entered into a confidentiality agreement. Declaration of Robert Tournour ("Tournour Decl."), ECF 35. In November 2011, the parties formed multiple business entities in anticipation of the business venture. Wolff formed Spherical IP, LLC ("Spherical") and Spherical Innovations, LLC ("Spherical Innovations"). ECF 41 at 5. The purpose of Spherical was to receive the revenues generated by Wolff's "Fiber Oriented Technology" ("FOT"). *Id.* Eight days later, Tomahawk organized Formtec, LLC ("Formtec") to apply for, obtain, and exploit patents for the use of FOT in the meat-forming industry. *Id.* at 6. In December 2011, the parties entered into a series of Confidentiality Agreements between the various business entities: Spherical and Formtec, Spherical and Spherical Innovations, and Spherical Innovations and Tomahawk executed agreements. *Id.* The substantive provisions of these Confidentiality Agreements (the 2011 NDAs) used identical language to the 2010 NDA (collectively, Signed NDAs). *Id.* On September 11, 2012, the Parties culminated this process with the signing of the FOT Agreement with Wolff signing on behalf of Spherical IP and Tournour signing on behalf of Formtec. *Id.*

Tomahawk formally employed Wolff as R&D Engineering Support in 2017. *Id.* Wolff's employment with Tomahawk was terminated in March 2021. *Id.*

Wolff sued in Oregon state court, alleging multiple claims against Tomahawk. Tomahawk removed this case to federal court.[1] Wolff's lawsuit alleges a breach of the 2010 NDA, whistleblower retaliation in violation of Oregon Revised Statutes ("ORS") § 659A.199, and disability discrimination in violation of ORS § 659A.112. *See* Am. Compl. (ECF 15). Formtec made a Commercial Demand for Arbitration with the American Arbitration Association in Wisconsin against Spherical for a breach of the FOT Agreement. *See* ECF 25-3. Spherical alleged counterclaims against Formtec in its arbitration answering statement.

    **B.**    **Wolff's Employment at Tomahawk**

            1.    <u>Wolff Received Negative Feedback After His Poor Interactions with Tomahawk's Largest Client Cargill</u>

When Tomahawk hired Wolff in 2017, his initial supervisor was George Hausladen. Declaration of Robert L. Gillette II, Exhibit A ("Wolff Dep.") 58:22-25. Within a few weeks, James Sommer became Wolff's supervisor. *Id.* at 58:22-59:5. Wolff admitted that shortly after he started working under Sommer, he provided Wolff with negative feedback regarding his behavior at Tomahawk's largest customer Cargill. *Id.* at 86:18-87:20 ("I seem to recall that [Mr. Sommer] told me that he couldn't have anybody on his team that would behave the way I did."). Shortly thereafter, Wolff told Tomahawk President Robert Tournour that he could no longer work with Mr. Sommer. *Id.* at 88:9-14. Wolff's explanation of his behavior that triggered this performance coaching was confusing. He initially discussed his refusal to answer Cargill's questions regarding failing interleaver bearings. *Id.* at 90:5-18. Wolff then raised the interleaver bearings issue on his own initiative in meeting with Cargill executives. *Id.* at 91:2-13. When asked if Cargill was upset with Tomahawk, Wolff described an additional incident with Cargill employees Greg Owen and Ray Lundy, which according to Wolff another Cargill employee misperceived as threats of violence, and resulted in Wolff having to "be put under oath" or participate in a "deposition or an official statement." *Id.* at 91:14-24.

---

[1] Mr. Wolff is a repeat litigant. He testified at his deposition that he has given deposition testimony "more than eight and less than 20" times. Wolff Dep., 7:2-5. Before his employment with Tomahawk, Mr. Wolff engaged in litigation against his two prior employers. *Id.* at 57:6-24; 44:6-25.

After the interleaver bearing failure debacle in 2017, Chuck Sweat took over as Wolff's supervisor. Wolff's worked without major incident at Tomahawk until Mr. Sweat resigned his position and Sommer returned as Wolff's supervisor in 2020. *Id.* at 99:4-12. When asked how he felt about Sommer supervising him again, Wolff admitted, "It didn't work the first time. I did not expect it to work the second time. . . ." *Id.* at 13-16.

       2.     <u>Tomahawk Counseled Wolff in 2020 Regarding His Negative Interactions with Employees and Customers</u>

On April 1, 2020, Wolff sent a confrontational email to his superiors at Tomahawk, accusing Tomahawk of engaging in "insanity." Gillette Decl., Ex. B (Wolff Deposition Ex. 5). The tone of the entire email was inappropriate to send to superiors, but one short example is, "Change the specifications and tolerances on prints to correct issues, NOW. Who is going to do this and When?" *Id.* Also around this time, Tomahawk had canceled the weekly meetings among engineers because Wolff had strained nearly all of the relationships with the engineering team. Declaration of Brad Nicholson, ¶ 3. Tomahawk provided verbal counseling to Wolff on or around April 2, 2020. *Id.*; Gillette Decl., Ex. C (Wolff Dep., Ex. 6). During the verbal counseling, Mr. Sommer and Mr. Nicholson discussed Wolff's interpersonal conflicts with the engineering team, Wolff's negative conversations with services technicians, and his problematic interactions with customers. *Id.* Wolff admitted during his deposition that he did not remember talking about the engineering team or services technicians with Sommer or Nicholson, so he has no way to dispute it. Wolff Dep., 184:22-185:1; 186:24-187:10. Wolff admitted that he did recall talking about his negative interactions with customers. *Id.* 187:13-188:1.

Tomahawk also noted Wolff's performance issues in his end of the year performance review. Tomahawk counseled Wolff against "thinking out loud sometimes in front of the customer." Gillette Decl., Ex. D (Wolff Deposition Ex. 10). Furthermore, Tomahawk also advised Wolff that he needed to "be prepared to alter the way you communicate . . . ." *Id.*

> 3.      In Early 2021, Wolff Manufactured a Complaint about COVID-19
> Protocols as a Defensive Tactic After Mr. Sommer Confronted Him
> Regarding New, Additional Complaints From Cargill.

On Friday, January 15, 2021, Wolff and other Tomahawk employees returned to Cargill to address the same interleaver problem had previously attempted to fix in 2017. Wolff Dep. 137:4-10. Upon arriving at the Cargill facility, Wolff learned that several employees at the facility had been removed from the facility due to concerns related to COVID-19. *Id.* at 128:17-24. Wolff decided to leave the facility and coordinated his departure with Sommer. *Id.* at 134:1-9. Sommer initially asked if there was a way to complete the work on-site, but away from other Cargill employees, but supported Wolff's decision to leave the facility after it was clear that was not a viable option. Sommer Decl., ¶ 3. Wolff understood Sommer wanted him and the other Tomahawk employee to support Cargill virtually on Saturday, January 16. Wolff Dep. 138:5-11.

On January 18, 2021, Sommer received a call from his point of contact at Cargill, who complained that Cargill did not receive the support from Wolff that Cargill was expecting. Sommer Decl., ¶ 4. Sommer emailed Wolff and another Tomahawk employee responsible for working on the Cargill project:

> Upon leaving the facility, I asked you to go back to the hotel and work a set of instructions to share with [Cargill] because they were going to carry on with the project by themselves and try to get as much done as they could I even called Sam later and asked him to follow up with [Cargill] and be there virtually to help them with the start up because I did not see any communication from us to [Cargill]. I also asked Sam if he had [Cargill's] phone number so that he could reach out to see if there was any questions and he said he did.
>
> This was our third attempt to do this project after poor engineering and project planning the first two times and this is the best we could do to support our largest customer. I understand your decision to leave the facility and completely agree with it, but I am very disappointed with the support you gave the customer after leaving and so are they.

*Id.*, Ex. A.

Wolff returned home from Cargill on Saturday, January 16. Wolff Dep. 134:15. Wolff decided he was in "quarantine and isolation" for 14 days beginning on January 15. *Id.* at 267:11-24. Wolff claimed to be in quarantine and isolation based on his trip to Cargill, despite the fact that

Wolff admitted that no one at Tomahawk suggested he isolate or quarantine. *Id.* at 266:21-267:15. Wolff decided on his own that he should be in a 14 day quarantine or isolation based on CDC guidelines with a start date of January 15, 2021. *Id.* at 267:11-24. Even though Wolff now claims that his quarantine and isolation were undertaken in good faith, Wolff admitted that he flew home on an airplane from Cargill on January 16 in direct contradiction of his self-imposed "quarantine."

> Q.    Okay. So you were not in isolation on [the] 16th, right?
> A.    I was that afternoon.
> Q.    Okay. Well, you flew on an airplane during that time, right?
> A.    Correct.

*Id.* 267:25-268:8.

On Tuesday, January 19, Sommer asked Wolff to travel to Standard Meats to assist with a customer service request. *Id.* 234:20-235:3. The way Wolff described it, Wolff asked Sommer "by what authority" Sommer could pull Wolff out of quarantine. Wolff Dep. 103:24-104:8. This January 19 conversation between Wolff and Sommer was the first time Tomahawk had learned of Wolff's self-imposed "quarantine." Sommer Decl., ¶ 5. Wolff admitted that he did not request to work remotely for the Standard Meats project. Wolff Dep., 166:12-19. Less than 24 hours later, Sommer encouraged Wolff not to travel to Standard Meats if he was concerned about his health. *Id.* By that time, Wolff was on layover in Salt Lake City and insisted on going to Standard Meats in Dallas, Texas. *Id.* at 266:1-7. Curiously, as a justification for why he did not return home after flying to Salt Lake City, Wolff claimed, "I can't fly if I tell them I've been exposed to COVID. It's one of the questions Delta asked you at the time." *Id.* Wolff used this as a justification, despite the fact that he had taken two separate flights since his claimed "exposure" on January 15.

Cargill confirmed to Sommer that Wolff and his Tomahawk colleagues were never in close contact with any Cargill employees that tested positive for COVID-19 or had been in close contact with someone who tested positive for COVID-19. Sommer Decl., ¶ 6. Even though Sommer relayed this information to Wolff after his return home, Wolff continued to insist a 14 day isolation was necessary, even though he had no evidence that he had been exposed to a person who had

tested positive for COVID-19 or a person who had been in close proximity to a person who had tested positive for COVID-19.

On January 20, 2021 – just two days after Sommer's critical email –Wolff complained to Tomahawk President Robert Tournour about the company's COVID-19 procedures related to the events at Cargill on January 15, 2021 and discussions regarding the service call at Standard Meat. Wolff accused Sommer of lying and retaliating against him. *Id.* Wolff closed his email with, "Feelings are not a Corporate or Government policy. Make a decision, I don't care what. Please provide written and signed guidelines for me to follow. I will do so." *Id.*

On January 21, 2021, Tomahawk's Chief Operating Officer conducted an investigation and drafted a report regarding his investigation and conclusions. Nicholson Decl., ¶ 4. In the report, Nicholson acknowledged that Wolff may have received inaccurate information regarding Tomahawk's quarantine guidance. *Id.* However, the report concludes that Sommer was attempting to follow company rules and regulatory requirements. *Id.*

In response to this investigation, Wolff accused Nicholson of running a "kangaroo court." Nicholson Decl., ¶ 5. On January 27, 2021, Wolff sent an email at 12:46:02 a.m. to Tournour, Nicholson, and Sommer that included combative accusations, including that Tomahawk instructs its employees to lie. *Id.* For the first time, Wolff raised complaints concerning a trip to Canada occurring in December 2020. *Id.* Wolff concluded this late-night email with the following:

> Your last communication concerning this event stated you take this very seriously. What does that mean?
>
> Your kangaroo court, or investigation had James involved. This fact alone shows a hostile workplace, threat of termination, disregard for privacy, biased beliefs, and your inability to perform the task of human resources.
> James should never been involved.

Nicholson Decl., Ex. B (TMHK000223-24).

Also around this time and for the second time during his employment at Tomahawk, Wolff stated that he would not work with Sommer. Nicholson Decl., ¶ 5. Shortly after this January 27, 2021 email, Tomahawk decided that it would need to terminate his employment. *Id.* Tomahawk management initially attempted to execute a consulting agreement with Tomahawk affiliate

company Formtec, LLC and Wolff so that he could work on the FOT Technologies without regularly interacting with Tomahawk employees. *Id.* However, Wolff rejected that proposal. *Id.*

Though Tomahawk was unaware of it at the time, in February 2021, Wolff and his company breached the NDA agreements by misappropriating Tomahawk trade secrets to a third party. Nicholson Decl, ¶ 6; Arbitration Decision, 5;16-17.

### C.    Wolff's Disability Discrimination Claim Unraveled at His Deposition

At Wolff's deposition on November 9, 2022, he made many admissions that rendered his disability discrimination claim baseless. First, Wolff revealed that his doctors recommended that he not fly, but then he arranged an agreement with Tomahawk to always fly first-class for work travel. Declaration of Robert L. Gillette II, Exhibit A ("Wolff Dep.") 117:14-118:23. When asked about the accuracy of the paragraph in the Second Amended Complaint ("SAC", ECF 59) addressing disability discrimination, Wolff testified, "I guess, I probably – with or without. **The only thing I would say is that the reasonable accommodation that I asked for was flying first class.**" *Id.* at 157:7-158:12. He also admitted that Tomahawk always allowed him to fly first class if there was a seat available. *Id.* Initially, Wolff testified that the only accommodations he ever requested regarding his blood clot issue was flying first class and stopping every few hours on long car rides. *Id.* at 158:9-159:5. When asked if there were any other accommodations he requested, Wolff responded, "Not that I can think of." *Id.* at 159:3-5. Wolff then stated, "The only one I would say is working remotely." *Id.* 159:6-8. But later in his deposition, Wolff on multiple occasions retracted the idea that he ever requested to work remotely:

> Q.    Okay. And did – so after that happened, did you ever notify anyone else at Tomahawk that you were requesting to do this job remotely?
>
> A.    I don't know if I requested remotely. I actually questioned I shouldn't be there. ...

Wolff Dep. 163:11-16; *see also* 166:16-17.

Finally, although Wolff's SAC alleges that he has an increased risk of serious illness if he contracted COVID-19 due to his blood clot condition, he never sought medical advice regarding COVID-19 and his blood clot condition because "it never occurred to" him. *Id.* at 171:8-20.

During his employment with Tomahawk, Wolff never submitted any documentation related to his blood clot condition and COVID-19. Nicholson Decl., ¶ 8; Sommer Decl, ¶ 7. Tomahawk is not aware of any request for accommodation by Wolff that related to a claimed disability. *Id.* While Tomahawk was aware of Wolff's blood clotting condition, his request to fly first class was granted as a convenience to Wolff, not necessarily because the blood clotting condition was disabling. *Id.* In any event, the request was granted by Tomahawk.

### D.    Tomahawk Affiliate Company Formtec, LLC Completely Prevailed at Arbitration Against Wolff

On November 17, 2022, the American Arbitration Association ("AAA") issued an award in favor of Formtec and against Spherical IP, Wolff's company, in connection with many of the same agreements and issues that are the subject of this case. This decision filed under seal by Tomahawk (ECF 49) precludes Wolff's First Claim for Relief under the principles of *res judicata* because all parties to this case are in privity with the parties that are subject to the arbitration award. In this case, Wolff's company Spherical claimed breach of contract against Tomahawk's affiliate company Formtec. *Id.* The AAA disagreed, and dismissed Wolff's company's claims.

### III.    <u>LEGAL ARGUMENT</u>

### A.    Legal Standard

Federal Rule of Civil Procedure 56(a) states that a Court must grant a motion for summary judgment when the moving party "shows there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." FRCP 56(a). A principal purpose of a summary judgment motion is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986). In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587, 106 S.Ct. 1348 (1986). However, the non-moving party may not merely state that it will discredit the moving party's evidence at trial, in hopes that evidence can be developed at trial to support the claim. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Summary judgment must be granted if, from all of the evidence, a reasonable person could reach only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita*, 475 U.S. at 586. To rebut a properly supported summary judgment motion, the nonmoving party may not rest on mere allegations, but must present admissible evidence showing there is a genuine issue of material fact for trial. *See* FRCP 56(c); *Celotex*, 477 U.S. at 325. It is the nonmoving party's burden to come forward with "specific, substantial evidence." *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983). In this matter, Plaintiff cannot establish the essential elements of his claims for violation of federal or state anti-discrimination laws, as to disability, so summary judgment is appropriate on these causes of action.

**B.      The Court Should Grant Summary Judgment and Dismiss Wolff's Claim for Breach of Contract Based on the New Decision from the Arbitration Panel**

Wolff alleges breach of contract in his First Claim for Relief stemming from a 2010 Confidential Agreement or "NDA" dated November 2, 2010 signed by Wolff and Mr. Tournour. The Court should grant summary judgment dismissing this claim because it is precluded by *res judicata*. The Court has previously granted a stay as to Wolff's First Claim for Relief for breach of contract while the Court's order denying Tomahawk's motion to dismiss or in the alternative compel arbitration was on appeal before the Ninth Circuit. ECF 68. On December 19, 2022, the Ninth Circuit affirming this Court's decision, which was the basis for the stay. ECF 93. Additionally, the American Arbitration Association ("AAA") arbitration panel's recent decision presents additional and significant considerations for the Court and the parties. The power to stay proceedings to "abide" concurrent litigation elsewhere "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for

itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A district court may stay claims "that arise out of substantially the same facts present in an ongoing administrative or arbitral proceeding." *Amaro v. Cont'l Can Co.*, 724 F.2d 747, 752 (9th Cir.1984). The Supreme Court has directed that "in some cases... it may be advisable to stay litigation among [ ] non-arbitrating parties pending the outcome of [an] arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 n.23 (1983) (citing *Landis*, 299 U.S. at 254–55). *Kaiser v. Cascade Cap., LLC*, No. 03:16-CV-0744-AC, 2017 WL 9690162, at *2 (D. Or. Dec. 19, 2017), *report and recommendation adopted in part, rejected in part,* No. 3:16-CV-00744-AC, 2018 WL 1521892 (D. Or. Mar. 28, 2018).

A stay is no longer necessary because the Ninth Circuit has affirmed this Court's order denying Tomahawk's motion to compel arbitration. Under the principles of *res judicata*, Wolff could have brought his First Claim for Relief before the arbitration panel. He failed to do so, and now it should be dismissed.

> 1.    The Court Should Dismiss Wolff's Breach of Contract Claim Because It is Precluded by *Res Judicata*

"The doctrine of *res judicata* provides that a final judgment on the merits bars further claims by parties or their privies based on the same cause of action," and "is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their *1052 jurisdiction." *In re Schimmels*, 127 F.3d 875, 881 (9th Cir.1997) (internal quotation marks omitted). The elements necessary to establish *res judicata* are: "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir.2003) (quotation marks and citation omitted); *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir.1997). The Arbitration Decision is a final judgment on the merits because attorneys' fees and costs are the only issues left for the panel to decide. Tomahawk has demonstrated all the necessary elements of *res judicata*.

2.      Identity of Claims

In determining whether a present dispute concerns the same claims as did prior litigation, the Ninth Circuit considers: (1) Whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. The last of these criteria is the most important. *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052 (9th Cir. 2005). In this case, it is clear that the same rights and interests are implicated in both cases.

While there are some distinctions between this litigation and the arbitration litigation, both cases arose out of the contractual agreements and business dealings between Wolff and Tournour. Any rulings in this case on Wolff's breach of confidentiality agreement claim could impair the arbitration decision. This Court has previously ruled in this case that "the FOT Agreement necessarily is breached if there is a breach of the signed NDAs, because of the binding nature of the signed NDAs as incorporated by reference into the FOT Agreement." Opinion and Order, ECF 41 at 17.  The AAA panel held that Wolff (or Wolff's company) breached the FOT Agreement by disclosing confidential information in violation of the NDAs, and that Tomahawk's affiliate company Formtec "fully complied with its material obligations under the FOT Agreement." ECF 92 at 10. If this Court were to hold that Tomahawk breached the 2010 NDA, it would be inconsistent with finding that Formtec fulfilled its obligations under the FOT Agreement since Tomahawk and Formtec are in privity. There is also substantial overlap of evidence in both cases, including many of the same witnesses and documents. Both actions involve infringement of the same contractual agreements signed by Tournour and Wolff. Finally, both actions involve the same transactional nucleus of facts where Tournour and Wolff documented their transactions in writing.

3.    <u>Privity</u>

Privity may include "assignors and assignees; parties to a contract, and in some cases promisees and third-party beneficiaries; indemnitors and indemnitees; corporations and their officers or shareholders; partners and their partnerships; and unincorporated associations and their members." *Id.* at 1053. *Headwaters* explains that the Ninth Circuit has a broader understanding of privity than the traditional relationships listed above and noted that a non-party can be bound by choices made by his "virtual representative." *Id.* Non-parties may be bound under "certain limited circumstances [in which] a person, although not a party, has his interests adequately represented by someone with the same interests who is a party," *Id.*; *see also United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir. 1980).

Here, Tomahawk and Formtec are in privity because Formtec was the third-party beneficiary of Tomahawk's rights and responsibilities under the 2010 NDA since it was ultimately Formtec that received information related to the FOT Technology. Wolff, Spherical, and Spherical Innovations are in privity because Spherical was the third-party beneficiary of Wolff's rights and responsibilities under the 2010 NDA.[2] There is also be privity between Wolff and Spherical and Tomahawk and Formtec because they share the same officers and shareholders in Wolff and Tournour.[3] By virtue of the fact that the same two individuals – Wolff and Tournour – signed all relevant agreements, Wolff can also be bound under a virtual representative theory.

Additional litigation of this breach of contract claim subjects the Parties to confusion, potentially inconsistent rulings, and unnecessary delay and costs. Wolff had a full and fair opportunity to present evidence regarding a breach of the 2010 NDA before the AAA panel. He failed raise these claims. Therefore, the Court should dismiss Claim for Relief One for breach of confidentiality agreement.

---

[2] "The purpose of Spherical was to receive the revenues generated by Wolff's "Fiber Oriented Technology" ("FOT")." Opinion and Order, ECF 41 at 5.
[3] All signed agreements in the Court record note Robert Tournour as "President" of Tomahawk Manufacturing, Inc. and James Wolff as "Managing Member" of Spherical IP, LLC and Spherical Innovations, LLC. ECF 29, 25-1, 25-2.

**C.    The Court Should Grant Summary Judgment and Dismiss Wolff's Claim for Disability Discrimination**

Wolff alleges that Tomahawk failed to provide him reasonable accommodations and terminated his employment because of his disability. SAC, ¶¶ 30-35. The Court should grant summary judgment dismissing this claim because there is no evidence to support it.

1.    Wolff Cannot Meet His Burden of Proving Discrimination under the *McDonnell Douglas* Burden Shifting Framework

The familiar three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to both federal discrimination claims brought under Title VII and to state law discrimination claims litigated in federal court. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir.2001) (federal court must apply the *McDonnell Douglas* framework when evaluating summary judgment motions in employment law claims arising under Oregon law). This burden-shifting framework requires the plaintiff first to establish a prima facie case of unlawful discrimination, at which point the defendant must articulate a legitimate, nondiscriminatory reason for its actions. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 n. 16 (9th Cir.2004). If the defendant does so, the plaintiff must show with direct or circumstantial evidence that the defendant's articulated reason is a pretext for discrimination.

2.    Wolff Cannot Demonstrate a *Prima Facie* Case

To establish a *prima facie* case for disability discrimination, plaintiff must prove that (1) he is disabled within the meaning of ORS 659A.100 and/or the ADA, (2) he is a qualified individual able to perform the essential functions of the job with or without a reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003). The standards for analyzing claims under Oregon's disability discrimination law mirror those used to analyze claims under the ADA. *See* ORS 659A.139 ("ORS 659A.112 to 659A.139 shall be construed to the extent possible in a manner that is consistent with any similar provision of the federal Americans with Disabilities Act of 1990,

as amended."); *Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657, 719 P.2d 1322 (1986) (standards used to establish a prima facie case of discrimination under Oregon law identical to those used in federal law). Wolff will not be able to demonstrate that he was disabled within the meaning of the ADA or that he was terminated because of his disability.

To satisfy the first prong of his *prima facie* case, plaintiff has the burden of proving that he is disabled within the meaning of state or federal law.[4] *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001) ("A plaintiff in an ADA case bears the burden of proving disability within the meaning of the ADA."); *Callen v. Confederation of Oregon School Administrators*, 79 Or. App. 73, 78, 717 P.2d 1252 (1986) (plaintiff bears the burden of establishing the prima facie elements of their claim).

If plaintiff proves that he is disabled as defined in the ADA and ORS 659A, he must then establish that he was "otherwise qualified" for his job. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). Plaintiff is otherwise qualified if he can perform the essential functions of his position with or without a reasonable accommodation. 42 U.S.C. § 12111(8); ORS 659A.115. If he establishes that he was "otherwise qualified," plaintiff must then prove that it was the alleged disability that was the cause of his termination. *Lansford v. Georgetown Manor, Inc.*, 192 Or. App. 261, 277, 84 P.3d 1105 (2004) ("In Oregon, a plaintiff must establish that the plaintiff's employer took an adverse employment action against the plaintiff based on the plaintiff's protected characteristic."). Plaintiff cannot establish all three prongs of his *prima facie* case, and his claim for disability discrimination fails as a matter of law.

---

[4] For purposes of ORS 659A. 112 and the ADA, a person with a disability is an individual who (1) has a physical or mental impairment that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. ORS 659A.100(1)(c); 42 U.S.C. § 12102(2); *Thornton*, 261 F.3d at 794. Plaintiff alleges that he has a blood clotting condition that impairs him and increases his risk of harm when subjected to COVID-19. Having a medical condition, however, is not sufficient for establishing that an individual is disabled within the meaning of state or federal law; the medical condition must substantially limit one or more major life activities. 42 U.S.C. § 12102(2); ORS 659A.100(2). For an individual to be substantially limited in a major life activity, the individual's impairment must either prevent the individual from performing a major life activity that an average person could perform, or "significantly restricts] the condition, manner or duration under which an individual can perform a particular major life activity * *." ORS 659A.100(2)(d). A substantial limitation is more than "a mere difference in an ability to perform a particular act." *Thornton*, 261 F.3d at 796-97. Factors used in determining whether an impairment is substantially limiting include: the severity of the impairment, the duration of the impairment, and the long term effect expected from the impairment. OAR 839-006-0212(1).

Tomahawk concedes that plaintiff was subject to an "adverse employment action" since he was terminated. However, Plaintiff cannot establish a *prima facie* case of discrimination because there is no evidence that he was terminated *because* of a disability. Tomahawk also does not concede that Wolff's medical condition was disabling under the law, given that he never sought medical treatment for how COVID-19 might affect his medical condition.

### 3.    Tomahawk Had Legitimate Non-Discriminatory Reasons for Wolff's Termination

The only adverse employment action suffered by plaintiff was his termination. Therefore, plaintiff must establish that his termination was caused by his alleged disability and was not for some other legitimate non-discriminatory reason. *Allen*, 348 F.3d at 1114; *Lansford*, 192 Or. App. at 277. Even if Wolff could establish a *prima facie* case of discrimination, Tomahawk had numerous, legitimate non-discriminatory reasons for ending his employment. Further, temporal proximity, in and of itself, is not sufficient to establish pretext. *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997); Speed, 2006 WL 897978, *8; *Bernsten v. Dollar Tree Stores, Inc.*, 2007 WL 756744, *8 (D. Or. March 6, 2007) ("Yet, this timing alone is insufficient to create a genuine issue of material fact of pretext concerning [employer's] legitimate, nondiscriminatory reason for [plaintiffs] discharge."). Over the course of his employment, Tomahawk repeatedly counseled Wolff regarding his interactions with co-workers and customers. The record contains ample evidence of Wolff's arrogant tone when emailing and speaking with co-workers. Wolff's inappropriate insults of Mr. Nicholson in an email to Tomahawk senior management including the owner cemented Wolff's termination. All of these reasons are legitimate reasons to terminate employment.

### 4.    Wolff Cannot Prove Pretext

As discussed above, the evidence demonstrates that Tomahawk terminated Wolff for a legitimate nondiscriminatory reason--insulting his superiors and being combative with employees and customers. Therefore, to survive summary judgment, Wolff must adduce evidence that

Tomahawk's reason for his termination is a pretext for discrimination based on an alleged disability. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410-11 (9th Cir. 1996) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) ("[W]hen evidence to refute defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case based on a *McDonnell Douglas* type presumption.")); *Snead v. Metropolitan Property & Casualty Ins. Co.*, 237 F.3d 1080, 1090-93, cert. denied, 534 U.S. 888 (9th Cir. 2001) (burden-shifting formula applicable in federal employment discrimination cases also applies to the assessment of Oregon employment discrimination claims in federal court).

To establish pretext, plaintiff must raise a "genuine issue as to whether the employer's explanation for its action is true." *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 1993). To meet his burden of establishing pretext, the evidence adduced must be "specific and substantial." *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 661 (9th Cir. 2002). In this case, plaintiff has no evidence that Tomahawk's stated reason for his termination is false. *Logan v. Denny's, Inc.*, 259 F.3d 558, 574-75 (6th Cir. 2001) (Plaintiff must show "both that the reason was false, and that discrimination was the real reason" for the termination. (citations omitted)). That plaintiff may disagree with the reason for his termination is irrelevant. "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). *See also Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 602 (9th Cir. 1993) (employer's misjudgment of a situation does not give rise to Title VII liability; courts may not substitute their judgment about whether an employment decision was wise or fair); *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1260-61 (11th Cir. 2001) (issue is not whether employer made its decision on correct facts, but rather whether employer honestly believed in the facts it relied upon to make the decision).

Moreover, the level of discipline imposed against plaintiff (in this case, termination) may not be second-guessed by plaintiff or the Court. The role of the trier of fact is to ferret out

discriminatory motives; "[i]t is not to substitute its own judgment about whether the employment decision was wise, or even fair * * *." *Odima*, 991 F.2d at 602, citing *Aucutt v. Six Flags over Mid-America, Inc.*, 85 F.3d 1311, 1317 (8th Cir. 1996) (court may not second-guess employer's personnel decisions unless such decisions are based on unlawful discrimination); *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999) (the court is not a "super-personnel" department and will not second-guess an employer's personnel decisions that are facially legitimate); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (holding courts do not act as "super personnel departments" and should not second-guess an employer's business judgment). Although plaintiff may believe his termination was unfair, and disagree with the discipline imposed, this is not evidence sufficient to establish discrimination.

Wolff has no specific and substantial evidence of pretext. Rather, the evidence demonstrates that Tomahawk continually worked with plaintiff to correct his interpersonal performance problems. Because Wolff has no evidence that Tomahawk's reason for terminating him was a pretext for discrimination based on an alleged disability, Wolff's disability discrimination claim fails.

### 5. Wolff Cannot Establish That Tomahawk Failed to Reasonably Accommodate Him

Plaintiff alleges that Tomahawk violated Oregon law by failing to engage in the interactive process to determine a reasonable accommodation for plaintiff's alleged disability, and by failing to provide him with a reasonable accommodation. (SAC ¶¶ 30-35.) However, Tomahawk had no duty to accommodate because, as discussed above, plaintiff was not an otherwise qualified person under the ADA or ORS 659A. *See Broussard v. University of California, at Berkeley*, 192 F.3d 1252, 1259 (9th Cir. 1999) (plaintiff must be a disabled, qualified individual to substantiate an accommodation claim). For this reason alone, plaintiff's allegation that Tomahawk failed to provide him with a reasonable accommodation fails as a matter of law, and Tomahawk is entitled to summary judgment on this claim.

However, even if the Court finds that plaintiff was an otherwise qualified disabled individual, Tomahawk did not violate ORS 659A because the evidence demonstrates that Tomahawk attempted to work with plaintiff to accommodate his requests. Nothing about Wolff's requests to fly first-class were reasonable. Specifically, a request for accommodation can be reasonable if it is directly contrary to the advice plaintiff's medical provider.  Significantly, plaintiff never requested reasonable accommodations as alleged in his SAC. Furthermore, Wolff's requested accommodation that he fly first-class on a commercial airline is distinctly at odds with his supposed request to work remotely. There is no evidence that Wolff requested to work remotely at any time.

6.    Tomahawk Did Not Unlawfully Fail to Accommodate Plaintiff's Alleged
         Disability

The duty to accommodate also does not apply unless and until the employer has notice of a disability that requires accommodation. 29 C.F.R. § 1630.9; *see also* ORS 659A.112(2)(e). As discussed above, plaintiff did not request a reasonable accommodation. Plaintiff admitted in his deposition that his requests for accommodation were not framed in the context of an alleged disability, but rather that he "should not be there." Wolff Dep., 159:24-160:2; 163:11-20. Therefore, Tomahawk was unaware that Wolff "had a disability that requires an accommodation" or what specific accommodation Wolff was seeking. Critically, Wolff never identified an instance prior to Mr. Sommer's critical email on January 18, 2021 where he requested to work remotely, despite the fact that the pandemic had been ongoing for over a year.

Further, plaintiff has the burden of showing that any proposed accommodation was "possible." *See Honstein v. Metro West Ambulance Service, Inc.*, 193 Or. App. 457, 465, 90 P.3d 1030 (2004) ("Defendant had no burden to establish undue hardship unless plaintiff could establish a reasonable accommodation.") (emphasis added); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002) (holding that under the ADA, the plaintiff has the burden of establishing the existence of a reasonable accommodation); *Braunling v. Countrywide*

*Home Loans*, 220 F.3d 1154, 1157 (9th Cir. 2000) ("Plaintiff has the burden of providing at least a facial showing that a reasonable accommodation is possible."). Plaintiff has not met this burden because Wolff has not described his requested accommodations in a clear or consistent manner.

The evidence demonstrate that Tomahawk granted every request Wolff ever sought over a period of several years. Tomahawk allowed Wolff to fly first class and take breaks during long car trips. Wolff admitted that Tomahawk always paid for Wolff to fly first class so long as a seat was available. Wolff's alleged requests for accommodation regarding remote work are nothing more than retaliatory allegations manufactured for the purposes of litigation. Wolff's failure to accommodate claim must be dismissed.

**D.    The Court Should Grant Summary Judgment and Dismiss Wolff's Second and Fourth Claims for Relief**

Wolff alleges that he was terminated in violation of the Oregon "whistleblower" statutes (ORS 659A.199, 659A.030) for reporting COVID-19 concerns and further alleges he was "wrongfully terminated" for reporting these concerns ¶¶ 15-29; 36-49. The court should grant summary judgment on these claims because there is no evidence to support them. Like the analysis above related to Wolff's disability discrimination claim, Wolff cannot carry his burden under the *McDonnell Douglas* framework.

1.    The Could Should Dismiss Wolff's Claims Based on Statutory Whistleblower Claims

Under Oregon law, an employer may discharge an employee at any time for any reason unless doing so violates a contractual, statutory, or constitutional requirement. *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407 (2002) (citing *Patton v. J.C. Penney Co.*, 301 Or. 117, 120 (1986)). Wrongful discharge in violation of Oregon's whistleblower protections is a narrow exception to this general rule—an employer cannot discriminate against an employee that has "in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." ORS § 659A.199(1). This statute was enacted in 2009, to further address whistleblowing protections. *De Bay v. Wild Oats Mkt., Inc*., 244 Ore. App. 443, 451 fn.2 (2011)

(§ 659A.199 inapplicable because *De Bay* case was commenced before 2010). To prove a claim of retaliation under ORS § 659A.199, Plaintiff must show that he (1) engaged in a protected activity (a good faith report of unlawful activity), (2) suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision. *Sandberg v. City of N. Plains*, No. 10-CV-1273-HZ, 2012 WL 602434, at *6 (D.Or. Feb. 22, 2012). The same *McDonnell-Douglas* burden-shifting framework applies to Wolff's claims violation of the "whistleblower" statutes. *See Mougeot v. McLane Foodservice, Inc.*, 2007 WL 4365755 (D. Or. 2007) (King, J.) (applying *McDonnell-Douglass* burden shifting framework to whistle-blower and wrongful termination claims). First, Wolff cannot prove that any report he made was in good faith. Second, there is no evidence to rebut the Tomahawk's showing that Wolff was terminated for legitimate, non-discriminatory reasons as stated above. For the same reasons, the court should grant summary judgment dismissing Wolff's Second and Fourth Claims for Relief.

> 2.    Wolff Reports to Tomahawk Were Retaliatory and Intended to Target His Supervisor Mr. Sommer

"Good faith" is a concept in law often thought to be understood; however, it is rarely analyzed by courts. The pith of whistleblowing statutes is to encourage individuals to be willing to come forward and tell their story and what they know in order to effectuate justice and reduce civil and criminal wrongs. In order to find safe harbor from retaliation or discrimination under the whistleblowing statutes, one's report of wrongdoing must be made in good faith. If a whistleblower's report is not made in good faith, then he too has unclean hands and the whistleblower will find no protection from the storm. Good faith is commonly understood to mean honesty or sincerity in dealing; in the whistleblower context, it means that one is genuinely seeking the outcome desired by the statute—an altruistic justice not just for one's self but also an end to wrongdoing. There is no good faith in mere revenge, animus, or emotional outburst. In this case, Wolff's report regarding COVID-19 protocols occurred just two days after a critical email from

his supervisor, which suggests retaliation. Furthermore, Wolff's self-imposed "quarantine" was also constructed in bad faith. The only reasonable interpretation of Wolff's bizarre claims and actions is that his self-imposed "quarantine" was a device to suit his purposes. After Mr. Sommer told Wolff he did not need to continue to Standard Meats, he reasoned that he had to continue because Delta would not let him fly if told them he was exposed to COVID-19. However, Wolff had flown multiple times after his feared exposure to COVID-19, but it was only after Mr. Sommer told him he could return home that Wolff claimed travel home was not feasible. Wolff's refusal to accept the accommodation he requested less than 24 hours prior demonstrates his motivation to unreasonably blame his supervisor. Wolff deployed this tactic as a way to retaliate against Mr. Sommer after a critical email. Wolff openly admitted that working with Mr. Sommer did not work the first time and he did not think it would work the second time.

### 3. No Evidence of Pretext

Even if Wolff could establish a prima facie case of whistleblower retaliation, which he cannot, he is unable to adduce any evidence to refute Tomahawk's legitimate justification for its actions. To succeed on his whistleblower claim, Wolff must present evidence that Tomahawk's reasons for its actions were merely pretextual, and that his alleged protected activity, not his poor behavior, was the real reason behind Tomahawk's decision to terminate his employment. *See Snead v. Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1091-93 (9th Cir. 2001); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973). Wolff "must show that [Tomahawk] would not have made the same decision absent a discriminatory motive." *See Merrill*, 2011 WL 1457461 at *7 (citing *El-Haken v. BJY Inc.*, 415 F.3d 1068, 1076 (9th Cir. 2005)); *see also Whitley v. City of Portland*, 654 F. Supp. 2d 1194, 1223 (D. Or. 2009). An employer's reason for its actions is pretextual when it is "unworthy of belief." *Pottenger v. Polatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003).

Whether Wolff disagrees with Tomahawk's decisions, or believes it was "nitpicking," is irrelevant, as "an employee's subjective personal judgments of his competence alone do not raise

a genuine issue of material fact." *Otsyula*, 2008 WL 5246092, *6 (internal quotations and citations omitted). Additionally, neither Wolff nor this Court may second-guess Tomahawk's decisions. The role of the trier of fact is to ferret out discriminatory motives, not to "substitute its own judgment about whether the employment decisions were wise, or even fair." *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 602 (9th Cir. 1993); s*ee also Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1317 (8th Cir. 1996) (citation omitted) (court may not second-guess employer's personnel decisions unless such decisions are based on unlawful discrimination).

On this record, Mr. Wolff cannot demonstrate his employment was terminated for any reason other than his poor behavior and frequent insulting of his superiors at Tomahawk. Wolff is unable to provide any evidence from which a reasonable jury could conclude that his performance was acceptable. Several of Wolff's emails to Tomahawk senior management are objectively inappropriate and unprofessional. Most jurors instinctively understand that if an employee accuses senior management of insanity or incompetence in an arrogant tone over email, that employee is subject to termination. In the face of well-documented feedback and management's constant counseling of his behavior, Wolff cannot provide any evidence that would support an inference that Tomahawk's explanation is pretext. Other than the mere fact that he reported concerns regarding COVID-19 protocols, and was subsequently terminated, "there is no evidence from which a reasonable juror could conclude that [Tomahawk's] explanation is unworthy of credence or otherwise not believable, or that [Tomahawk] was more likely motivated by [retaliatory intent]. Thus, his claim also fails at the pretext level of analysis." *Otsyula*, 2008 WL 524692, *10 (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91) ("[W]hen evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case based on a *McDonnell Douglas* type presumption."). *See also Cohen*, 686 F.2d at 797. Accordingly, Wolff's whistleblower retaliation claim must fail as a matter of law.

E.    **Wolff's Common Law Wrongful Discharge Claim Fails as a Matter of Law**

The common-law tort of wrongful discharge is a limited exception to the general rule that employment is "at-will" and may be terminated by either the employee or the employer at any time. *Patton v. J.C. Penney Co., Inc.*, 301 Or. 117, 120 (1986) ("Generally an employer may discharge an employee at any time, absent a contractual, statutory or constitutional requirement."), overruled on other grounds by *McGanty v. Staudenraus*, 321 Or. 532 (1995). To allege a claim of wrongful discharge "there must be a discharge, and that discharge must be 'wrongful.' " *McGanty*, 321 Or. At 551 (internal citation omitted). Wolff's wrongful discharge claim fails for two reasons. First, an adequate statutory remedy precludes Wolff's common law claim. Second, Wolff cannot demonstrate his employment termination was wrongful. Accordingly, his wrongful discharge claim must be dismissed.

1.    Wolff's Common Law Claim for Wrongful Discharge Is Precluded by Existing Statutory Remedy

Wolff's wrongful discharge claim must fail because an adequate statutory remedy exists that precludes his common law claim. Under Oregon law, "an at-will employee may be discharged at any time for any reason by an employer." *Huff v. City of Portland*, 342 F. Appx. 282, 284 (9th Cir. 2009) (citing *Estes v. Lewis & Clark College*, 152 Or. App. 372 (1998)), rev. denied, 327 Or. 583 (1998). The tort of wrongful discharge is a limited exception to that rule, and is an "interstitial tort designed to fill a remedial gap where a discharge would be left unvindicated." *See id; Reid v. Evergreen Aviation Ground Logistics Enter. Inc.*, Civil No. 07-1641-AC, 2009 WL 136019, *16 (D. Or. Jan. 20, 2009) (quoting *Dunwoody v. Handskill Corp*., 185 Or. App. 605, 612 (2003)). Accordingly, "if an adequate statutory remedy exists, a common law wrongful discharge claim based on the same conduct is precluded." *Reid*, 2009 WL 136019, at *16; *see also Whitley*, 654 F. Supp. 2d at 1223.

This Court has expressly held that ORS 659A.199 provides an adequate remedy for plaintiff's common law wrongful discharge claim. *Duran v. Window Products, Inc.*, Civil No. 10-125-ST, 2011 WL 1261190 (D. Or. Mar. 29, 2011) (court held that plaintiff's statutory 659A.199

whistleblowing claim precluded her common law wrongful discharge claim); *Franklin v. Clarke*, Civil No. 10-00382-CL, 2011 WL 4024638, *11 (D. Or. Sept. 9, 2011).

Wolff's ORS 659A.199 and 659A.030 claims are predicated on his assertion that Tomahawk discharge him for reporting what he believed was a violation of law related to COVID-19 regulations. SAC ¶¶ 26, 38. He relies on the very same conduct to support his common law wrongful discharge claim. *Id.* ¶¶ 45-46. Because the Oregon statutes provide an adequate remedy with respect to the same conduct, Ms. Wolff's common law wrongful discharge claim is precluded.

> 2.    <u>Wolff's Wrongful Discharge Claim Still Fails Because He Cannot Provide Evidence That Establishes Wrongful Termination</u>

In order for a discharge to fall within the narrow tort of wrongful discharge, Wolff must prove that his employment was terminated *because* he: (1) he exercised "a job-related right that reflects an important public policy"; or (2) he fulfilled "some important public duty." *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407 (2002) (citations omitted). Wolff does not fit into either category. If anything, Wolff's complaints and accusations related to COVID-19 were deeply personal and retaliatory. The record contains ample uncontroverted evidence that Wolff's was terminated because of his combative behavior toward his superiors and co-workers. Even in the light most favorable to Wolff, there is no way to view his complaints as made on behalf of an important public duty. The record is devoid of any evidence demonstrating that his termination was related to any important public policy or duty. Consequently, he cannot prevail on this claim. Accordingly, Wolff's claim for wrongful termination should be dismissed.

### IV.    <u>CONCLUSION</u>

For the reasons above, Tomahawk respectfully requests that the Court grant Tomahawk's Motion for Summary Judgment

Dated: December 20, 2022                          GORDON REES SCULLY MANSUKHANI, LLP


By: */s/ Robert L. Gillette*
    David W. Silke (OBN 914295)
    Robert L. Gillette, II (OBN 220903)

    L&G Law Group, LLP
    Thomas C. Koessl, *Pro Hac Vice*
    Ashleigh A. Stochel, *Pro Hac Vice*

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, the foregoing document will be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered participants.

Morris J. Morris, OSB #772839
Aruna A. Masih, OSB #973241
mike@bennetthartman.com
aruna@bennetthartman.com
*Attorneys for Plaintiff*

Michael G. Jacobs, OSB #09392
mike@bennetthartman.com
*Attorney for Defendant*

Thomas C. Koessl, Pro Hac Vice
Asleigh A. Stochel, Pro Hac Vice
tkoessl@lgcounsel.com
astochel@lgcounsel.com
*Admitted Pro Hac Vice Attorneys for Defendants*

DATED:  December 20, 2022.

*s/ Christine F. Zea*
Christine F. Zea, Legal Assistant