Michael J. Morris, OSB # 772839
Email: mike@bennetthartman.com
Aruna A. Masih, OSB #973241
Email: aruna@bennetthartman.com
BENNETT HARTMAN, LLP
210 SW Morrison St., Suite 500
Portland, Oregon 97204-3149
Telephone: (503) 227-4600/Fax: (503) 248-6800
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **JAMES B. WOLFF,** | Civil No. 3:21-cv-00880-SI |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **TOMAHAWK MANUFACTURING**, a Wisconsin corporation, | |
| Defendant. | |

TABLE OF CONTENTS

*I.*    *INTRODUCTION.* ........................................................................................................ 7

*II.*   *RELEVANT MATERIAL FACTS.* ................................................................................ 8

  A. Structure of Tomahawk ........................................................................................ 8

  B. Wolff Pre-Employment Record of Disability and Contractual Relationships. ...................... 9

  C. Employment with Tomahawk: May 2017-December 2019 .................................. 11

  D. Pandemic Accommodation Requests, Opposition to Unsafe Conditions, and Retaliation/Termination. ........................................................................................ 13
     1.   November-December 2020 Canada Trip. ...................................................... 15
     2.   December 2020 Performance Evaluation. ..................................................... 16
     3.   January 15, 2021 Fresno Cargill Trip. .......................................................... 17
     4.   January 20, 2021 Emails re: Quarantine. ...................................................... 18
     5.   Tomahawk Stops Giving Wolff Assignments. .............................................. 20
     6.   March 25, 2021 – Termination of Employment and Post-Termination Acts. .............. 21

*III.*  *SUMMARY JUDGMENT STANDARD.* ..................................................................... 23

*IV.*  *LEGAL ARGUMENT.* ............................................................................................ 24

  A. The court should deny defendant's motion for summary judgment on the first claim for relief regarding the 2010 NDA because defendants have failed to establish that *res judicata* is applicable. .................................................................................................. 24
     1.   The elements of *res* judicata are not present here. ....................................... 24
     2.   The scope of the 2012 FOT Agreement. ....................................................... 24
     3.   The parties and issues in the arbitration. ....................................................... 25
     4.   The issues in this case. ................................................................................. 25
     5.   Issue in the arbitration relating to the 2010 NDA. ........................................ 26
     6.   A ruling by this Court that Wolff may enforce the 2010 NDA against Tomahawk is not inconsistent with the arbitrators' rulings. ............................ 26
     7.   The principles of *res judicata* cannot be applied here. .................................. 27

  B. Defendants motion should be denied as to the Second and Fourth Claims for Relief under ORS 659A.199 and ORS 659A.030(1)(f) because when viewed in the light most favorable to Wolff, the record evidence raises genuine issues of material fact that Tomahawk's asserted reason for termination of Wolff's employment is a pretext for retaliation. .............................. 28
     1.   Wolff engaged in protected activity. ............................................................. 30
     2.   Wolff experienced an adverse action. ........................................................... 31
     3.   Causal connection between protected activity and adverse action. ............... 31
     4.   Pretext. ......................................................................................................... 32

  C. Defendants motion should be denied as to the Third Claim for Relief under ORS 659A.112 because when viewed in the light most favorable to Wolff, the record evidence raises genuine issues of material fact that Tomahawk failed to engage in the interactive process for reasonable accommodation in good faith/perceived Wolff as disabled, and its asserted reason for termination of Wolff's employment is a pretext for disability discrimination. .................. 34
     1.   Termination of Employment. ........................................................................ 36

**BENNETT HARTMAN, LLP**
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600

2.    Reasonable Accommodation. ...................................................................... 37

D. Defendants motion should be denied as to the Fifth Claim for relief to the extent that the court determines that Wolff's assertion of concerns do not fall within the scope of the above statutory protections. ............................................................................................................ 38

V.    *CONCLUSION*. ............................................................................................................ *40*

TABLE OF AUTHORITIES

Cases

*Allen v. City of Los Angeles*,
  66 F.3d 1052 (9th Cir.1995) ................................................................................. 24

*Alpha Energy Savers, Inc. v. Hansen*,
  381 F.3d 917 (9th Cir. 2004) ................................................................................ 32

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................. 23

*Arizona v. California*,
  460 US 605, 103 S Ct 1382, 75 L Ed 2d 318 (1983) ........................................... 27

*Babick v. Oregon Arena Corp.*,
  333 Or. 401, 40 P.3d 1059 (2002) ....................................................................... 38

*Brunozzi v. Cable Commc'ns, Inc.*,
  851 F.3d 990 (9th Cir. 2017) ............................................................................... 28

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................. 23

*Chuang v. Univ. of Cal. Davis*,
  225 F.3d 1115 (9th Cir. 2000) ....................................................................... 30, 33

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ............................................................................. 32

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) ............................................................................... 32

*Dark v. Curry Cnty.*,
  451 F.3d 1078 (9th Cir. 2006) ............................................................................. 38

*Davis v. Team Elec. Co.*,
  520 F.3d 1080 (9th Cir. 2008) ............................................................................. 30

*De Bay v. Wild Oats Market, Inc.*,
  244 Or. App. 443, 260 P.3d 700 (2011) .............................................................. 39

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir.2001) .............................................................................. 23

*Draper v. Astoria School Dist. No. 1C*,
  995 FSupp 1122 (D. Or. Feb. 12, 1998) .............................................................. 39

*Estes v. Lewis and Clark College*,
  152 Or. App. 372 (1998) ...................................................................................... 29

*Farrington v. Pepsi-Cola Bottling Co. of Bend*,
  2004 WL 817356 (D. Or. February 25, 2004) .................................................... 38

*Hall v. State of Oregon*,
  274 Or. App. 445, 366 P.3d 345 (2015) ......................................................... 28, 39

*Hanson v. Oregon, Legislative Assembly*,
  2023 WL 22196 (D. Or. Jan. 3, 2023) ........................................................... 32, 36

*Headwaters Inc. v. U.S. Forest Serv.*,
  399 F3d 1047 (9th Cir 2005) ............................................................................... 24

*Herbert v. Altimeter, Inc.*,
  230 Or App 715 ................................................................................................... 36

**PAGE 4 - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BENNETT HARTMAN, LLP**
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600

*Hirsovescu v. Shangri–La Corp.*,
    113 Or.App. 145, 831 P.2d 73 (1992) ..................................................................... 34

*Huitt v. Optum Health Services*,
    216 F.Supp.3d 1179 (2016) ..................................................................................... 36

*Humphrey v. Mem'l Hosps. Ass'n*,
    239 F.3d 1128 (9th Cir. 2001) ................................................................................ 37

*In re Schimmels*,
    127 F.3d 875 (9th Cir.1997) ................................................................................... 24

*Karthauser v. Columbia 9-1-1 Commc'ns Dist.*,
    2022 WL 17979739 (D. Or. Dec. 28, 2022) .......................................................... 29

*Kemp v. Masterbrand Cabinets, Inc.*,
    257 Or. App. 530, 307 P.3d 491 (2013) ................................................................ 39

*Larmanger v. Kaiser Found. Health Plan of the Nw.*,
    895 F. Supp. 2d 1033 (D. Or. 2012) ...................................................................... 29

*Lynch v. Klamath County School District*,
    2015 WL 2239226 (2015) ...................................................................................... 34

*Mayo v. PCC Structurals, Inc.*,
    795 F.3d 941 (9th Cir. 2015) ................................................................................. 36

*McAlindin v. County of San Diego*,
    192 F.3d 1226 (9th Cir.) ......................................................................................... 37

*McDonnell Douglas Corp v. Green*,
    411 U.S. 792 (1973) ............................................................................................... 29

*McLaughlin v. Wilson*,
    365 Or. 535, 449 P.3d 492 (2019) ................................................................... 29, 31

*McManus v. Auchincloss*,
    271 Or. App. 765, 353 P.3d 17 ............................................................................. 39

*Miller v. Fairchild Indus.*,
    885 F.2d 498 (9th Cir. 1989) ................................................................................. 32

*Miller v. Fairchild Indus., Inc.*,
    797 F.2d 727 (9th Cir. 1986) ................................................................................. 33

*Nees v. Hocks*,
    272 Or 210 (1975) .................................................................................................. 38

*Playboy Enters., Inc. v. Welles*,
    279 F.3d 796 (9th Cir.2002) .................................................................................. 23

*PSU Association of University Professors v. PSU*,
    352 Or. 697, 291 P.3d 658 (2012) ......................................................................... 31

*Reid v. Evergreen Aviation Ground Logistics Enterprises Inc.*,
    2009 WL 136019 (D. Or. Jan. 20, 2009) .............................................................. 38

*Rohrer v. Oswego Cove, LLC*,
    309 Or. App. 489, 482 P.3d 811 (2021) ................................................................ 39

*Schechner v. KPIX-TV*,
    686 F.3d 1018 (9th Cir. 2012) ............................................................................... 36

*Schmidt v. Safeway Inc.*,
    864 F. Supp. 991 (D. Or. 1994) ............................................................................ 37

*Snead v. Metro Prop. & Cas. Ins. Co.*,
    237 F.3d 1080 (9th Cir. 2001) ............................................................................... 29

**PAGE 5  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

*Strother v. S. Cal. Permanente Med. Grp.*,
    79 F.3d 859 (9th Cir. 1996) ................................................................................ 32
*Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    322 F.3d 1064 (9th Cir.2003) ........................................................................... 24
*Thomas v. City of Beaverton*,
    379 F.3d 802 (9th Cir. 2004) .............................................................................. 32
*Tornabene v. Nw. Permanente, P.C.*,
    156 F. Supp. 3d 1234 (D. Or. 2015) ......................................................... 30, 34
*Van Asdale v. Int'l Game*,
    577 F.3d 989 (9th Cir. 2009) .............................................................................. 32
*Wallis v. J.R. Simplot Co.*,
    26 F.3d 885 (9th Cir. 1994) ................................................................................ 36
*Yartzoff v. Thomas*,
    809 F.2d 1371 (9th Cir. 1987) ........................................................................... 30

Statutes

ORS 654.062 ...................................................................................................... 7, 29, 32
ORS 659A.001 ...................................................................................................... 28-29
ORS 659A.030(1)(f) ............................................................................................. *Passim*
ORS 659A.104 ...................................................................................................... 35
ORS 659A.139 ...................................................................................................... 35
ORS 659A.199 ...................................................................................................... *Passim*
ORS 659A.820 ...................................................................................................... 29

Rules

Fed.R.Civ.P. 56(a) ............................................................................................... 23

Regulations

Or. Admin. R. 839-006-0206 (4) ........................................................................ 37

**PAGE 6  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BENNETT HARTMAN, LLP**
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600

Plaintiff, James Wolff ("Wolff"), submits this memorandum in opposition to the motion for summary judgment filed by defendant Tomahawk Manufacturing ("Tomahawk"). Wolff also relies upon the following documents submitted herewith: the declaration of James Wolff ("Wolff Decl."), the declaration of Michael J. Morris ("Morris Decl."), the declaration of Aruna A. Masih ("Masih Decl."), the declaration of Samuel Gannon ("Gannon Decl."), and the declaration of Elisabeth Wolff.

## I.    INTRODUCTION.

Wolff filed this action on May 10, 2021 in Multnomah County Circuit Court, asserting claims against Tomahawk for breach of a 2010 Confidentiality Agreement ("2010 NDA"), whistleblower retaliation under ORS 659A.199, and disability discrimination under ORS 659A.112. On June 10, 2021, Tomahawk removed the claims to federal court. ECF 1. On August 2, 2021, Tomahawk moved to dismiss and compel arbitration, and Wolff filed an amended complaint. ECF 14, 15. On August 12, 2021, Tomahawk filed an answer to the amended complaint (ECF 18) and renewed its motion to dismiss or in the alternative to compel arbitration of at least the first claim regarding the 2010 NDA. ECF 25. On February 8, 2022, this court denied defendant's motion to dismiss/compel arbitration of the first claim. EC 41.

On February 18, 2022, Tomahawk appealed the denial of the motion to the Ninth Circuit Court of Appeals (ECF 45) and on March 14, 2022, moved this court to stay the proceedings on the first claim regarding the 2010 NDA pending the appeal. ECF 50. On March 25, 2022, Wolff filed a second amended complaint to add a fourth claim for ORS 659A.030(1)(f) retaliation and a fifth claim for wrongful discharge. ECF 59. On April 19, 2022, the court granted Tomahawk's motion to stay the first claim regarding the 2010 NDA pending the appeal. ECF 68.

The parties proceeded with discovery on the remaining employment claims. On November 21, 2022, within the time set for amendments, Wolff moved the court to file a third amended complaint to add a sixth claim for retaliation under ORS 654.062 for health and safety reporting and opposition. ECF 80. The court has yet to rule on that motion.

On December 19, 2022, the Ninth Circuit Court of Appeals affirmed this court's denial of Tomahawk's motion to compel arbitration of the first claim regarding the 2010 NDA. ECF 93. On December 20, 2022, Tomahawk moved for summary judgment on all of Wolff's claims, including the first claim which had been stayed. ECF 98-102.

For the reasons explained further below, the court should deny Tomahawk's motion for summary judgment on the first claim for relief regarding breach of the 2010 NDA because *res judicata* cannot be applied here. In addition, the motion for summary judgment should be denied as to the three statutory employment claims because Wolff can establish a prima facie case and when viewed in the light most favorable to Wolff, the record evidence raises genuine issues of material fact that Tomahawk's asserted reason for termination of Wolff's employment is a pretext for retaliation and/or disability discrimination. Finally, to the extent the court determines that Wolff's allegations do not fall within the scope of the statutory protections and relief, the court should deny Tomahawk's motion for summary judgment as to the common law wrongful discharge claim because Wolff was exercising job-related rights that reflect an important public policy to provide a safe and discrimination free work environment for employees, particularly those being sent into known "COVID hot spots" prior to the availability of vaccines.

## II.    RELEVANT MATERIAL FACTS.

### A.  Structure of Tomahawk.

Tomahawk is a Wisconsin corporation which provides forming equipment, tooling, parts, engineering, and service technician support to clients in the food forming industry throughout the United States. Masih Decl. ¶2, Ex. 1 (Sommer Dep. Tr. 11-12); Ex. 4. Tomahawk's President is Robert Tournour ("Tournour"). *Id.* At all times relevant to the complaint, its Executive Vice President was James Sommer ("Sommer"). *Id.* Ex. 1(Sommer Dep. Tr. 13:6). From January 2020 onwards, its Chief Operating Officer was Brad Nicholson ("Nicholson"). *Id.* Ex. 2, (Nicholson Dep. Tr. 8). Tomahawk employs approximately 80 employees in the United States. *Id.* Ex. 2, p. (Nicholson Dep. Tr. 9). Relevant to the complaint, Tomahawk employs individuals classified as

engineers and as service technicians. Wolf Decl. ¶12. These individuals are responsible for designing, supporting, and/or servicing the equipment and tooling parts Tomahawk sells to its customers in the food forming industry. *Id.* Within the industry "servicing" means on-site work on the machinery, and "support" means providing information regarding the parts and methods needed for servicing from off-site. *Id.*

### B.  Wolff Pre-Employment Record of Disability and Contractual Relationships.

Wolff is a brilliant inventor, master machinist, and outspoken man. He worked for Fulton Provision Co. ("Fulton") in the meat-forming industry for 18 years where his primary responsibilities were to make sure the machines were running smoothly and efficiently and to recommend any repairs or maintenance issues. Wolff Decl. ¶2. During his employment, Wolff became intimately familiar with the meat-forming machines available in the marketplace (*id.*), including tooling and equipment sold by Tomahawk to his employer Fulton. Wolff Decl. ¶3. Based on this examination, Wolff was able to identify various deficiencies in Tomahawk's design. *Id.* When he became acquainted with Tomahawk's President Tournour in the mid-1990s, Wolff suggested to him various innovations and improvements to the designs of Tomahawk equipment and tooling. *Id.* Tournour was impressed with Wolff's suggested improvements and Tomahawk incorporated them for example, in all 26-style forming machines. *Id.*

After Wolff's employment at Fulton ended in 2008, Tournour had Tomahawk retain Wolff as a consultant to assist Tomahawk's engineers. Wolff Decl. ¶4. During the next few years as a consultant for Tomahawk, Wolff had many occasions to explain to Tournour his "Fiber Oriented Technology," ("FOT"), a concept Wolff had been working on for several years. *Id.* Tournour wanted to explore a business relationship with Wolff but Wolff first insisted upon a Confidentiality Agreement, covering not just new ideas but also those imparted prior to the date of the agreement. Wolff Decl. ¶5. Wolff explained that he was frustrated that Tomahawk was using his ideas without compensating him. *Id.* Wolff wanted to ensure that Tomahawk recognized that his confidential concepts would be protected by a non-disclosure agreement and

that any use of them had to be with Wolff's written consent, which could be withheld or withdrawn at his discretion. *Id.* Tomahawk executed the Confidentiality Agreement on November 18, 2010, i.e., the "2010 NDA." Wolff Decl. ¶5, Ex. 1.

Shortly thereafter, on December 12, 2010, Wolff notified Tournour of certain proprietary innovations that were to be covered by the 2010 NDA. Wolff Decl. ¶6, Ex. 2. They included the FOT, but also certain other innovations that were not part of FOT. *Id.* For example, the Ever Sharp Technology could be used without FOT. *Id.* The list was not all-inclusive. *Id.* Tournour never disagreed with the statements in this notification. *Id.*

A few months later, on February 23, 2011, Wolff, who has a hypercoagulable disorder with recurrent thromboembolic disease, was admitted to the hospital with extensive bilateral pulmonary emboli. Wolff Decl. ¶7. He was discharged on February 27, 2011 after extensive testing, education, and counseling regarding anticoagulation management during his hospitalization. *Id.* Wolff was advised that he would require lifelong treatment and referred for management of anticoagulation therapy. *Id.* Wolff's hypercoagulable disorder is a lifelong condition which continues to substantially limit his major life activities of sitting, standing, walking, and breathing. *Id.* On March 1, 2011, Wolff and Tournour exchanged emails about Wolff's hospitalization and health condition. Wolff Decl. Ex. 3.

Following his hospitalization, Wolff continued to discuss his health condition with Tournour and to provide consulting services to Tomahawk, offering his confidential solutions to various problems. Wolff Decl. ¶8. During this time Tournour and Wolff discussed at length his FOT. *Id.* The technology employs a principle of physics known as the "Venturi effect," the reduction in fluid pressure that results when a fluid flows through a constricted section of a pipe. *Id.* Applied in meat-forming machines, Wolff's FOT causes a re-alignment of the meat fibers, resulting in a better meat patty. *Id.* Tournour wanted to team up with Wolff to obtain patents and exploit the FOT. *Id.* After study of the advantages of Wolff's innovations Tournour organized

/ / /

Formtec, LLC to apply for, obtain and exploit patents for the use of FOT in the meat-forming industry. *Id.*

In anticipation of the new business relationship, on November 21, 2011, Wolff organized Spherical IP, LLC. Wolff Decl. ¶9.  The purpose of Spherical IP,  LLC was to receive the revenues generated from FOT. *Id.* On November 29, 2011, Tournour organized Formtec, LLC. *Id.* Formtec LLC and Spherical IP, LLC executed the Confidentiality Agreement dated December 20, 2011. Wolff Decl. Ex. 4. Subsequently, on September 11, 2012, Formtec, LLC and Spherical IP, LLC executed the FOT Agreement. Wolff Decl. ¶10. Tomahawk used its intellectual property legal counsel, Phil Weiss, to pursue patents under these agreements. *Id.* Wolff continued in his capacity as a consultant for Tomahawk until 2017. Wolff Decl. ¶11.

### C.  Employment with Tomahawk: May 2017-December 2019.

On or about May 15, 2017, Tomahawk hired Wolff as a full-time employee in the position of Research & Development/Engineering Support. Wolff Decl. ¶¶11, 13, Ex. 5. The position had a base salary of $100,000 and included health, dental, vision, vacation, and retirement benefits. *Id.* In addition, although not written into the offer letter, Tournour agreed that if Wolff were assigned to travel for Tomahawk, the company would purchase first class seats for him if they were available as an accommodation for his hypercoagulable disorder. Wolff Decl. ¶12. In addition, if Wolff were to be asked to go on any long drives, he would be permitted breaks to allow him to step out of the vehicle and walk. *Id.*

Tomahawk's Employee Handbook in effect at the time that Wolff was hired required "annual performance reviews" intended to "measure the quality and quantity of work you perform, your effort and attitude, and your ability to work with others" and noted that such reviews would have a "direct impact to wage and salary increases." Wolff Decl. ¶14, Ex. 6. From May 2017 until December of 2020, Tomahawk did not conduct any written performance evaluations of Wolff but did provide Wolff annual salary increases, which, consistent with the

/ / /

employee handbook, he understood to mean that his performance was acceptable to Tomahawk. Wolff Decl. ¶15; Masih Decl. Ex. 1, (Sommer Dep. Tr. 9).

Wolff's work as Research & Development/Engineering Support involved some work on-site at Tomahawk assembling machines or engineering for specific machines. Wolff Decl. ¶16. However, most of the work involved supporting the work of engineers to determine the best method to fix a problem for clients. *Id.* Sometimes, Wolff performed this support work via telephone calls, emails, or video conferences. *Id.* However, if that did not work, he did travel to clients to support engineers or service technicians in the field. *Id.*

Prior to 2020, the only negative incident Wolff can recall is from early in his career in 2017 in which Sommer, Wolff's then-supervisor, threatened Wolff for speaking honestly with the client Cargill about a failure with an interleaver project. Wolf Decl. ¶17. The client was under the misapprehension that Tomahawk was manufacturing parts which could fix the interleaver problem. When pressed by Cargill's representative for information about the fix, Wolff told the client, "I cannot answer your question because if I do, I'm going to be lying to you and I won't do that." *Id.* In response to Wolff providing honest information to the customer, Sommer threatened Wolff, telling Wolff that he had "fired over 200 people in his career" without any litigation. *Id.* Wolff reported the incident to Tournour, with whom he had a long-standing relationship, and requested a reassignment to a different supervisor. *Id.* The request was a reasonable one given that Sommer was a Vice President of Sales and Marketing and not as familiar with the technical aspects of Wolff's work. *Id.* Wolff was reassigned to report to Chuck Sweat who held the position in charge of sales and installation. *Id.* Tomahawk honored the reassignment request until Sweat's resignation in early-2020 when Sommer was reinstated as Wolff's supervisor just as the COVID pandemic was taking hold. *Id.* Wolff continued to have concerns about the prior threatening behavior but accepted his reassignment to report to Sommer because that was the choice made by Tournour. *Id.*

**D. Pandemic Accommodation Requests, Opposition to Unsafe Conditions, and Retaliation/Termination.**

In January of 2020, Tomahawk updated its Employee Handbook. Wolff Decl. ¶18, Ex. 7. The new handbook included a similar annual evaluation tied to salary increase provision, but also included reference to the fact that all agreements needed to be in writing and signed by the President. *Id.* Because his first-class travel accommodation for his hypercoagulable disorder was not in his offer letter, Wolff spoke with Chief Operating Officer Nicholson about it. *Id.* Wolff had also told Sommer about his hospitalization related to his hypercoagulable disorder and need for the first-class travel accommodation. *Id.* Wolff needed to share this info with Sommer because Sommer was his supervisor and would need to be aware of the first-class travel accommodation. *Id.* Sommer acknowledges that Wolff made him aware of his health condition and need for travel accommodation. Masih Decl. ¶2, Ex. 1 (Sommer Dep. Tr. 21, 23).

In March of 2020, Tomahawk notified employees that it was designated an "essential business." Masih Decl. ¶6, Ex. 5. It reassured workers that, "We will continue to monitor the Covid-19 situation along with recommendations provided for 'essential' business operations by state and federal agencies as we all work together with the focus on the health and wellbeing of our team members, their families, and our community." *Id.* Tomahawk continued to send workers out into the field, including to meat-packing plants. The only equipment provided by Tomahawk to Wolff for use in the field was a packet mailed to employees which included gloves, masks, a thermometer, a time/temperature chart, and instructions to monitor temperature in the morning and evening and after a client site visit. Wolff Decl. ¶19. Wolff reported to Sommer that the thermometer provided did not function and told Tournour about problems with the size of the gloves and fogging-up of the masks which created a safety hazard for him when he was working with large machinery. *Id.* Wolff did not get a response back so he purchased his own replacement gear. *Id.*

Although Tomahawk did not follow-up with Wolff about his safety concerns regarding the personal protective gear provided, Sommer and Nicholson did have a phone call with Wolff

regarding suggestions Wolff had provided in an April 1, 2020 email at the request of the company after Sweat had stepped down as supervisor. Gillete Decl. Ex. B. Wolff Decl. ¶20. Wolff recalls a phone call with Sommer and Nicholson at about this time to go over his suggestions line by line. *Id.* According to Wolff, during the conversation Nicholson noted that the only suggestion provided by Wolff that Tomahawk was interested in was the second relating to "Master programs for all machines." *Id.* There was no reference to the phone call being a "verbal counseling," and the company did not provide Wolff any written counseling document or even follow-up the phone call with an email confirming what was discussed. *Id.* In discovery, Tomahawk produced internal emails Sommers sent to Nicholson which were never shared with Wolff and which included bullet points which Wolff disputes were ever discussed with him. *Id.*

In late April and early May of 2020, Wolff continued to text and share information with Tournour about clotting risks for COVID-19 patients. Wolff Decl. ¶21, Ex. 8. Once news about meat plants being COVID hot-spots resulting in the deaths of workers surfaced during May-July of 2020,[1] Wolff's daughter requested a conference call with Tournour, and a conference call was held in which Tomahawk's patent legal counsel Weiss was also involved to remind them of Wolff's history of hypercoagulable disorder. She expressed concern to them regarding Wolff's health condition and what would happen if he were stricken by COVID. Elsabeth Wolff Decl.

In October of 2020, Nicholson sent out Covid-19 Updated Guidelines to all staff.[2] Masih Decl. ¶5, Ex. 5. The guidelines included the following points:

- *Guidelines for when Team Members should Quarantine*:
  Quarantine is used to keep someone who *might have been exposed to COVID-19* away from others. Quarantine helps prevent spread of disease that can occur before a person knows they are sick or if they are infected with the virus without feeling symptoms. People in quarantine should stay home, separate themselves from others, monitor their health, and follow directions from their state or local health department.

---

1 *See e.g.,* Masih Decl. ¶7, Ex. 6 (CDC Weekly Document); Ex. 2 (Nicholason Dep. Tr.38)

2 The all-staff emails went to Wolff's Tomahawk email address (jamesw@tomahawkmfg.com) which he had reported did not always work for him. Therefore, he had requested that others email him at his personal email (jake2far@hotmail.com) to assure that he received the message. Wolff Decl. ¶23.

https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html

- *Travel Policy*
  Tomahawk will be resuming work travel to support our customers and business requirements. Team members will be required to follow Tomahawk's social distancing and COVID-19 guidelines and policies as well as the guidelines and policies of the customer while working outside of a Tomahawk facility. Additionally, we will no longer enforce previously communicated mandatory quarantine requirements following travel. Quarantine practices will follow CDC guidelines outlined above.

(Emphasis in original). Masih Decl. ¶6; Ex. 5. CDC Guidelines at the time required that with limited exceptions to be used as a "last resort," "individuals (including critical infrastructure workers) exposed to a person with suspected or confirmed COVID-19 should quarantined for 14 days, consistent with Public Health Guidance for Community-Related Exposure." Wolff Decl. ¶32, Ex. 15. The CDC Guidance also noted that, "The best way to protect yourself and others is to stay home for 14 days if you think you have been exposed to someone who has COVID-19."

Following issuance of these guidelines and within two months of his termination, Wolff complained to Tournour about two instances in which Sommer violated CDC and/or other local guidelines where the work was being performed. On January 20, 2021, he complained about Sommer pulling him prematurely out of quarantine following potential COVID-19 exposure at the Cargill, Fresno, California plant on January 15, 2021. Wolff Decl. ¶33, Exs. 14-17. And on January 26, 2021, he complained about Sommer telling him not to follow Canadian Border Service instructions to quarantine for 14 days and to lie to the CBS agent about being in quarantine while leaving the hotel daily to service machinery at Humber Valley Foods in Mississauga, Ontario in early December of 2020. Wolff Decl. ¶37, Ex. 18.

### 1. November-December 2020 Canada Trip.

On or about November 30, 2020, Wolff was sent to Canada to assist Tomahawk client Humber Valley. Wolff Decl. ¶24. He was provided essential worker paperwork by Tomahawk (Wolff Decl. Ex. 10) and was allowed entry into the country. He completed his work at the Humber Valley foods site and was scheduled to leave on Friday, December 4, 2020. Wolff Decl.

¶24. While he was at the airport, he received a call from Sommer instructing him not to get on the plane and to return to Humber Valley to address some additional client concerns. *Id.* Wolff collected his checked-in luggage and attempted to find Canadian Border Security to gain reentry into the country. *Id.* The CBS agents informed Wolff that he would need to quarantine at his hotel for 14 days. *Id.* That same day, Wolff also commenced receiving emails from the Government of Canada advising him to quarantine for 14 days. Wolff Decl. ¶25, Ex. 11. Wolff forwarded the message to Sommer, noting "It states I must quarantine. Please let me know what Tomahawk wants." *Id.* Sommer instructed Wolff via telephone to proceed to Humber Valley and to just rely on his original entry authorization. *Id.* When a CBS agent came to the hotel to confirm that Wolff was in quarantine, Sommer advised Wolff to lie to the agent and to say that he had remained in quarantine in the hotel. Wolff Decl. ¶26. Wolff continued to receive the email messages from the Government of Canada to quarantine and forwarded them on to Sommer expressing concerns about his lack of quarantine. Wolff Decl. ¶27, Ex. 12. Sommer continued to take the position that Wolff was legally in the country despite the contrary information Wolff was receiving from the Canadian Border Security. Wolff abided by Sommer's instructions because he was fearful that Sommer would terminate his employment. Wolff was aware that Sommer had terminated the employment of his former supervisor Chuck Sweat. Wolff Decl. ¶22, Ex. 9.

### 2.  December 2020 Performance Evaluation.

In December of 2020, Sommer also conducted Wolff's performance evaluation via a Teams virtual conference. Wolff Decl. ¶28, Ex. 13. The written evaluation commended Wolff's technical skills noting that, "You have outstanding knowledge in almost every aspect including mechanical, electrical, hydraulics, and pneumatics. The in-depth way think makes you our best trouble shooting technician on the hard to solve problems." *Id.* In areas to improve, Sommer noted, "Some areas that I would like you to work on is your relaying of information to customers." *Id.* Wolff asked Sommer whether this was in relation to the interleaver incident, and

Sommer told him that it was. Wolff Decl. ¶28. Notably, the performance evaluation made no reference to any prior "counseling" and included a $4,000 bonus and a $2,200 base salary increase. *Id.*

### 3.  January 15, 2021 Fresno Cargill Trip.

In mid-January of 2021, Wolff was sent to Cargill in Fresno, California. Wolff Decl. ¶29. He was joined by engineer Sam Gannon. *Id.*; Gannon Decl. ¶¶4-14. When they first arrived at the client's site on January 15, 2021, the Security gate did not perform the proper security clearance (i.e., ID checks, temperature checks, etc.), which they found to be concerning. *Id.* Next, when they were taken to their annual Cargill procedures renewal class, the instructor (Marcello) told them that several employees had COVID-19 and that he had even had some family members die from it. *Id.* Wolff and Gannon were next taken to the maintenance area where they were informed by Cargill employees, that a large part of the second shift of employees was out with COVID-19, and that they had an active outbreak going on. *Id.* The plant was operating with only one shift and had established a Rapid Testing site. *Id.*

Wolff and Gannon immediately called Sommer on speaker phone from the maintenance office to share their concerns about an active outbreak and the lack of security protocols upon arrival. *Id.* Wolff and Gannon felt that Sommer wanted them to stay on premises and complete the work. *Id.* Sommer also instructed them to say nothing about the lack of proper security clearance at the front gate. *Id.* Sommer implied that he would speak with Brad Aydelott ("Aydelott"), their Cargill contact person, and get back to them. *Id.* A few minutes later, Aydelott came and told Wolff and Gannon that he understood if they wanted to leave. *Id.* Wolff and Gannon then called Sommer to tell him that they were leaving the site and returning to their hotel room. *Id.* Sommer gave a monotone response of, okay." *Id.* That evening, Sommer called and spoke to Gannon and Wolff and instructed them to create a plan to send to Aydelott. *Id.* Gannon's intention was to complete the plan first thing on Monday as no work would be happening over the weekend because incidentally, the electrical work for the project which was

PAGE 17  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT HARTMAN, LLP
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600

to be conducted by another company (Wild) had also been delayed. Gannon Decl. ¶12. Wolff secured an earlier flight on Saturday and quarantined himself in a trailer at home. Wolff Decl. ¶29.

On Monday, January 18, 2021, Sommer sent an email to Gannon and Wolff instructing them to complete the follow-up with Aydelott for the project.  Sommer Decl. Ex. A.; Wolff Decl. ¶30; Gannon Decl. Ex. 1. Sommer forwarded a message from Aydelott, but the message included no complaint or request for immediate help. *Id.* Sommer is unsure whether he or Aydelott initiated a call on Monday morning. Masih Decl. Ex. 1 (Sommer Dep. Tr. 81). Aydelott never contacted Wolff or Gannon over the weekend and never expressed any concerns about their departure or need for immediate help to Gannon or Wolff.[3] Wolf Decl. ¶29; Gannon Decl. ¶24. They provided the remote support that they were instructed to provide. *Id.*

### 4.  January 20, 2021 Emails re: Quarantine.

On January 19, 2021, while Wolff was still in his post-Fresno quarantine, Sommer called Wolff and instructed him to fly to Standard Meat Company in Texas the next day. Wolff Decl. ¶31. Wolff informed Sommer that he was in a 14-day quarantine which he believed to be consistent with CDC Guidelines given that he had been exposed to a facility with an active COVID-19 outbreak. *Id.* Wolff's request to work remotely or to have someone else cover the call was denied by Sommer, and Sommer told Wolff that CDC Guidelines allowed him to pull Wolff out of quarantine after 72 hours if he showed no symptoms. *Id.* If Sommer had offered to send another employee to cover the job, Wolff would have taken him up on that offer and remained in quarantine. *Id.*

However, no such accommodation was extended by Sommer, and so Wolff purchased a ticket, came out of quarantine, and prepared to fly to Texas on January 20, 2021. Wolff Decl. ¶32. Before flying, on the morning of January 20, 2021, however, Wolff sent three emails to

---

3 Gannon completed the Cargill project in late-March after the other company Wild finally completed the electrical work. Gannon Decl. ¶16.

Tournour. Wolff Decl. ¶32, Exs. 14, 15, 16. The first email requested "any links to CDC that's provided guidance showing 72 hours is correct timeline for return to work." Wolff Decl. Ex. 14. The second email attached a CDC Guidance entitled "COVID-19 Critical Infrastructure Sector Response Planning dated December 3, 2020 which reflected changes since November 16, 2020, including evidence of transmission risk from asymptomatic workers and that reintegrating exposed, asymptomatic workers should be used as "**a last resort and only in limited circumstances**." (Emphasis in original). Wolff Decl. Ex. 15. The third email, attached a CDC Guidance entitled "Testing Strategy for Coronavirus (COVID-19) in High-Density Critical Infrastructure Workplaces after COVID-19 Is Identified," and noted that "I found no references to the 72-hour guidelines." Wolff Decl. Ex. 16. Having sent the emails, Wolff commenced his travel to Texas as instructed to do by Sommer. Wolf Decl. ¶32.

During his layover at the Salt Lake City airport on January 20, 2021, Wolff received a call from Sommers. Wolff Decl. ¶33. Sommers told Wolff that he had spoken with Nicholson and received confirmation that he could pull Wolff out of quarantine after 72-hours but that Wolff should do what he "feels is the right thing." *Id.* Wolff did not go home because he feared that Sommer would terminate his employment for not completing the job with Standard Meats. *Id.* Instead, that evening, he sent a follow-up email to Tournour expressly noting in relevant part that:

> "I respectfully request in writing signed by Robert Tournour a statement that all Agents, Representatives, and Employees of Tomahawk Mfg. are instructed and required to follow CC, OSHA, Federal, State, Local and Customer Companies recommendations concerning COVID.
>
> [***]
>
> The events that occurred at Cargill Fresno beginning last Friday January 15, 2021 and continuing through today have lead me to this request.
>
> James [Sommer] has lied to me today, yesterday, Monday he took retaliation action against Sam [Gannon] and Me, Friday he lied to me, instructed me to lie to a customer, pressured me to stay at a active COVID site, refused to engage in a conversation concerning the events, and in my opinion threatened me with termination.

> James has repeatedly refused to answer if I am required by Tomahawk to follow
> both our and listed agencies guidelines, instead he has told me of non existent
> CDC policies and told me I need to do what "I feel is the right thing." I take it as a
> threat, the last person who expressed a feeling, frustration, was terminated for his
> feelings."

Wolff Decl. ¶33, Ex. 17. The next day, Wolff also accurately reported his possible exposure in

Fresno to Standard Meat representatives and paid for a rapid COVID test himself before

completing the work assigned. Wolff Decl. ¶34.  Masih Decl., ¶8, Ex. 7. The client was satisfied

with the work performed by Wolff. *Id.*

### 5.    Tomahawk Stops Giving Wolff Assignments.

On or about January 24, 2021, Tournour, Nicholson, and Mike Haines ("Haines") held a

phone conference with Wolff. Masih Decl. ¶4, Ex. 3. During that phone call, Wolff reiterated

that he felt "pressured" and "threatened" by Sommer. *Id.* On January 25, 2021, Nicholson

created a "written response," in which he noted that, "Based on our discussion and my interview

with James Sommer, it does appear that you were provide inaccurate information regarding

Tomahawk's quarantine guidance specially as it relates to a "'72-hour non-symptomatic

quarantine.'" Nicholson Decl. ¶4, Ex. A. The written response made no reference to Wolff's

concerns regarding feeling "pressured" and "threatened" and ended with a direction Wolff to

schedule a "phone conversation with James Sommer to provide further clarification and guidance

to you." *Id.*

On January 26, 2021, therefore, Wolff responded expressing additional concerns

regarding Sommer and providing information to Tournour and Nicholson regarding Sommer's

instructions to him during his trip to Canada to lie to the Canadian Border Service. Wolff Decl.

¶7 Ex. 18. Wolff then forwarded several of the automated responses he received from the

Canadian Government advising him to remain in quarantine. He also responded to Nicholson's

follow-up questions by explaining that CBS had come to the hotel where he was staying and that

/ / /

**BENNETT HARTMAN, LLP**
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600

he had communicated this fact to Sommer. *Id.* Wolff's follow-up messages were sent on January 27 and January 28, 2021. *Id.*

Following this exchange, Tomahawk provided Wolff no further assignments. Wolff Decl. ¶38. Instead, Tomahawk commenced "termination" discussions with Wolff through its legal counsel, Weiss, with whom it knew Wolff had an existing relationship related to patents. *Id.* In a phone call on February 22, 2021, Wolff complained to Weiss that "James still has a job and I'm just being park[ed] here" and "If I did nothing wrong, why are they punishing me?" Wolff Decl. Ex. 19. Tomahawk's legal counsel responded as follows:

> "The issue is, unfortunately, your job became a, you know, for whatever reason, became as a service technician, you know, at Tomahawk, and, you know, health-wise you can't do it, Jim. I'm the -- I mean, as your friend I'm the first person to tell you that. You -- you can't -- you know, the way things are now, and, and, you know, maybe it'll change over the summer or whatever, you can't travel. It's -- it's very bad for your health. You're the -- I think you're the lone support for your family, right?" [***]
>
> And, I mean, I would -- I would never want anything to happen to you. Obviously, you know that. And, obviously, your family can't -- you can't do what Tomahawk needs anymore, okay? You can't be a service tech. And I think you realize that, right?"

*Id.* Wolff responded that he had been able to do his job until he was instructed to lie and break quarantine. *Id.* Weiss encouraged Wolff to accept the termination of employment being proposed by Tomahawk and a return to a consultant agreement. *Id.* He expressly noted that:

> "I know, but you know what, Jim, but, I mean, you know, Bob asked me to do this, to be the guy, you know, because I am the attorney for Form Tech and I have a relationship with you and I have a relationship with him, you know, to be the guy."

*Id.* Weiss indicated that Tomahawk had retained employment counsel who would be charged with preparing any agreements regarding separation of employment/consulting. *Id.*

### 6. March 25, 2021 – Termination of Employment and Post-Termination Acts.

On March 25, 2021, less than 60 days after Tomahawk had received the last of the email reports regarding quarantine concerns from Wolff, Nicholson sent Wolff an email notifying him

that, "we have decided to terminate your employment as R&D Service Engineer with Tomahawk Manufacturing" and indicated that their employment counsel would be sending proposed agreements. Wolff Decl. ¶39, Ex. 20. The decision was made jointly by Nicholson, Tournour, and Sommer. Masih Decl. ¶3, Ex. 2, p. (Nicholson Dep. Tr. 68:15-17).

The only agreements proposed by Tomahawk, thereafter, however, required Wolff to waive certain interests he had in the 2010 NDA and the 2011 and 2012 contracts and included unacceptable non-competition and non-solicitation terms. Wolff Decl. ¶39; Morris Decl. Ex 1. On or about May 4, 2021, after Wolff indicated his reluctance to waive rights, Tomahawk's counsel sent Wolff's counsel a letter including the following points:

> "We understand Mr. Wolff is organizing a consulting company, and we want to remind Mr. Wolff of his post-employment obligations with respect to Tomahawk Manufacturing's confidential information and trade secrets and the FOT Agreement.
>
> [***] Because of Mr. Wolff's access to Tomahawk Manufacturing's Confidential Information during the course of his employment, Mr. Wolff is prohibited from consulting on the following items:
>
> - 6 series Former and 400 series Former;
> - TMP series Interleaver;
> - Meatball rollers;
> - 27 series Cuber;
> - Reciprocating platen;
> - Rotating Former roller;
> - Anti-leak pump box;
> - Two piece hopper;
> - Shear plate spacer keeper;
> - Fill System for Forming Machines (Patent No. US 8, 678, 812 B2);
> - Vent System for Food Processing Machines (Patent No. US 7, 014, 456 B1);
> - Method of Process Food Patties (Patent No. US 7, 566, 471 B2);
> - Food Processing Machines with Increased Mold Plate Fill Area and Stroke (Patent No. 6, 827, 111, B1); and
> - All Tomahawk tooling e.g. mold plates, breather plates, fill plates.
>
> These items, systems, and processes are unique to Tomahawk Manufacturing, and consulting on any of the above would require Mr. Wolff to utilize Confidential information he would not have had but for his employment with Tomahawk Manufacturing.
>
> [***]Additionally, Mr. Wolff is bound by the confidentiality provision in the FOT Agreement date September 12, 2012, which incorporated non-disclosure agreements entered into between Formtec and Spherical, LLC/Mr. Wolff

regarding the Technology. Consulting on problems with machines using the
Technology will be a violation of the FOT Agreement. If Mr. Wolff violates this
provision during the course of any consulting work performed by Mr. Wolff,
Formtec reserves the right to pursue legal and equitable remedies to enforce the
FOT Agreement.

   Finally, Mr. Wolff must refrain from making any defamatory statements
about Tomahawk Manufacturing, Formtec, and any other agents or products
either orally or in writing , which includes comments and posts on social media.
Should Tomahawk Manufacturing or Formtec learn of defamatory statements
made by Mr. Wolff, the parties reserve the right to pursue all legal and equitable
remedies to enjoin further defamatory statement and seek damages."

Morris Decl. ¶3; Ex. 3.

   This cease-and-desist letter issued by counsel for Tomahawk has effectively prevented

Wolff from working in this food forming industry since his termination and resulted in

continuing loss of compensation to Wolff.  Wolff Decl. ¶40. In addition, despite his May 12,

2021 demand that Tomahawk cease and desist from using and return his Confidential

Information under the 2010-NDA, to date, Tomahawk has refused to do so. Wolff Decl. ¶41. The

2010 NDA relates to improvements to machinery, equipment and tooling manufactured by

Tomahawk which does not involve FOT, nor to the technology which is the subject of the FOT

Agreement. Wolff Decl. ¶42.

## III. SUMMARY JUDGMENT STANDARD.

   Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material of fact and that the moving party is entitled to judgment as a matter of

law. Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving

party has the initial burden of showing that no genuine issue of material fact exists. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th

Cir.2001) (en banc). The court cannot weigh the evidence or determine the truth but may only

determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796,

800 (9th Cir.2002). An issue of fact is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In assessing whether

/ / /

**PAGE 23  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BENNETT HARTMAN, LLP**
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600

a party has met its burden, the court views the evidence in the light most favorable to the

nonmoving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir.1995).

## IV.    LEGAL ARGUMENT.

### A.    The court should deny defendant's motion for summary judgment on the first claim for relief regarding the 2010 NDA because defendants have failed to establish that *res judicata* is applicable.

#### 1.    The elements of *res* judicata are not present here.

In *Headwaters Inc. v. U.S. Forest Serv.,* 399 F3d 1047, 1051–52 (9th Cir 2005), the

Ninth Circuit Court of Appeals explained that:

> "The doctrine of res judicata provides that a final judgment on the merits bars further claims by parties or their privies based on the same cause of action," and "is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdiction." [Quoting *In re Schimmels*, 127 F.3d 875, 881 (9th Cir.1997) (internal quotation marks omitted).] The elements necessary to establish res judicata are: "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." [Quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir.2003) (quotation marks and citation omitted)]"

There is no identify of claims here.  The claims in this case relate to non-FOT

technologies while the claims in the arbitration relate to FOT Technology, as defined in the 2012

FOT Agreement.  No final judgment on the merits was issued by the arbitrators on the claims

brought in this case for the simple reason that no claims on the merits were before the Panel.  For

the reasons discussed further below, defendant's motion for summary judgment on the first claim

for relief must be denied.

#### 2.    The scope of the 2012 FOT Agreement.

Wolff was familiar with  the venturi effect, a principle of physics in which material

(solid, liquid or gas) passing through a constricted tube accelerates in velocity and causes a

reduction in pressure. Wolff Decl. ¶8. Wolff discovered that the application  of the venturi effect

to meat-forming machines causes the fibers of ground meat to align, creating a better meat patty.

Wolff named his invention "Fiber Orienting Technology" or "FOT." *Id.* The court is referred to

the limited definition of "Technology" in the 2012 FOT Agreement (ECF 25, Ex. 2, p. 1 ¶1) filed

under seal pursuant to this court's order (ECF 49). Morris Decl ¶6.

### 3. The parties and issues in the arbitration.

The parties to the arbitration were Formtec LLC and Spherical IP, LLC.  Morris Decl. ¶5.

Each party asserted that the other had breached the FOT Agreement.  *Id.* Neither Tomahawk nor

Wolff were ever made parties to the arbitration and neither could have been made parties without

the consent of the other.  *Id.*

Each party submitted pleadings to the American Arbitration Association. The court is

referred to such pleading (ECF 14, Exhibits 3, 4, and 5), filed under seal pursuant to this court's

order (ECF 49). Morris Decl. ¶7. Formtec LLC asserted no claims against Wolff individually and

Spherical IP, LLC asserted no claims against Tomahawk. Specifically, Spherical IP, LLC did not

include any claim that Tomahawk breached the 2010 NDA.

### 4. The issues in this case.

Wolff has imparted to Tomahawk several innovations and inventions.  Wolff Decl. ¶42.

Some relate to FOT, while others do not involve FOT.  It is the non-FOT Confidential

Information that is the current subject of this case.  The 2010 Confidentiality Agreement

provides:

> "Confidential Information" shall mean all information provided by Disclosing
> Party [Wolff] to Receiving Party [Tomahawk] related to business programs,
> products, applications, systems, components, technologies and business topics
> including but not limited to  written, oral, audio tapes, video tapes, computer
> discs, machines, prototypes, designs, specifications, articles of manufacture,
> drawings, human or machine readable documents.  Confidential Information shall
> also include all information provided by Disclosing Party to Receiving Party prior
> to the signing of this Agreement.***."

Wolff Decl. Ex. 1. The Wolff Declaration sets out a non-exclusive list of several examples of the

non-FOT Confidential Information that Wolff seeks to enjoin Tomahawk from further use. Wolff

Decl ¶42.

**PAGE 25  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BENNETT HARTMAN, LLP**
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600

**5. Issue in the arbitration relating to the 2010 NDA.**

Notwithstanding that this Court had ruled that the 2010 NDA was not subject to arbitration, Formtec continued to assert in the arbitration that it was. In its arbitration submission it stated, "***Claimant asserts that Respondent's asserted claims for violation of the 2010 NDA are to be governed by the 2012 FOT Agreement requiring all disputes to be submitted to binding arbitration before the AAA."

The arbitrators recognized that Wolff and Tomahawk were not parties to the arbitration and only ruled that FOT disclosures made pursuant to the 2010 NDA were subsumed within the 2012 FOT Agreement. The court is referred to footnote 6 of the Award (ECF 92) also filed under seal. The arbitrators did not rule that non-FOT disputes under the 2010 NDA must be arbitrated.

**6. A ruling by this Court that Wolff may enforce the 2010 NDA against Tomahawk is not inconsistent with the arbitrators' rulings.**

Tomahawk argues that if this Court ruled that Tomahawk is in breach of the 2010 NDA it would be inconsistent with the arbitrators' finding that Formtec LLC fulfilled its obligations under the 2012 FOT Agreement because "Tomahawk and Formtec are in privity." This argument reveals a misunderstanding of the concept of privity.

Privity may be a factor in deciding whether one party is bound by a ruling against another party with which the first party has a close relationship. However, it is nonsensical to argue that a ruling that one party fulfilled its obligations under one contract yields the conclusion that a second party fulfilled its obligations under a second contract just because the two parties are in "privity."

Tomahawk argues that there may be an overlap of witnesses and documents. There is nothing unusual about the same witnesses and documents being used in two different cases. Tomahawk also argues that the two actions involve infringement of the "same contractual agreements signed by Tournour and Wolff." As shown above, the issues in this case involve

/ / /

**PAGE 26  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

non-FOT Confidential Information  and do not overlap with issues involving FOT Technology litigated in the arbitration.

### 7.   The principles of *res judicata* cannot be applied here.

#### a.   Wolff did not have a full and fair opportunity to present evidence regarding a breach of the 2010 NDA.

Wolff was not a party to the arbitration and could not make himself a party to the arbitration.  Indeed, if he had tried to enter the arbitration he could have been met with the complete defense that there was another action pending for the same claim in a different forum, namely this case.

The Ninth Circuit has affirmed this Court's ruling that the 2010 NDA is not subject to arbitration.  ECF 93.  Therefore, Wolff can maintain the claims in this Court and could not be forced to arbitrate the First Claim for Relief in the arbitration.

#### b.   The arbitrators made no rulings on the legal question whether claims under the 2010 NDA had to be arbitrated.

Res judicata cannot be applied to a ruling of law.  Rather, the doctrine of "law of the case" applies, but only in litigation involving different stages of the same case.

> "Unlike the more precise requirements of res judicata, law of the case is an amorphous concept.  As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."

*Arizona v. California*, 460 US 605, 618, 103 S Ct 1382, 1391, 75 L Ed 2d 318 (1983), decision supplemented, 466 US 144 (1984).  Thus, even if the arbitrators had made a legal ruling it would not bind Wolff under principles of *res judicata* because he was not a party to the arbitration and this case is not a continuation of the arbitration.

#### c.   The arbitrators made no rulings on the merits of the First Claim for Relief.

As shown above, the merits of the First Claim for Relief, that is, whether Tomahawk is in breach of the 2010 NDA, was not an issue in the arbitration. All Formtec LLC sought was a declaratory ruling from the arbitrators, contrary to the ruling of this Court, that claims under the

2010 NDA must be arbitrated. The arbitrators did not issue such a declaratory ruling. Therefore, this court should deny defendant's motion for summary judgment on the first claim for relief.

**B. Defendants motion should be denied as to the Second and Fourth Claims for Relief under ORS 659A.199 and ORS 659A.030(1)(f) because when viewed in the light most favorable to Wolff, the record evidence raises genuine issues of material fact that Tomahawk's asserted reason for termination of Wolff's employment is a pretext for retaliation.**

Both ORS 659A.199 and ORS 659A.030(1)(f) protect employees against retaliation, albeit using slightly different terminology. ORS 659A.199 expressly provides in relevant part that:

> "It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."

ORS 659A.199 applies a subjective, good faith standard to employees who report perceived violations of the law. *See Hall v. State of Oregon*, 274 Or. App. 445, 453, 366 P.3d 345 (2015) (noting that ORS 659A.199's express "[r]eference to the employee's belief indicates a subjective, good faith standard"). And the term "reported" in the statute "mean a report of information to either an external or internal authority." *Brunozzi v. Cable Commc'ns, Inc.,* 851 F.3d 990, 998–1000 (9th Cir. 2017).

ORS 659A.030(1)(f), in turn, expressly provides that:

> "(1) It is an unlawful employment practice:
>
> (f) For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

ORS 659A.001 defines the terms "unlawful practice" and "unlawful employment practice" as follows:

> (13) "Unlawful employment practice" means a practice specifically denominated as an unlawful employment practice in this chapter. "Unlawful employment practice" includes a practice that is specifically denominated in

another statute of this state as an unlawful employment practice and that is specifically made subject to enforcement under this chapter.

(14) "Unlawful practice" means any unlawful employment practice or any other practice specifically denominated as an unlawful practice in this chapter. "Unlawful practice" includes a practice that is specifically denominated in another statute of this state as an unlawful practice and that is specifically made subject to enforcement under this chapter, or a practice that violates a rule adopted by the commissioner for the enforcement of the provisions of this chapter.

For example, ORS 654.062(5) makes it an unlawful employment practice for any person to discharge an employee who has, among other things, opposed unsafe working conditions and makes the violation enforceable under ORS 659A.820. Thus, ORS 659A.030(1)(f) is quite broad in its scope. The Oregon Supreme Court has also recognized that ORS 659A.030(1)(f) protects beyond the traditional workplace adverse job actions with its use of "otherwise discriminate" and includes "persons" other than just an employer. *McLaughlin v. Wilson*, 365 Or. 535, 449 P.3d 492 (2019).

At the summary judgment stage, this court applies the *McDonnell Douglas* burden-shifting analysis, to these state law claims. *See Snead v. Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093-94 (9th Cir. 2001)(citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)); *Larmanger v. Kaiser Found. Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1049 (D. Or. 2012) (applying burden-shifting framework to a claim alleged under ORS 659A.199); *Karthauser v. Columbia 9-1-1 Commc'ns Dist.*, No. 3:20-CV-127-SI, 2022 WL 17979739, at *9 (D. Or. Dec. 28, 2022)(applying same analysis to ORS 659A.030(1)(f) claim). This analysis follows three steps. First, a plaintiff must establish a prima facie case of retaliation. "To establish a prima facie case of retaliation a plaintiff must show (1) protected activity, (2) an adverse employment decision, and (3) a causal link between the protected activity and the adverse employment decision." *Larmanger*, 895 F. Supp. 2d at 1049 (internal quotation marks and citation omitted) (italics added). A "causal connection" means that "the employee's protected activity [was] a substantial factor in the motivation" for the adverse employment action. *Estes v. Lewis and Clark College*, 152 Or. App. 372, 381 (1998). This causal connection can be demonstrated through "circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in

protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). "The requisite degree of proof necessary to establish a prima facie case [of retaliation] ... is minimal and does not even need to rise to the level of a preponderance of the evidence." *Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1242 (D. Or. 2015)(internal citation omitted).

If the plaintiff can establish a prima facie case, then the defendant, the employer, "must articulate a legitimate, nondiscriminatory reason for the challenged action[s]." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1088-89 (9th Cir. 2008). Lastly, if the defendant "satisfies this burden," the plaintiff "must show that the 'reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000)).

As shown below, the record evidence supports not only a prima facie case, but also raises genuine issues of material fact that Tomahawk's asserted reason for termination of Wolff's employment is a pretext for retaliation.

### 1. Wolff engaged in protected activity.

The record evidence includes several emails sent by Wolff to Tournour and/or Nicholson between January 20-January 27, 2021 (Wolff Decl. Exs. 14-18), in which he engages in the following protected activity:

- Leaving the Fresno Plant where a whole shift of employees was out with COVID and the front gate was not performing ID or temperature checks.
- Reports/opposes violation of CDC Guidelines -72-hour extraction from Quarantine
- Reports/opposes pressure to stay at an active COVID site in Fresno and to travel to Texas over objection regarding 72-hour extraction
- Reports/opposes instructions from Sommer to ignore the correspondence from the Canadian government regarding remaining in quarantine and to lie to Canadian Border Service
- Request that Tomahawk follow CDC, OSHA, Federal, State, Local guidelines concerning COVID

**PAGE 30  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Wolff supported his subjective good faith belief and safety concerns by attaching copies of CDC guidance and the actual correspondence he received from the Canadian Government. *Id. See also* Morris Decl. ¶8, Ex. 4. The legitimacy of his concerns are recognized by Nicholson who noted that, "it does appear you were provided inaccurate information regarding Tomahawk's quarantine guidance [which was to follow CDC guidance] specially as it relates to a '72-hour non-symptomatic quarantine.'" Nicholson Decl. Ex. A, p. 3.  The declaration of Engineer Gannon who was present at the Fresno site supports Wolff's feeling that Sommer pressured them to stay at the Fresno site while a whole shift was out with COVID and the front gate was not abiding by proper security and temperature checks. Gannon Decl. ¶8. Finally, Sommer's own email response to Wolff supports Wolff's assertion that he was instructed to ignore communications from the Canadian Government to quarantine. Wolff Decl. Ex. 18.

### 2.  Wolff experienced an adverse action.

Not only did Tomahawk terminate Wolff's employment on March 25, 2021 (Wolff Decl. Ex. 20), but also in the lead-up to the termination, and after Wolff's email reports to Tournour and/or Nicholson, Tomahawk failed to give Wolff any further assignments. Wolff Decl. ¶38. Wolff felt he was being "punished" and complained to Tomahawk's legal counsel, Weiss, that "James still has a job and I'm just being park[ed] here" and "If I did nothing wrong, why are they punishing me?" Wolff Decl. ¶38, Ex. 19. The Oregon Supreme Court like the federal courts has recognized that, "retaliatory activity" includes any activity "that reasonably would impede or deter employees from pursuing their rights under [ORS ch. 659A]." *McLaughlin v. Wilson*, 365 Or. at 550 *citing  PSU Association of University Professors v. PSU,* 352 Or. 697, 713, 291 P.3d 658 (2012).

### 3.  Causal connection between protected activity and adverse action.

As noted above, causal connection between protected activity and the adverse action can be established based on temporal proximity. Courts often consider temporal proximity of several

months or less enough to support an inference of retaliation on its own. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) (two-and-one-half months); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004) (three months); *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (seven weeks); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (three, five, and eight months, respectively, all sufficient to support an inference of retaliation); *Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (42 days). The Oregon legislature has also indicated a legislative intent that a termination occurring within 60-days of opposition to unsafe working conditions creates a rebuttable presumption of retaliation. ORS 654.062(7)(a).

Here, all of Wolff's protected activity occurred during a short period of time from approximately December 4, 2020 (Canada Trip), January 15, 2021 (Fresno Trip), January 20, 2021 (Texas Trip), January 20, 2021 (Email reports re. Fresno/Texas Trip and quarantine), and January 25-27, 2021 (Email reports re. Canada Trip and quarantine). Tomahawk's action of "parking" Wolff occurred within days of his January 20, 2021 email reports, and his termination occurred within 60-days of his January 25-27, 2021 email reports. In addition, in its memorandum in support of summary judgment at page 24, Tomahawk acknowledges that it took into account Wolff's emails and accusations against his supervisors in making the termination decision. Therefore, the record evidence supports a *prima facie* case.

### 4.  **Pretext.**

As this court explained recently in *Hanson v. Oregon, Legislative Assembly*, No. 3:21-CV-780-SI, 2023 WL 22196, at *12 (D. Or. Jan. 3, 2023), although a plaintiff's burden is higher to show pretext than to prove a prima facie case, "[t]he same evidence can be used to establish a prima facie case and to create a genuine issue regarding whether the employer's explanations are pretextual." *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 870 (9th Cir. 1996) (emphasis in original); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (explaining that plaintiffs "may rely on the same evidence they used to establish a prima

facie case or put forth additional evidence"); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732 (9th Cir. 1986) ("To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish her prima facie case, although she may of course provide additional proof of the defendants' unlawful motivation."). "[T]he plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quotation marks omitted).

Here in addition to the points noted above in support of causal connection, the record evidence also includes the following additional points. First, immediately prior to the protected activity outlined above, on or about December 3, 2020, Tomahawk issued Wolff a positive performance evaluation with a $4,000 bonus and a $2,200 wage increase. Wolff Decl. Ex. 13. The evaluation came six months after Wolff had sent the "Einstein" email, at the invitation of Tomahawk. Gillete Decl. Ex. B. In other words, the "Einstein" email about which Tomahawk now makes such big deal in its summary judgment motion was not only not believed to be a "terminable offense" but did not even rise to the level of meriting a passing reference on the annual performance evaluation. Second, under its own employee handbook, "Annual performance reviews have a direct impact to wages and salary merit increases." Wolff Decl. Ex. 7. However, none of the conduct which preceded the December 3, 2020 evaluation was deemed to be something so egregious as to warrant any impact on Wolff's wages. To the contrary, he was given a bonus and an increase in wages. Third, the only actions taken by Wolff after the December 3, 2020 evaluation were protected activity.

- Leaving a plant at which a whole shift was out with covid and at which the front gate was not performing ID or temperature checks
- Expressing concern about whether a 72 or 14-day quarantine was appropriate under the CDC guidelines
- Requesting that someone else be sent to Texas instead of him because he was still quarantining

- Requesting that Tomahawk clarify its COVID policy and abide by CDC, OSHA, Federal, State, and Local COVID recommendations
- Reporting the instructions to ignore communications from the Canadian government that he should quarantine.

That Wolff expressed himself emotionally and forcefully is not unreasonable given that Tournour and Summer were well-aware that Wolff suffered from a hypercoagulable disorder with recurrent thromboembolic disease and that clotting was a well-publicized problem for those who contracted COVID.[4] Furthermore, how was Wolff to know that requesting a reassignment from Sommer had become a terminable offense. When he had previously requested a reassignment from Sommer, Tomahawk had given him a different supervisor, i.e., Chuck Sweat. All this in addition to the proximity in time of the retaliatory acts to the protected activity raises sufficient issues of genuine material fact on the issue of pretext. 'When the motive for a discharge is in dispute, and the evidence is subject to more than one interpretation, the resolution of the issue is properly left to the trier of fact.' " *Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1248 (D. Or. 2015) *citing Lynch v. Klamath County School District*, 2015 WL 2239226, at * 5 (2015)(*quoting Hirsovescu v. Shangri–La Corp.*, 113 Or.App. 145, 149, 831 P.2d 73 (1992)). The court should deny defendant's motion as to the second and fourth claims.

    **C. Defendants motion should be denied as to the Third Claim for Relief under ORS 659A.112 because when viewed in the light most favorable to Wolff, the record evidence raises genuine issues of material fact that Tomahawk failed to engage in the interactive process for reasonable accommodation in good faith/perceived Wolff as disabled, and its asserted reason for termination of Wolff's employment is a pretext for disability discrimination.**

ORS 659A.112 provides in relevant part that:

    (1) It is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment on the basis of disability. [***]

---

    4 https://www.washingtonpost.com/health/2020/04/22/coronavirus-blood-clots/ ("A Blood-clotting complication is killing coronavirus patients); https://hms.harvard.edu/news/covid-19-blood-clots (COVID-19 and Blood Clots Elevated levels of a blood clotting factor linked to worse outcomes in severe COVID-19).

(2) An employer violates subsection (1) of this section if the employer does any of the following:

(e) The employer does not make reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability who is a job applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer.

Under ORS 659A.104(1) an individual has a disability if: (a) they have a physical or mental impairment that substantially limits one or more major life activities; (b) they have a record of having such an impairment; (c) they are regarded as having such an impairment. Sitting, standing, walking, and breathing all fall within the ORS 659A.104(2) definition of major life activities. The terms of the Oregon statute are construed to the extent possible consistent with any similar terms under federal law. ORS 659A.139(1). However, the definition of an individual with a disability is to be "construed in favor of broad coverage of individuals, [***], to the maximum extent permitted" by the state statutes.

Here, the record evidence establishes that Wolff suffers from a hypercoagulable disorder with recurrent thromboembolic disease and had a record of such a condition. Wolff Decl. ¶7. At all times relevant, it substantially limited the major life activities of sitting, standing, walking, and breathing. *Id.* Tomahawk President Tournour and Wolff's supervisor Sommer were both aware of Wolff's hospitalization and lifelong impact of the condition, including his need for travel accommodations. Wolff Decl. Ex. 3; Masih Decl. Ex. 1 (Sommer Dep. Tr. 21. 23). Wolff's daughter had also had phone conferences with Tournour and Tomahawk counsel about Wolff's hypercoagulable disorder and the negative interaction of blood clots with COVID. Elisabeth Wolff Decl. Wolff had been performing the essential functions of his job as Research & Development/Engineering Support for Tomahawk without but requested the minimal reasonable accommodations of (1) travel accommodations; (2) good PPE; (3) remote work if there were an active outbreak at a plant; and (4) ability to quarantine for 14-days consistent with the CDC guidelines. However, Tomahawk denied the last three of even these minimal requests, refused to give him additional projects (i.e., "parked" him), and terminated his employment.

### 1.  Termination of Employment.

To establish a prima facie case of discrimination under Oregon law, the plaintiff must show: (1) she is a qualified individual with a disability, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and her disability.  *Huitt v. Optum Health Services*, 216 F.Supp.3d 1179 (2016). "The requisite degree of proof necessary to establish a prima facie case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Schechner v. KPIX-TV*, 686 F.3d 1018, 1022 (9th Cir. 2012) (alteration in original) (*quoting Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). If the employee establishes a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the alleged adverse employment action. *See Mayo v. PCC Structurals, Inc.* , 795 F.3d 941 (9ᵗʰ Cir. 2015)( burden-shifting framework outlined in *McDonnell Douglas Corp*. applies to state claims)). If the employer does so, the burden shifts back to the employee to "prove that the reason given by the employer was pretextual." *Id*.

Not only has Wolff met his prima facie burden to show that he is an individual falling within the broad intended scope of state law, but also record evidence establishes that Tomahawk regarded him as disabled. As noted above, Tomahawk legal counsel Weiss called Wolff at the request of Tournour and told him, "The issue is, unfortunately, your job became a, you know, for whatever reason, became as a service technician, you know, at Tomahawk, and, you know, health-wise you can't do it, Jim. [***] you can't do what Tomahawk needs anymore, okay?  You can't be a service tech.  And I think you realize that, right?" Wolff Decl. Ex. 19. When Wolff disputed the assertion that he could not perform the job and had only requested minimal accommodations, Tomahawk proceeded with termination. Both the statements of Weiss and the proximity of time between Wolff's accommodation requests and termination support pretext. *See e.g. Hanson*, 2023 WL 22196, at *12; *see also Herbert v. Altimeter, Inc.*, 230 Or App 715, 218 P23d 542 (2009)( Evidence that supervisor of employee, a truck driver, had told employee that

she should not be driving a truck anymore raised issue for jury on whether employer perceived employee as having a disability, as required to support employee's claim that she was wrongfully terminated as a result of perceived disability discrimination after complaining that an alleged exhaust leak in her truck was making her sick). Tomahawk's motion for summary judgment as to the third claim for relief on the issue of termination must, therefore, be denied.

### 2.  Reasonable Accommodation.

Tomahawk contends it is entitled to summary judgment because Wolff failed to affirmatively request an accommodation. The statute does not require Wolff to speak any magic words, however, before he is subject to its protections. The employee need not mention the ADA or even the term "accommodation." *Schmidt v. Safeway Inc*., 864 F. Supp. 991, 997 (D. Or. 1994). An employer knows an employee has a disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation. The employer need only know the underlying facts, not the legal significance of those facts. *Id.* "Once a qualified employee or applicant with a disability has requested reasonable accommodation or otherwise disclosed to the employer a disability that may require reasonable accommodation, the employer has a duty to initiate a meaningful interactive process with the employee or applicant to determine whether reasonable accommodation would allow the employee or applicant to perform the essential functions of a position held or sought."  Or. Admin. R. 839-006-0206 (4). Finally, the duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.'" *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001), *citing McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir.), *amended* 201 F.3d 1211, and *cert. denied*, 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000).

As noted above, Tomahawk, through its agents Tournour and Sommer, was on notice that Wolff suffered from a lifelong hypercoagulable disorder with recurrent thromboembolic disease and had a record of such a condition. In fact, Tomahawk had been providing Wolff a first-class

travel accommodation. Wolff also put them on notice that the PPE they had provided, specifically the masks, gloves, and thermometer did not function. Wolff Decl. ¶19. Wolff's daughter had also had discussions with Tournour and its attorney Weiss regarding the danger of clots and COVID. Elisabeth Wolff Decl. Therefore, regardless of what Sommer thought of Wolff's request to quarantine for 14-days post-Fresno, and to work from home if there was an active COVID outbreak at a worksite, it had an obligation to engage in an interactive process in good faith to determine what reasonable accommodations it could provide to allow Wolff to continue in his position. There is nothing in the record that the minimal accommodations being requested by Wolff were unreasonable or an undue burden on Tomahawk. "To avoid summary judgment, however, Wolff 'need only show that an "accommodation" seems reasonable on its face, i.e., ordinarily or in the run of cases.'" *Dark v. Curry Cnty.*, 451 F.3d 1078, 1088 (9th Cir. 2006). Id. (*quoting Barnett*, 535 U.S. at 401-02) (emphasis added in *Dark*). Wolff has met this lower burden; therefore, the court should deny Tomahawk's motion as to the reasonable accommodation aspect of the third claim for relief.

### D. Defendants motion should be denied as to the Fifth Claim for relief to the extent that the court determines that Wolff's assertion of concerns do not fall within the scope of the above statutory protections.

Oregon courts have recognized two bases for a wrongful discharge claim: (1) "when the discharge is for exercising a job-related right that reflects an important public policy" and (2) "when the discharge is for fulfilling some important public duty[.]" *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407, 40 P.3d 1059 (2002). The District Court has recognized that "[t]he question of whether a terminated employee may bring a common law wrongful discharge claim when a statutory remedy also exists is a 'gnarly one,' … because of the difficulty in harmonizing the Oregon Supreme Court's and the Oregon Court of Appeals' numerous decisions in the years that followed the… [Oregon Supreme Court's] creation of the tort [in *Nees v. Hocks*, 272 Or 210 (1975)]." *Reid v. Evergreen Aviation Ground Logistics Enterprises Inc.*, No. 07-1641-AC, 2009 WL 136019, *16 (D. Or. Jan. 20, 2009) (*citing Farrington v. Pepsi-Cola Bottling Co. of Bend*,

No. 03-6297-TC, 2004 WL 817356, *2 (D. Or. February 25, 2004)). The "thorough analysis and stated rule [in *Draper v. Astoria School Dist. No. 1C*, No. 97-354-MA, 995 FSupp 1122, 1129 (D. Or. Feb. 12, 1998)] —that if an adequate statutory remedy exists, a common law wrongful discharge claim based on the same conduct is precluded—represents the rule" in Oregon District Court. *Id*.

 If the court determines, however, that no statute provides an adequate remedy, then a wrongful discharge claim must be allowed to fill that gap in remedy. *See e.g., Rohrer v. Oswego Cove, LLC*, 309 Or. App. 489, 495–96, 482 P.3d 811, 815 (2021)(reversing dismissal of plaintiff's common law wrongful discharge case because ORS 659A.199 did not provide plaintiff a remedy for her claim of retaliation for seeking legal counsel); *see also De Bay v. Wild Oats Market, Inc.*, 244 Or. App. 443, 449-52, 260 P.3d 700 (2011)(reversing dismissal of common-law wrongful discharge claim alleging employer retaliated against employee for making complaints concerning "unlawful activity under the securities laws," because federal statute allowing a wrongful discharge claim on that basis was not "adequate under Oregon law to provide a complete remedy"); *Kemp v. Masterbrand Cabinets, Inc.*, 257 Or. App. 530, 538-39, 307 P.3d 491 (2013)(common-law wrongful discharge claim available to plaintiff where, among other points, "at the time of the incident, she did not have adequate state statutory remedies" for the allegedly wrongful discharge); *see also Hall v. State of Oregon*, 274 Or. App. 445, 455, 366 P.3d 345 (2015)(ruling that the trial court erred in dismissing the plaintiff's common-law wrongful discharge claim); *McManus v. Auchincloss*, 271 Or. App. 765, 780, 353 P.3d 17, rev. den., 358 Or. 145, 363 P.3d 1287 (2015) (ruling that the trial court erred when it granted summary judgment in defendant's favor with respect to the plaintiff's common-law wrongful discharge claim).

 Similarly, here, after ruling on the other motions, the court should deny defendant's motion as to this final claim to the extent that the court determines that Wolff's assertion of concerns do not fall within the scope of the above statutory protections.

**PAGE 39  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## V.     CONCLUSION.

For all these reasons, Wolff respectfully requests that the court deny Tomahawk's motion

for summary judgment.

DATED this 31st day of January 2023.

BENNETT HARTMAN, LLP,

/s Michael J. Morris
Michael J. Morris, OSB #772839
Aruna A. Masih, OSB #973241
Telephone (503) 227-4600
Of Attorneys for Plaintiff

**PAGE 40  - PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BENNETT HARTMAN, LLP**
210 SW Morrison St., Suite #500
Portland, OR 97204
Telephone: (503) 227-4600