# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JAMES B. WOLFF**, | Case No. 3:21-cv-880-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **TOMAHAWK MANUFACTURING**, | |
| Defendant. | |

Michael J. Morris and Aruna A. Masih, BENNETT HARTMAN LLP, 210 SW Morrison St., Suite 500, Portland, OR 97204. Of Attorneys for Plaintiff James B. Wolff.

David W. Silke and Robert Lowery Gillette, II, GORDON REES SCULLY MANSUKHANI LLP, 701 5th Ave., Suite 2100, Seattle, WA 98104; Ashleigh A. Stochel, KILPATRICK TOWNSEND & STOCKTON LLP, 175 W. Jackson Blvd., Suite 950, Chicago, IL 60604. Of Attorneys for Defendant Tomahawk Manufacturing.

**Michael H. Simon, District Judge.**

Plaintiff James B. Wolff (Wolff) sues Tomahawk Manufacturing (Tomahawk), his former employer. Wolff asserts a breach of contract claim against Tomahawk, alleging that Tomahawk breached a non-disclosure agreement (NDA) between the parties. Wolff also brings two whistleblower retaliation claims under Oregon Revised Statutes (ORS) §§ 659A.199, 659.030(1)(f). Additionally, Wolff alleges a disability discrimination in violation of ORS § 659A.112. Finally, in the alternative to his whistleblower retaliation and disability discrimination claims, Wolff brings a common-law claim for wrongful discharge. Before the

Court is Tomahawk's motion for summary judgment on all claims,[1] Wolff's motion for leave to

file a third amended complaint, Wolff's motion to compel production of documents, and Wolff's

motion to extend case deadlines. For the reasons discussed below, the Court grants in part and

denies in part Tomahawk's motion for summary judgment,[2] grants Wolff's motion for leave to

amend his complaint, grants in part Wolff's motion to compel, and grants Wolff's motion extend

deadlines.[3]

---

[1] Tomahawk's pending motion, ECF 98, challenges Wolff's breach of contract claim on the ground that the claim is precluded under the doctrine of claim preclusion (also known as *res judicata*). Tomahawk recently filed a second motion for summary judgment, ECF 164, to which Wolff has not yet responded. In this second motion, Tomahawk argues that Wolff's breach of contract claim is barred by the statute of limitations and fails because Wolff did not perform a condition precedent required under the contract.

[2] In its summary judgment reply, Tomahawk raises an evidentiary objection to the admissibility at summary judgment of a recording of a telephone call between Wolff and Phil Weiss, an attorney for an affiliated entity of Tomahawk. Tomahawk argues that the recording that Wolff made of his phone call with Weiss, and the transcript made from that recording, are hearsay and do not fall under any of the exceptions for hearsay under Rule 802(d)(2) of the Federal Rules of Evidence. The Court overrules this objection on two grounds. First, the recording provides sufficient evidence that Weiss was acting with the express authority of Robert Tournour, the President of Tomahawk. Thus, Weiss was acting as an agent of Tomahawk's and his statements are those of a party opponent. Second, even if the statements are hearsay, in evaluating the nonmoving party's facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). For example, in *Fraser* the Ninth Circuit considered a diary's contents to defeat a motion of summary judgment, despite a hearsay challenge, because the contents of the diary "could be admitted into evidence at trial in a variety of ways," including that the witness "could testify to all the relevant portions of the diary from her personal knowledge." *Fraser*, 342 F.3d at 1037. "Because the diary's contents could be presented in an admissible form at trial, [the court could] consider the diary's contents in the [movant's] summary judgment motion." *Id.* Similarly, the contents of Wolff and Weiss's recorded statements could be presented in an admissible form at trial, such as if Weiss and Wolff testified.

[3] Notwithstanding Tomahawk's request for oral argument, the Court does not believe that oral argument would help resolve the pending motion. *See* LR 7 1(d)(1).

## STANDARDS

### A. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

### B. Motion to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the "court should freely give leave [to amend a pleading] when justice so requires." A district court should apply Rule 15's "policy of favoring amendments with extreme liberality." *Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (cleaned up). The purpose of the rule "is 'to facilitate decision on the merits, rather than on the pleadings or technicalities.'" *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (quoting *Chudacoff v. Univ. Med. Ctr.*, 649 F.3d 1143, 1152 (9th Cir. 2011)). A district court, however, may, within its discretion, deny a motion to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (alteration in original) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)). "Not all of the factors merit equal weight. As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Futility of amendment, however, "can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Generally, however, "[a]bsent prejudice, or a strong showing of any of the remaining [four] factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital*, 316 F.3d at 1052 (alterations added, emphasis in original). When weighing the factors, all inferences should be made in favor of granting the motion to amend. *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

## BACKGROUND

### A.  Wolff's Preemployment Relationship with Tomahawk

Wolff worked at Fulton Provision Co. (Fulton), in the meat forming industry, for 18 years. His primary responsibilities were to identify maintenance issues and recommend repairs to ensure that the company's machines were running effectively and efficiently. Wolff Decl. ¶ 2 (ECF 118). Tomahawk manufactures and sells protein forming and processing equipment and parts and provides services to customers who have purchased its products. Tournour Decl. ¶ 4 (ECF 35).

Through Wolff's work at Fulton, he became familiar with the tooling and equipment sold by Tomahawk to Fulton. Because of his familiarity and expertise, Wolff developed several innovations and improvements to the designs of Tomahawk's equipment and tooling. Wolff

suggested these innovations to Tomahawk's President Robert Tournour (Tournour) after.
Tomahawk incorporated some of Wolff's suggestions into their machinery. Wolff Decl. ¶ 3.

In the late 2000's, Wolff began developing his "Fiber Oriented Technology" (FOT), a
concept he had been working on for several years. Wolff Decl. ¶ 4. The technology employs a
principle of physics known as the "Venturi effect." Wolff Decl. ¶ 8. Wolff's FOT, when applied
in meat-forming machines, causes a re-alignment of the meat fibers, resulting in a "better" meat
patty. *Id*.

After Wolff's employment at Fulton ended in 2008, Tomahawk retained Wolff as a
consultant to assist Tomahawk's engineers. Wolff Decl. ¶ 4; Tournour Decl. ¶ 9. Tournour and
Wolff discussed a business relationship in which Wolff's FOT would be used by Tomahawk.
Wolff wanted a confidentiality agreement covering the ideas Wolff previously had imparted to
Tomahawk and any future ideas that Wolff might impart. Wolff Decl. ¶ 5. Tomahawk and Wolff
signed a Confidentiality Agreement on November 18, 2010 (2010 NDA). Wolff Decl. Ex. 1. On
December 12, 2010, Wolff notified Tournour of certain proprietary innovations that Wolff
believed were covered by the 2010 NDA. Wolff Decl. Ex. 2. This notification included the FOT
and other innovations that Tournour contends were not part of the FOT. *See id*; Wolff Decl. ¶ 6.

One year later, on November 21, 2011, Wolff organized Spherical IP, LLC (Spherical).
Wolff Decl. ¶ 9. The purpose of Spherical was to receive the revenues generated from utilizing
his FOT. *Id.* On November 29, 2011, Tournour organized Formtec, LLC (Formtec), to monetize
the FOT and apply for patents on the FOT. Wolff Decl. ¶¶ 8-9; Tournour Decl. ¶ 14. On
December 20, 2011, Formtec and Spherical signed their own confidentiality agreement. Wolff
Decl. Ex. 4.

Nine months later, on September 11, 2012, Formtec and Spherical signed the FOT

Agreement. ECF 25-2. The FOT Agreement elaborates on the rights and responsibilities of

Formtec and Spherical and establishes payment terms for revenues generated by Formtec's FOT

patents. *See id.*

## B. Wolff's Employment at Tomahawk

Wolff continued as a consultant for Tomahawk until he was hired as an employee in

May 2017. Wolff Decl. ¶ 11. Tomahawk hired Wolff for the position of Research &

Development/Engineering Support. *Id.*; Ex. 5. In that position, Wolff worked on-site at

Tomahawk assembling machines or working on their engineering, traveled to client facilities to

resolve problems, and sometimes worked remotely, to provide support to Tomahawk engineers.

Wolff Decl. ¶ 16; Tournour Decl. ¶ 21.

Wolff has a hypercoagulable disorder with recurrent thromboembolic disease, requiring

lifelong treatment. Wolff Decl. ¶ 7. At the time of Wolff's hiring, Tournour was aware of

Wolff's condition. *Id.*; *see also* Wolff Decl. Ex. 3 (email from Wolff to Tournour dated March 1,

2011, discussing Wolff's health situation). Although not expressly stated in Wolff's offer of

employment letter, *see* Wolff Decl. Ex. 5, Tournour agreed that when Wolff was asked to travel

for Tomahawk, the company would buy first class seats for him, if available, as an

accommodation. Wolff Decl. ¶ 13. Tournour also agreed that if Tomahawk asked Wolff to go on

any long drives as a part of his work, Wolff would be permitted to take breaks to allow him to

step out of the vehicle and walk. *Id.*

In January 2020, in response to a change to Tomahawk's Employee Handbook

suggesting that all employment agreements needed to be signed by Tournour, Wolff spoke with

Chief Operating Officer Brad Nicholson (Nicholson) about Wolff's first-class travel

accommodation for his hypercoagulable disorder. Wolff Decl. ¶ 18. Wolff also told his

supervisor James Sommer (Sommer) about his hypercoagulable disorder, a 2011 hospitalization related to his disorder, and his need for first-class business travel. Wolff Decl. ¶ 18. Sommer acknowledges that Wolff made him aware of his health condition and need for travel accommodation. Sommer Dep. Tr. 21:10-25; 22:24-23:22 (Masih Decl. Ex. 1, ECF 117-1).

In March 2020, in response to the COVID-19 pandemic, Tomahawk notified employees that it was designated an "essential business[]." Masih Decl. Ex. 5 at 2 (ECF 117-5). It reassured workers: "We will continue to monitor the COVID-19 situation along with recommendations provided for 'essential' business operations by state and federal agencies as we all work together with the focus on the health and well-being of our team members, their families, and our community." *Id.* Tomahawk continued to send workers into the field, including to meat-packing plants. For use in the field, Tomahawk mailed employees, including Wolff, a packet that included gloves, masks, a thermometer, a time/temperature chart, and instructions to monitor temperature in the morning, evening, and after a client site visit. Wolff Decl. ¶ 19.

In spring 2020, Wolff forwarded information to Tournour about clotting risks for COVID-19 patients. Tournour responded, "Be Safe, I hope your meds have been helping your clotting concerns." Wolff Decl. ¶ 21; Ex. 8 at 1. In summer 2020, Wolff's daughter Elisabeth became concerned after COVID-19 outbreaks in meat plants made the news. Elisabeth Wolff Decl. ¶ 2 (ECF 119). Understanding that COVID-19 was a serious risk to individuals like Wolff who had blood clotting issues, Elisabeth had a conference call with Tournour and Phil Weiss (Weiss),[4] to discuss her concerns about Wolff's health condition. *Id.* at ¶¶ 2-3; Wolff Decl. ¶ 21.

---

[4] Weiss worked as a patent attorney to prosecute and obtain patents for the FOT. He worked for Formtec and based on the recorded telephone conversation, Wolff also considered Weiss to represent Wolff. It is unclear whether Weiss also had an attorney-client relationship with Tomahawk or Spherical.

She understood from previous conversations with Wolff that Tournour knew about her father's health condition. E. Wolff Decl. ¶ 3.

On April 1, 2020, Wolff sent an email with the subject line "Suggestions" to Tournour, Nicholson, Sommer, and Haines. Gillette Decl. Ex. B (ECF 102 at 44). This email was a response to Sommer's solicitation of suggested improvements from all staff members. Wolff Decl. ¶ 20. Shortly thereafter, Wolff had a phone conversation with Sommer and Nicholson. As Wolff recalls, the focus of the conversation was on the suggestions for improvement that Wolff provided. *Id*. According to Nicholson, however, the purpose of this conversation was to provide "verbal counseling" to Wolff regarding "negative interactions with co-workers and customers." Nicholson Decl. ¶ 3. Before the telephone conference, Sommer sent an email to Nicholson with the subject line "Jim Wolff Counseling" that attached a document in which Sommer outlined talking points for the conversation with Wolff. Gillette Decl. Ex. C (ECF 102 at 47-49). The talking points included references to Sommer's concerns relating to "how [Wolff's] frustration and interaction with team members and customers is negatively impacting the business." *Id*. at 48. Despite this, Wolff recalls that neither Sommer nor Nicholson referred to the call as "verbal counseling," and the company did not provide Wolff with the "Jim Wolff Counseling" document or any other written document memorializing a human resources warning or even a general summary of the telephone call. Wolff Decl. ¶ 20.

The Tomahawk Employee Handbook that was effective at the time of Wolff's hiring through the time it was updated in 2020 required "annual performance reviews" intended to "measure the quality and quantity of work . . . perform[ed], . . . effort and attitude, and . . . ability to work with others." Wolff Decl. ¶ 14; Ex. 6 at 9. These reviews would have a "direct impact to wage and salary increases." Wolff Decl. Ex. 6 at 9. After the handbook was updated in 2020, this

requirement remained unchanged. Wolff Decl. Ex. 7 at 13. Despite the handbook's requirement, from May 2017 until December 2020, Tomahawk did not conduct any written performance evaluations of Wolff. Wolff Decl. ¶ 15; Sommer Dep. Tr. at 27:11-28:8. Tomahawk did, however, provide Wolff annual salary increases, which Wolff understood to mean that his performance was acceptable to Tomahawk. Wolff Decl. ¶ 15; Sommer Dep. Tr. at 31:3-6.

## C.  Wolff's Work Trip to Canada

In late November 2020, Tomahawk sent Wolff to Canada to assist Tomahawk client Humber Valley. Wolff Decl. ¶ 24. Wolff was provided essential worker paperwork by Tomahawk and was allowed entry into Canada. *Id.*; Wolff Decl. Ex. 10. He was unable to complete his work at the Humber Valley site and was instructed to leave on Friday, December 4, 2020. Wolff Decl. ¶ 24. While he was at the airport, Wolff received a call from Sommer, instructing Wolff not to get on the plane, but instead to return to Humber Valley to address additional client concerns. When Wolff attempted to regain entry into the country, Canadian Border Security (CBS) agents informed him that he would need to quarantine at his hotel for 14 days. *Id.* That same day, Wolff also began receiving emails from the government of Canada advising him to quarantine for 14 days. Wolff Decl. ¶ 25; Ex. 11. Wolff forwarded the message to Sommer, noting "It states I must quarantine. Please let me know what Tomahawk wants." Wolff Decl. Ex. 11. Sommer instructed Wolff by telephone to proceed to Humber Valley and to rely on his original entry authorization. Wolff Decl. ¶ 25. According to Wolff, when a CBS agent came to the hotel to confirm that Wolff was in quarantine, Sommer advised Wolff to tell the agent that he had remained in quarantine in the hotel. Wolff Decl. ¶ 26. Wolff continued to receive email messages from the Canadian government directing him to quarantine. Wolff forwarded these emails to Sommer. Wolff Decl. ¶ 27; Ex. 12.

In December 2020, Sommer conducted a performance evaluation with Wolff by teleconference. Wolff Decl. ¶ 28; Ex. 13. The written evaluation commended Wolff's technical skills: "You have outstanding knowledge in almost every aspect including mechanical, electrical, hydraulics, and pneumatics. The in-depth way you think makes you our best trouble shooting technician on the hard to solve problems." Wolff Decl. Ex. 13. The written report also noted that although Wolff had "been in some tough customer situations and ha[d] handled most of them in a professional way," he "need[s] to be prepared to alter the way [he] communicat[s] and be able to follow through the [sic] project until the end resolution is achieved." *Id.* Sommer added that "[s]ome areas that [he] would like [Wolff] to work on is [Wolff's] relaying of information to customers." *Id.* Wolff asked Sommer whether this related to an incident that occurred more than three years earlier, and Sommer confirmed that it did. Wolff Decl. ¶ 28. The performance evaluation did not mention any prior "counseling" and included a $4,000 bonus and a $2,200 base salary increase. *Id.*; Wolff Decl. Ex. 13.

**D. Wolff's Cargill Assignment**

In mid-January 2021, Tomahawk sent Wolff to Cargill in Fresno, California. Wolff Decl. ¶ 29. He was joined by engineer Sam Gannon (Gannon). Wolff Decl. ¶ 29; Gannon Decl. ¶ 4 (ECF 120). When they arrived on Friday, January 15, 2021, the security gate personnel did not perform security or health clearance (e.g., ID checks, temperature checks). Wolff and Gannon found this concerning. Wolff Decl. ¶ 29; Gannon Decl. ¶ 5. When the two attended the on-site training required by Cargill, they learned from persons at Cargill that the situation was dangerous and several employees had COVID-19. Wolff Decl. ¶ 29; Gannon Decl. ¶¶ 6-7. Because of the COVID-19 outbreak, the plant was operating with only one shift and had established a Rapid Testing site. Wolff Decl. ¶ 29; Gannon Decl. ¶ 7.

Wolff and Gannon called Sommer to express their concerns. Wolff and Gannon felt that Sommer wanted them to stay on premises and complete the work. Wolff Decl. ¶ 29; Gannon Decl. ¶¶ 8, 10. Sommer stated that he would speak with their Cargill contact. A few minutes later, the Cargill contact told Wolff and Gannon that he would understand if they wanted to leave. Wolff Decl. ¶ 29; Gannon Decl. ¶ 8. Wolff and Gannon then called Sommer to tell him that they were leaving the site and returning to their hotel. Wolff Decl. ¶ 29; Gannon Decl. ¶ 10. Sommer acknowledged their decision. Wolff Decl. ¶ 29; Sommer Decl. ¶3 (ECF 101). That evening, Sommer called and spoke to Gannon and Wolff and instructed them to create a plan to send to Cargill. Wolff Decl. ¶ 29; Gannon Decl. ¶ 12. Gannon's intention was to provide the plan on Monday because he believed that no work could happen over the weekend because a different company first had to complete electrical work. Gannon Decl. ¶ 12. On Saturday, January 16, 2021, Wolff flew home, where he quarantined by himself. Wolff Decl. ¶ 29.

On Monday, January 18, 2021, Sommer emailed Gannon and Wolff instructing them to complete the follow-up with Cargill for the project and expressing disappointment with the level of support Gannon and Wolff provided Cargill after leaving their facility. Gannon Decl. Ex. 1. Cargill, however, never contacted Wolff or Gannon over the weekend and never expressed to Gannon or Wolff any concerns about their departure or Cargill needing immediate help. Wolff Decl. ¶ 29-30; Gannon Decl. ¶ 14, 16.

**E.  Wolff's Assignment at Standard Meat Company**

On January 19, 2021, while Wolff was still in his post-Cargill quarantine, Sommer called Wolff and instructed him to fly to Standard Meat Company (Standard Meat) in Texas the next day. Wolff Decl. ¶ 31; Sommer Decl. ¶5. Wolff informed Sommer that he was in a 14-day quarantine that he believed to be consistent with Center for Disease Control (CDC) Guidelines because he had been exposed to a facility with an active COVID-19 outbreak. Sommer told

Wolff that CDC Guidelines allowed him to pull Wolff out of quarantine after 72 hours if he showed no symptoms. Wolff Decl. ¶ 31; *see also* Nicholson Decl. Ex. A (ECF 100 at 7).

After his conversation with Sommer, Wolff bought a ticket, came out of quarantine, and prepared to fly to Texas on January 20, 2021. Wolff Decl. ¶ 32. On the morning of January 20, 2021, before flying, Wolff sent three emails to Tournour. *Id.*; Exs. 14, 15, 16. The first email requested links to any CDC "guidance showing 72 hours is correct timeline for return to work." Wolff Decl. Ex. 14. The second and third emails included links to two CDC guidance articles. Wolff Decl. Ex. 15, 16. The third email closed with Wolff noting that he "found no references to the 72-hour guidelines" that Sommer referenced. Wolff Decl. Ex. 16. After sending these emails, Wolff commenced his travel to Texas. Wolff Decl. ¶ 32.

During his layover at the Salt Lake City airport on January 20, 2021, Wolff received a call from Sommer. Wolff Decl. ¶ 33; Sommer Decl. ¶ 5. Sommer told Wolff that he had spoken with Nicholson and received confirmation that Sommer could pull Wolff out of quarantine after 72 hours, but that Wolff should do what he "feels is the right thing." Wolff Decl. ¶ 33. Wolff did not go home because he feared that Sommer would terminate Wolff's employment for not completing the job with Standard Meat. *Id.* That evening, Wolff sent a follow-up email to Tournour "respectfully request[ing] in writing . . . a statement that all Agents, Representatives, and Employees of Tomahawk Mfg. are instructed and required to follow CDC, [Occupational Safety and Health Administration], Federal, State, Local and Customer Companies recommendations concerning [COVID-19]." Wolff Decl. Ex. 17. The next day, Wolff reported his possible exposure in Fresno at Cargill to Standard Meat representatives and paid for a rapid COVID-19 test before completing the work assigned. Wolff Decl. ¶ 34; Gillette Second Decl. Ex. A (ECF 126-1 at 16-17).

### F.  Wolff's Termination

On or about January 24, 2021, Tournour, Nicholson, and Haines, held a telephone conference with Wolff. Masih Decl. Ex. 3 at 5-6 (ECF 117-3). During that call, Wolff reiterated that he felt "pressured" and "threatened" by Sommer. *Id.* at 5. On January 25, 2021, Nicholson drafted a "written response," in which he noted that, "[b]ased on [his and Wolff's] discussion and [his] interview with James Sommer, it does appear that [Wolff] [was] provid[ed] inaccurate information regarding Tomahawk's quarantine guidance specially as it relates to a '72-hour non-symptomatic quarantine.'" Nicholson Decl. Ex. A. (ECF 100 at 7). The written response did not mention Wolff's concerns about feeling "pressured" and "threatened" and ended with a direction Wolff to schedule a "phone conversation with James Sommer to provide further clarification and guidance to [Wolff]." *Id.* at 9.

On January 27, 2021, Wolff emailed Tournour, Nicholson, Sommer, and Haines to further discuss Nicholson's written response. Wolff expressed frustration about his interactions with Sommer while travelling and reiterated that Sommer had instructed him to "lie" to the Canadian authorities. Nicholson Decl. Ex. B (ECF 100 at 11). Wolff accused the recipients of mischaracterizing the CDC guidelines as "not clear," when they were "written in plain language." *Id.* at 11-12. On January 27 and 28, 2021, Wolff forwarded several of the email notifications he had received from the Canadian government advising him to remain in quarantine. Wolff Decl. Ex. 18. He commented in forwarding one email that he did not call the CBS but they came to his hotel, that he communicated the situation to Sommer, and that the email is "clear." *Id.* at 6; *see also* Wolff Decl. ¶ 37.

After this exchange, Tomahawk provided Wolff no further assignments. Instead, Tomahawk commenced "termination" discussions with Wolff through Weiss. Wolff Decl. ¶ 38. In a phone call on February 22, 2021, Wolff complained to Weiss that "James [Sommer] still has

a job and I'm just being park[ed] here" and asked why Tomahawk was "punishing" Wolff. Wolff

Decl. Ex. 19 at 2. Weiss explained:

> The issue is, unfortunately, your job became a, you know, for
> whatever reason, became as a service technician, you know, at
> Tomahawk, and, you know, health-wise you can't do it, Jim. I'm
> the—I mean, as your friend I'm the first person to tell you that.
> You—you can't—you know, the way things are now, and, and,
> you know, maybe it'll change over the summer or whatever, you
> can't travel. It's—it's very bad for your health. You're the—I think
> you're the lone support for your family, right?
>
> * * *
>
> And, I mean, I would—I would never want anything to happen to
> you. Obviously, you know that. And, obviously, your family can't–
> you can't do what Tomahawk needs anymore, okay? You can't be
> a service tech. And I think you realize that, right?

*Id*. at 2-3. Wolff responded that he had been able to do his job until he was instructed to "lie" and

break quarantine. *Id*. at 3. Weiss stated that he had the consulting agreement for Wolff and that

he was sending it to Wolff "right now." *Id*. at 2.

When Wolff asked why Weiss was involved in talking to Wolff about his termination,

Weiss explained:

> Because I'm involved in this in terms of Form Tech [*sic*], that's
> why I'm involved, because I'm Form Tech's [*sic*]attorney. And,
> you know, if you remember, when the original consulting
> agreement with Form Tech, [*sic*] I wrote that ten years ago.
>
> * * *
>
> Bob told me . . . that he wants me to, you know, whatever you
> want to say, say it to me, okay? And he wants me to kind of be the
> go-between between you and him. He doesn't want you guys
> fighting, you know what I mean?
>
> * * *
>
> I know, but you know what, Jim, but, I mean, you know, Bob
> asked me to do this, to be the guy, you know, because I am the

attorney for Form Tech [*sic*] and I have a relationship with you and
I have a relationship with him, you know, to be the guy.

*Id.* at 4-5.

On March 25, 2021, Nicholson emailed Wolff notifying him that "[Tomahawk] . . .
decided to terminate your employment as an R&D and Service Engineer with Tomahawk
Manufacturing" and specified that Tomahawk's employment counsel had provided the
separation terms to Wolff's employment counsel. Wolff Decl. Ex. 20 at 1. The decision was
made jointly by Nicholson, Tournour, and Sommer. Nicholson Dep. Tr. at 68:15-17 (Masih
Decl. Ex. 2, ECF 117-2). Tomahawk expressed its "desire to continue a professional
relationship" with Wolff, which he understood to be in the capacity as a consultant. Wolff Decl.
Ex. 20 at 1; *see* Wolff Decl. Ex. 19 at 2.

Tomahawk proposed an agreement that required Wolff to waive certain interests he had
in the 2010 NDA and the 2011 and 2012 contracts; Tomahawk also included non-competition
and non-solicitation terms that Wolff found unacceptable. Morris Decl. Ex. 1 (ECF 116-1);
Wolff Decl. ¶ 39. On May 4, 2021, after Wolff conveyed his reluctance to waive those rights,
Tomahawk's counsel sent Wolff's counsel a letter reminding Wolff of his obligations under the
various NDAs and requesting return of company property. Morris Decl. Ex. 2 (ECF 116-2). On
May 12, 2021, Wolff demanded that Tomahawk cease and desist from using, and return, his
Confidential Information under the 2010 NDA. Morris Decl. Ex. 3 (ECF 116-3). Wolff's claim
in this lawsuit under the 2010 NDA followed.

**G.  Procedural History**

On August 2, 2021, Tomahawk moved to dismiss for lack of subject matter jurisdiction
Wolff's first claim, alleging continuing breach of the 2010 NDA. In the alternative, Tomahawk
moved to compel Wolff to arbitrate his claim under an arbitration provision in the FOT

agreement, arguing that the FOT agreement incorporated the 2010 NDA by reference. The Court declined to "allow[] a motion to compel arbitration . . . to be brought under Rule 12(b)(1)." *Wolff v. Tomahawk Mfg.* (*Wolff I*), 2022 WL 377926, at *4 (D. Or. Feb. 8, 2022). The Court denied Tomahawk's motion to dismiss Wolff's first claim. The Court also denied Tomahawk's motion to compel arbitration. The Court treated the FOT agreement as a fully integrated final agreement between Formtec and Spherical. The Court declined to compel arbitration because neither Wolff nor Tomahawk were signatories to that agreement and Tomahawk's "ownership theory [did] not itself confer a right upon Tomahawk to enforce the agreement's arbitration provision against Wolff." *Id*. at *11 (cleaned up). Tomahawk then moved to stay Wolff's first claim while Tomahawk appealed the Court's decision to the Ninth Circuit. The Court granted Tomahawk's motion to stay pending appeal on April 25, 2022, staying the litigation on Wolff's first claim "until the Ninth Circuit resolves Tomahawk's appeal of this Court's decision on Tomahawk's motion to dismiss." ECF 68 at 3.

During the stay, Formtec and Spherical arbitrated their claims under the FOT agreement. On November 26, 2022, the American Arbitration Association issued a decision related to these claims. On December 19, 2022, the Ninth Circuit affirmed the opinion of this Court. *See Wolff v. Tomahawk Mfg.* (*Wolff II*), 2022 WL 17749271, at *1 (9th Cir. Dec. 19, 2022).

On November 21, 2022, Wolff moved for leave to file a third amended complaint. Wolff sought to add a sixth claim for relief alleging retaliation in violation of reporting safety concerns, under Oregon law and to add specific damage allegations to his existing claims two through five. Wolff did not propose to add any new facts. On December 20, 2022, Tomahawk moved for summary judgment. On June 9, 2023, Wolff filed a motion to compel the production of documents. On July 17, 2023, Wolff filed a motion to extend the deadlines in this case. On

July 19, 2023, Wolff filed an amended motion for leave to file a third amended complaint, seeking to add a claim for money damages to his first claim for relief for breach of contract, clarifying some factual allegations, and retaining the changes proposed in his original motion to amend. On July 21, 2023, the Court denied his motion to amend without prejudice for failure to comply with the local rules to delineate his proposed changes. On July 23, 2023, Wolff filed another amended motion for leave to file a third amended complaint that complied with the local rules.

On August 21, 2023, Tomahawk filed its second motion for summary judgment, directed only against Wolff's first claim. That motion has not yet been fully briefed. As described above, that motion challenges Wolff's first claim on different grounds than the claim preclusion argument raised in the current motion.

## DISCUSSION

### A.  Tomahawk's Motion for Summary Judgment

#### 1.  Breach of Contract

Tomahawk argues that the Court should grant summary judgment on Wolff's first claim, for breach of the 2010 NDA, based on the doctrine of claim preclusion (formerly known as *res judicata*). Tomahawk argues that the decision of the arbitration panel bars Wolff from bringing his claim for breach of contract here. Under the doctrine of claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). The elements necessary to establish claim preclusion are: "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003).

The parties do not dispute that the November 16, 2022 arbitration decision was a final judgment on the merits. Tomahawk argues that because this litigation and the arbitration litigation both arose out of the "contractual agreements and business dealings" between Wolff and Tournour, the identity of claims element is met. The arbitration, however, involved the FOT Agreement and was between Formtec and Spherical. This case is between Tomahawk and Wolff and involves the 2010 NDA. Tomahawk also argues that Formtec is in privity with Tournour and Spherical is in privity with Wolff. Tomahawk contends that Wolff could have raised his claim in the arbitration. The Court, however, previously denied Tomahawk's motion to compel arbitration of this claim. *Wolff I*, 2022 WL 377926, at *11. The Court determined that Wolff was not a signatory to the FOT Agreement or otherwise bound to that agreement, and that his claim against Tomahawk for breach of the 2010 NDA was not subject to arbitration.

Under these circumstances, the Ninth Circuit has foreclosed Tomahawk's argument that the arbitration decision precludes Wolff's breach of contract claim here. *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992).[5] In *Clark*, the Ninth Circuit stated:

> By definition, res judicata bars only those grounds for recovery which could have been asserted in the prior litigation. If a claim could not have been asserted in prior litigation, no interests are served by precluding that claim in later litigation. Another way of stating the same principle is that a claim is not barred by res judicata if the forum in which the first action was brought lacked subject matter jurisdiction to adjudicate that claim.
>
> Here, pursuant to the terms of Bear Stearns' agreement with Clark, *the district court refused to compel arbitration of Clark's federal securities claims, and, in the process, retained jurisdiction for itself*. Because the arbitration panel did not have subject matter jurisdiction over Clark's federal claims, Clark could not have

---

[5] The parties did not address *Clark* in their original briefing. The Court thus requested supplemental briefing on the effect of *Clark* on Tomahawk's argument based on claim preclusion.

brought those claims in the prior proceeding. Consequently, they
are not barred by res judicata.

*Id.* (citations omitted) (emphasis added); *see also Wolf v. Gruntal & Co.*, 45 F.3d 524, 528-29

(1st Cir. 1995).

Tomahawk argues that the Ninth Circuit held that the arbitrator lacked subject matter

jurisdiction over the claims because the arbitration panel could not hear federal securities claims.

That reasoning, however, is not what is described by the Ninth Circuit. The Ninth Circuit stated

that by refusing to compel arbitration, the district court retained jurisdiction for itself, and so the

arbitration panel did not have jurisdiction over that claim. *See also Wolf*, 45 F.3d at 528-29

(explaining that because arbitrators only have jurisdiction over claims through contract, when a

district court determines that a written agreement does not provide jurisdiction over a claim, the

arbitral forum's exercise of jurisdiction over that claim is outside of its power).

Tomahawk also argues that claim preclusion applies because Wolff *could have* elected to

bring a counterclaim in the arbitration, despite this Court's retention of jurisdiction, and that

Wolff's company, Formtec, which was subject to the arbitration, did bring counterclaims in the

arbitration. Tomahawk misses the point for purposes of claim preclusion.

"[T]he proponent of the *res judicata* defense . . . [is] charged with the burden of proving,

at a bare *minimum*, that the arbitral forum possessed jurisdiction over the [disputed] claim *at the*

*time*" arbitration is demanded. *See Wolf*, 45 F.3d at 529 (emphasis in original) (citations

omitted). The arbitral forum did not possess jurisdiction over Wolff's breach of contract claim

because "[u]nlike federal courts of limited jurisdiction and state courts of general jurisdiction . . .

arbitral tribunals' authority over particular 'claims' is for the most part *predetermined by*

*contract*; that is, *by written agreement of the parties*." *Id.* at 528 (emphasis in original) (citation

omitted). This Court held that Wolff and Tomahawk were not bound by the written agreement

that conferred jurisdiction to the arbitral forum. *Wolff I*, 2022 WL 377926, at \*9-11. The parties also agreed that the written agreement to which Wolff and Tomahawk were bound did not confer jurisdiction to the arbitrator. "As arbitral 'jurisdiction' is dependent upon a written agreement between the parties, however, any exercise of arbitral authority over uncovered claims—absent a 'meeting of the minds' duly memorialized in a joint arbitral submission—would constitute an *exces de pouvoir*." *Wolf*, 45 F.3d at 528 (footnote omitted). Without a "*bilateral, written* submission an arbitral forum . . . could not acquire 'jurisdiction' over" Wolff's breach of contract claim. *See id.* at 529 (emphasis in original).

This Court refused to compel arbitration of Wolff's breach of contract claim and thus retained jurisdiction over that claim. The Ninth Circuit affirmed. *Wolff II*, 2022 WL 17749271, at \*1. Wolff never submitted his claim to arbitration or otherwise agreed to arbitrate his breach of contract claim. Thus, under *Clark*, the arbitration panel did not have jurisdiction over the claim and claim preclusion does not apply.[6]

---

[6] Even if the Court were to examine claim preclusion, it would not apply. Tomahawk fails to show an identity of claims. The FOT agreement elaborated on the rights and responsibilities of Formtec and Spherical related to the FOT. *See* ECF 14-2 (defining "technology" as referenced in the FOT agreement as "any inventions relating to any use of a venturi effect using spherical geometry, and any fiber orientation"). The 2010 NDA, however, envisions broader protections, protecting "all information . . . related to business programs, products, applications, systems, components, technologies and business topics." *See* ECF 118-1. Although Confidential Information as defined in the 2010 NDA encompasses the FOT technology, it also includes other information not relating to the FOT. Wolff contends that he has imparted to Tomahawk several innovations and inventions, some relating to the FOT, others unrelated. It is the non-FOT Confidential Information that is the current subject of this case. *See* Wolff Decl. ¶ 42 (setting out a non-exclusive list of non-FOT Confidential Information that Wolff seeks to enjoin Tomahawk from using further). Thus, there is not an identity of claims and any decision by this Court regarding Tomahawk's alleged violation of its non-FOT obligations in the 2010 NDA would not affect the arbitration decision.

2.  **Disability Discrimination**

Wolff's Third Claim for relief alleges two theories of disability discrimination under

ORS § 659A.112. Wolff alleges that Tomahawk discharged him on the basis of his disability.

Wolff also alleges that Tomahawk failed to provide reasonable accommodations.

### a.        Disability Discrimination—Wrongful Termination

At summary judgment for Wolff's disability discrimination claim for wrongful

termination under Oregon law, the Court applies the *McDonnell Douglas* burden-shifting

analysis. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093-94 (9th Cir. 2001). To

establish a *prima facie* case of disability discrimination under Oregon law, the plaintiff must

show: (1) he is a qualified individual with a disability, (2) he suffered an adverse employment

action, and (3) there was a causal connection between the adverse employment action and his

disability. *Huitt v. Optum Health Servs.*, 216 F. Supp. 3d 1179, 1187 (D. Or. 2016).

### i.  *Prima facie* Case

Tomahawk concedes that Wolff has shown an adverse employment action—

termination—but argues that Wolff is unable to demonstrate the first and third elements of his

*prima facie* case. As for whether Wolff is disabled under the statute or was regarded by

Tomahawk as disabled, in a footnote Tomahawk states that Wolff alleges he had a blood clotting

condition but Tomahawk notes that having a medical condition by itself does not qualify as

disabling unless the condition substantially limits a major life activity. Tomahawk then cites the

standards for substantially limiting a major life activity. Tomahawk offers no specific argument

on this point. Later in its brief, Tomahawk states that it does not concede this element because

Wolff "never sought medical treatment for how COVID-19 might affect his medical condition,"

without argument or authority.

Generally, a party must "specifically and distinctly" argue an issue in the opening brief to present the issue for consideration. *See, e.g.*, *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). Issues raised in a brief that are "not supported by argument are considered abandoned." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1100 (9th Cir. 2007); *see also United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived."). Thus, Tomahawk did not sufficiently present its argument that Wolff did not have a disabling medical condition.

Even if Tomahawk's minimal assertions in its motion that Wolff did not have a disabling condition were enough to present the issue, it would fail. First, seeking *treatment* for how COVID-19 might affect Wolff's condition is not required for Wolff to have a disabling condition or be regarded as having a disabling impairment—Wolff claimed a disabling condition independent of COVID-19. He sought and received travel accommodation from Tomahawk before COVID-19. He also forwarded articles to Tomahawk about how COVID-19 could interact with his pre-existing medical condition. Considering what was happening during that period of the pandemic, it was not unreasonable for a person who believed they were medically vulnerable to conduct and share online research regarding increased risk factors rather than travel to a medical facility and risk potential exposure. Further, Tomahawk did not request clarification on this point, additional documentation, or medical records.

Second, Wolff submits sufficient evidence to defeat summary judgment. Wolff provides his declaration explaining that he suffers from a hypercoagulable disorder with recurrent thromboembolic disease that substantially limits the major life activities of sitting, standing, walking, and breathing. Wolff also states that in April and May, 2020, he shared information

with Tournour about clotting risks of persons with COVID-19 and submits copies of his 2020

text messages and Tournour's responses. Wolff also cites several public news articles from

spring and summer 2020 linking blood clotting to the worst outcomes from COVID-19, noting

that it was "a well-publicized problem." Wolff's daughter also spoke by telephone with Tournour

and Weiss to discuss her concerns about Wolff's condition and COVID-19, after meat-packing

plant deaths because of COVID-19 began surfacing in the news. All of this is evidence on which

a jury could find that Wolff's condition was disabling and known or regarded as such by

Tomahawk.

Third, Tomahawk was aware of Wolff's condition and made travel accommodations for

Wolff. Tomahawk admits that it paid for him to fly first class. Tomahawk claims that it did so as

a "convenience" even though Tomahawk did not claim that his medical condition was disabling.

This also raises an issue of fact for the jury—whether a company would pay for an employee to

fly first class as an accommodation if the employer did not believe that it was medically

necessary for a disabling medical condition. Wolff also describes that Tomahawk made

additional travel accommodations when Wolff traveled by car, allowing for breaks. Further,

when Tomahawk first conveyed Wolff's termination, through Weiss, Weiss stated it was because

of Wolff's health condition and the fact that it was too dangerous to his health for him to travel.

All this evidence, viewed in the light most favorable to Wolff, creates a triable issue on whether

he had a disabling condition and whether he had a record of that impairment or Tomahawk

regarded Wolff as having a disabling impairment such that he qualified as disabled under the

statute.

Regarding causation, Tomahawk argues that Wolff cannot establish a causal connection between his termination and his disability. Tomahawk contends that the evidence shows that Wolff's disrespectful conduct was the cause of his termination.

Wolff responds that his February 2021 telephone call with Weiss establishes the necessary causal connection sufficient to at least create a genuine issue of fact for trial. On that call, Weiss explained that Tournour requested that Weiss speak with Wolff on Tournour's behalf. When Wolff questioned Weiss about why Tomahawk had "parked" him (stopped assigning him work), and was planning to terminate him, Weiss responded:

> The issue is, unfortunately, your job became a, you know, for whatever reason, became as a service technician, you know, at Tomahawk, and, you know, health-wise you can't do it, Jim. . . . [Y]ou can't travel. It's—it's very bad for your health.
>
> * * *
>
> [Y]ou can't do what Tomahawk needs anymore, okay? You can't be a service tech. And I think you realize that, right?

Wolff Decl. Ex. 19 at 2-3. This is enough to show a causal connection to meet Wolff's minimal burden necessary to establish a *prima facie* case.

### ii.  Legitimate and Nondiscriminatory Reason

Tomahawk presents evidence that it terminated Wolff's employment because of his poor behavior, particularly in relation to insulting his superiors. Wolff does not contest that Tomahawk has met its burden of offering a legitimate, nondiscriminatory reason for the asserted adverse employment actions. The Court, thus, proceeds to consider pretext.

### iii.  Pretext

To show pretext, Wolff must raise a "genuine issue as to whether the employer's explanation for its action is true." *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 1993). A plaintiff may show that a defendant's reason is pretextual either with indirect evidence, by

presenting evidence that the explanation is not credible, or with direct evidence, by showing that the defendant's action was more likely than not motivated by a discriminatory or retaliatory purpose. *Snead*, 237 F.3d at 1093-94. Direct evidence need only be "very little." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1128 (9th Cir. 2000) (quotation marks omitted). Indeed, the Ninth Circuit has "repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005); *see also Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (holding that "very little . . . evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder" (second alteration in original) (quotation marks omitted)). "To show pretext using circumstantial evidence, in contrast to direct evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1282 (9th Cir. 2017) (quotation marks omitted). Although a plaintiff's burden is higher to show pretext than to prove a *prima facie* case, a plaintiff may "rely on the same evidence [he or she] used to establish a prima facie case or put forth additional evidence." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (applying standard to claims under the Age Discrimination in Employment Act); *see also Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732 (9th Cir. 1986) ("To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish her prima facie case, although she may of course provide additional proof of the defendants' unlawful motivation.").

Weiss was given delegated authority by Tomahawk's decisionmaker, Tournour, to negotiate Wolff's termination. In so doing, Weiss made a discriminatory statement, stating that Tomahawk was terminating Wolff because of his health issues. This is direct evidence and "direct evidence alone is sufficient to defeat summary judgment." *Mayes*, 846 F.3d at 1282. In addition, direct evidence can be "bolstered by indirect evidence." *Id.*

A plaintiff may show causation through "circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). A causal link "'can be inferred from timing alone' when there is a close proximity between the two." *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)). The Ninth Circuit has concluded that events occurring within intervals less than three months "are sufficiently proximate to support an inference of causation." *Id.* (citing cases). "Proof of a causal link between [a plaintiff's] complaint and his termination—as evidenced by temporal proximity—is certainly relevant to an evaluation of pretext." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 694 (9th Cir. 2017). Indeed, "[i]n some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext." *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011).

The temporal proximity between Wolff's January 2021 expressions of concern about COVID-19 in his assignments at Cargill and Standard Meat and Tomahawk's cessation of assigning Wolff work, negotiating his termination, and terminating him establishes a genuine dispute on pretext. Wolff had a longstanding relationship with Tomahawk and had been an

employee for nearly four years "yet he was fired barely one month after making" these complaints. *See Reynaga*, 847 F.3d at 694.

Additionally, Wolff points to the positive performance evaluation, bonus, and wage increase that he received in early December 2020. Wolff argues that this positive performance review belies Tomahawk's contention that Wolff had a history of acting inappropriately and unprofessionally and that this history played a role in Tomahawk's decision to terminate Wolff. Wolff also notes that under Tomahawk's employee handbook, "[a]nnual performance reviews have a direct impact to wage and salary merit increases." Wolff Decl. Ex. 7. Thus, argues Wolff, at the time of this evaluation Tomahawk did not consider any of his previous actions so egregious as to warrant any impact on Wolff's wages. This point, again, supports Wolff's argument of pretext. Tomahawk argues that given Wolff's history of "well-documented feedback and management's constant counseling of his behavior," Wolff is unable to show pretext. Those points, however, are disputed issues of fact. At summary judgment, the Court views disputed issues of fact in the light most favorable to the non-moving party.

Wolff presents sufficient evidence creating a genuine dispute for trial that Tomahawk's suspension of assigning work to Wolff (i.e., "parking" him) and terminating Wolff's employment were discriminatory. The Court denies Tomahawk's motion for summary judgment on Wolff's claim of disability discrimination.

### b. Failure to Provide Reasonable Accommodations

Wolff alleges that Tomahawk failed to accommodate his disability in violation of ORS § 659A.112. Tomahawk argues that Wolff never requested any accommodation and that Tomahawk was unaware that Wolff had a disability that required an accommodation. Wolff responds that there are factual disputes that preclude summary judgment.

### i. Legal Standards

Under ORS § 659A.112, an employer is prohibited from failing to make a reasonable accommodation for the known disability of a qualified individual. ORS § 659A.112(2)(e). To establish a *prima facie* case for failure to accommodate, Wolff must show: (1) he is a qualified individual; (2) Tomahawk received adequate notice of his desire for a reasonable accommodation; and (3) a reasonable accommodation was available that would have enabled Wolff to perform the essential functions of his job. *See Snapp v. United Transp. Union*, 889 F.3d 1088, 1095, 1099 (9th Cir. 2018) (listing the elements of a failure to accommodate claim under the American with Disabilities Act); ORS § 659A.139 ("[ORS § 659A.112] shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act . . .").

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation . . . to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem. Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." *Id.* There is no "particular language" required to activate this duty but the employee must "inform the employer of the need for an adjustment due to a medical condition." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000), *vacated on other grounds sub nom. U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)).

An appropriate reasonable accommodation effectively enables an employee to "perform the duties of the position." *Humphrey*, 239 F.3d at 1137 (quoting *Barnett*, 228 F.3d at 1115). In other words, it must enable the employee "to perform the essential functions of an available job."

*Dark v. Curry Cnty.*, 451 F.3d 1078, 1088 (9th Cir. 2006). Examples of reasonable accommodations include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). An employer may, however, raise the affirmative defense that the requested accommodation creates an undue hardship. *See* ORS § 659A.112(2)(e) (requiring reasonable accommodation "unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer").

Finally, at trial the employee has the burden of showing the existence of a reasonable accommodation. *Dark*, 451 F.3d at 1088. "To avoid summary judgment, however, [she] 'need only show that an "accommodation" *seems reasonable on its face*, i.e., ordinarily or in the run of cases.'" *Id.* (quoting *U.S. Airways*, 535 U.S. at 401) (emphasis added in *Dark*).

### ii.  Analysis

Wolff alleges in his Second Amended Complaint that there were two times when Tomahawk failed to accommodate his disabilities: (1) by failing to provide adequate personal protective equipment (PPE); and (2) by not allowing Wolff to work remotely. In responding to Tomahawk's motion for summary judgment, Wolff further explains that he informed Tomahawk that the PPE it had provided did not function. Wolff adds in his summary judgment response, however, that he also requested an accommodation when he informed Sommer that he was in a 14-day quarantine after being exposed to COVID-19 at Cargill.

### A.  PPE

Tomahawk's motion for summary judgment does not address Wolff's alleged accommodation request for functional PPE. Tomahawk broadly denies that Wolff ever requested any accommodations and generically asserts that Tomahawk was unaware Wolff had a disability that required an accommodation. Thus, Tomahawk has waived challenging by summary

judgment this aspect of Wolff's claim. *Graf*, 610 F.3d at 1166; *Rattlesnake Coal.*, 509 F.3d at 1100; *Kama*, 394 F.3d at 1238.

Even if Tomahawk had sufficiently made this argument, it would fail. Wolff has presented sufficient evidence to create a genuine issue of material fact about whether Tomahawk knew that Wolff had a disability that required accommodation. The evidence shows that Tomahawk provided Wolff with two accommodations for his hypercoagulable disorder throughout his tenure with the company. First, Tomahawk bought first class seats for Wolff whenever a seat was available to accommodate his health condition. Second, Tomahawk allowed Wolff to take breaks during long work-related car trips so he could get out of the vehicle to improve his circulation. As discussed above, Tomahawk's assertion that it was unaware that Wolff had a disability requiring accommodations is contradicted by the fact that Tomahawk provided Wolff with accommodations for that very disability. It is also contradicted by texts from Tournour regarding Wolff's condition, the conference call between Tournour, Weiss, and Wolff's daughter Elisabeth, and by Weiss's statements when terminating Wolff.

Wolff has also presented evidence sufficient to create a genuine issue of material fact about whether Wolff requested functioning PPE. Wolff states in his declaration, and Tomahawk does not contest Wolff's assertion, that although Tomahawk provided Wolff with gloves, masks, a thermometer, the gloves did not fit, and the thermometer did not function. Wolff also states that he informed Sommer of the issues that he was having with the PPE, and after he received no response from Sommer, Wolff bought the replacement gear himself. Evidence at summary judgment is viewed in the light most favorable to the nonmoving party. Thus, the Court denies Tomahawk's motion for summary judgment as to this requested accommodation.

**B.  Remote Work**

Tomahawk argues that Wolff is unable to establish that Tomahawk failed to provide the reasonable accommodation of remote work because Wolff cannot show that Tomahawk received adequate notice of Wolff's desire for accommodation. In the deposition testimony submitted by Tomahawk, Wolff answered whether there was ever a time he requested to work remotely and was denied in the affirmative, stating "many times" and providing as one example "The Fresno trip that we're talking about; A) I shouldn't have been there. B) Eventually, it was done remotely." Wolff Dep. Tr. 159:19-160:2 (Gillette Decl. Ex. A, ECF 102 at 27-28). Wolff identified James Sommer as the person who denied Wolff's request, before he left for the project. *See id.* at 160:8-12. The "Fresno trip" was the Cargill assignment.

Tomahawk argues that Wolff later recants this statement. Tomahawk cites Wolff's testimony: "I don't know if I requested remotely," and "I don't know if I requested to work remotely." *Id*. at 163:15-16; 166:16-17. When these statements by Wolff are read in context of the question asked, however, Wolff is referring to the job he completed for Standard Meat in Texas, not for the job the week before at Cargill.

After discussing Cargill as a failure to accommodate for remote work, Wolff stated that Standard Meat was another example. He then described the situation with Sommer pulling Wolff out of quarantine early. Immediately before his first cited statement about not knowing if he requested remote work, Wolff described the 72-hour quarantine dispute relating to Standard Meat. The next deposition question was: "Okay. And did—so after *that* happened, did you ever notify anyone else at Tomahawk that you were requesting to do *this job* remotely?" *Id.* at 163:11-14 (emphasis added). Wolff responded to that question that he did not know if he requested remote work. The context of the question, following the discussion about the 72-hour quarantine dispute, shows that the question is referencing the Standard Meat job.

Similarly, for the second statement, Wolff was asked "Okay. So let's talk about the Standard Meats project. You testified earlier that you did request to remotely for that project; is that right?" *Id.* at 166:12-15. He then gave the second cited statement about not knowing whether he asked to work remotely. Thus, neither statement applies to Wolff's allegation relating to Cargill.

Although there is no "particular language" required to activate the duty to accommodate, the employee must "inform the employer of the need for an adjustment due to a medical condition." *Zivkovic*, 302 F.3d at 1089. Here, given Wolff's deposition testimony, there is a genuine issue of material fact about whether Wolff informed Tomahawk of his need for an adjustment due to a medical condition before he was sent on assignment to Cargill. The Court denies Tomahawk's motion for summary judgment as to this requested accommodation.

### C. 14-Day Quarantine

Tomahawk does not challenge the timeliness of this newly-asserted incident of failure to accommodate. Instead, Tomahawk argues that Wolff failed to present evidence that he requested the 14-day quarantine "because of" a disability. Assuming without deciding that Wolff could raise this new incident, the Court agrees with Tomahawk. Indeed, Wolff presents evidence that he informed Sommer that "he was in a 14-day quarantine which [he] believed *to be consistent with CDC guidelines* given that I had been exposed to a facility with an active [COVID-19] outbreak." Wolff Decl. ¶ 31 (emphasis added). Wolff informed Tomahawk of his intent to follow CDC guidelines, but he did not inform Tomahawk that his need to follow CDC guidelines was due to his medical condition. Wolff must inform Tomahawk of his need for an accommodation to trigger the obligation to participate in an interactive process. *Zivkovic*, 302 F.3d at 1089. Thus, partial summary judgment is granted on this purported accommodation.

### 3. Retaliation

Wolff's Second Claim asserts unlawful retaliation for whistleblowing under ORS § 659A.199. Wolff's Fourth Claim alleges unlawful retaliation under Oregon's employment discrimination and retaliation statute, ORS § 659A.030(1)(f). These claims are based on allegations that Tomahawk terminated Wolff because he reported violations of the law. Wolff alleges that these violations occurred when Sommer instructed Wolff to ignore correspondence from the Canadian government about a mandatory 14-day quarantine; when Sommer pressured Wolff to stay at Cargill after he discovered there was a recent COVID-19 outbreak; and when, in violation of contemporaneous CDC guidance, Sommer pulled Wolff from his self-imposed quarantine to travel to Standard Meat in Texas.

#### a. Standards

A claim for whistleblower retaliation under ORS § 659A.199 is a statutory claim whose elements derive from the statute. *See Burley v. Clackamas Cnty.*, 298 Or. App. 462, 465-66 (2019). To prove whistleblower retaliation under ORS § 659A.199, Wolff must show that Tomahawk discharged, demoted, suspended, or otherwise discriminated or retaliated against Wolff "with regard to promotion, compensation or other terms, conditions or privileges of employment" because Wolff "in good faith reported information that [he] believe[ed] [was] evidence of a violation of a state or federal law, rule or regulation." ORS § 659A.199(1); *see also Hall v. State*, 274 Or. App. 445, 453-54 (2015) (analyzing the statute's "subjective, good faith" standard). "To prove a violation [of ORS § 659A.199], a plaintiff must establish a causal link between her complaints about the violation of a law, rule, or regulation, on the one hand, and defendant's adverse employment actions, on the other." *Rohrer v. Oswego Cove, LLC*, 309 Or. App. 489, 497 (2021) (cleaned up); *see also Ossanna v. Nike, Inc.*, 290 Or. App. 16, 28 (2018), *aff'd*, 365 Or. 196 (2019) (interpreting the statute's causation requirement as incorporating "the

tort principle of causation by requiring proof that the employee's protected activity was a substantial factor in the employer's adverse decision"). ORS § 659A.030(1)(f) makes it unlawful "[f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice."

To establish a *prima facie* case of retaliation, Wolff must show that: (1) he engaged in a protected activity; (2) Tomahawk subjected him to an adverse employment action; and (3) "a causal link exists between the protected activity and the adverse action."[7] *Manatt v. Bank of Am., NA*, 339 F.3d 792, 800 (9th Cir. 2003) (quotation marks omitted). If Wolff can establish a *prima facie* case, "then *McDonnell Douglas* burden-shifting is appropriate." *Villiarimo*, 281 F.3d at 1064.

"At the prima facie stage of a retaliation case, the causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007) (cleaned up). "The requisite degree of proof necessary to establish a *prima facie* case for claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (cleaned up). If the plaintiff can establish a *prima facie* case, then the defendant, the employer, "must articulate a legitimate, nondiscriminatory reason for the challenged action[s]." *Id.* If the defendant "satisfies this burden," the plaintiff "must show that the 'reason is pretextual either

---

[7] "The elements of a *prima facie* case under ORS § 659A.030(1)(f) are substantially similar" to those for retaliation under Title VII. *Meyer v. State by and through Oregon Lottery*, 292 Or. App. 647, 678 (2018); *see also Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 712 (2012) ("Title VII also contains an antiretaliation provision that is analogous to ORS § 659A.030(1)(f)."). "[F]ederal precedent interpreting the antidiscrimination provisions of Title VII can provide useful additional context to aid [a court's] analysis of the meaning of ORS § 659A.030(1)(f)." *Portland State Univ.*, 352 Or. at 711.

directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Chuang*, 225 F.3d at 1123-24).

### b. Application

#### i. *Prima Facie* Case

Tomahawk argues that Wolff cannot establish a *prima facie* case of retaliation because his reports were not made in "good faith." According to Tomahawk, Wolff made his reports intending to retaliate against Sommer for sending Wolff a negative performance email on January 18, 2021. Tomahawk also argues that Wolff's self-imposed quarantine after his potential exposure to COVID-19 was made in bad faith, again, as a tactic to retaliate against Sommer for his critical email. The Court finds both arguments unpersuasive, particularly viewing the evidence in the light most favorable to Wolff. Ultimately, a jury will have to decide this dispute.

Wolff has shown that at various points throughout his tenure at Tomahawk he expressed concerns to, and sought guidance from, Tomahawk about COVID-19 and compliance with any related and applicable regulations or guidance. Most of these communications occurred before Sommer's January 18, 2021, email. For example, in April and May 2020 Wolff sent Tournour several articles relating to clotting risks in COVID-19 patients. Further, when on a job assignment in December 2020, Wolff contacted Sommer at least two times requesting advice on how to comply with the Canadian government's COVID-19 quarantine requirements and forwarded the information Wolff was receiving from the government. Additionally, when on assignment to Cargill, on January 15, 2021, Wolff and Gannon contacted Sommer with concerns about their possible exposure to COVID-19 and how to proceed in response to that potential exposure. Wolff then bought a return plane ticket for Saturday, January 16, 2021, and quarantined at home.

PAGE 35 – OPINION AND ORDER

Tomahawk argus that these were not reports of misconduct. But no matter if they rise to the level of a report of misconduct for retaliation, they are relevant to show Wolff's good faith in his January 20, 2021 reports. Wolff's regular communications showing his concerns about COVID-19, at a minimum, raise a genuine issue of fact whether his reports on January 20, 2021, relating to COVID-19 and his assignment at Standard Meat, adhered to his other reports regarding COVID-19 and were unrelated to Sommer's email. For these reasons, Wolff has met the minimal burden necessary to establish a *prima facie* case for both whistleblower retaliation under ORS § 659A.199 and unlawful discrimination for opposition to an unlawful practice under ORS § 659A.030(1)(f).

### ii. Legitimate and Nondiscriminatory Reason

Tomahawk presents evidence that it terminated Wolff's employment because of his poor behavior, particularly in relation to insulting his superiors. Wolff does not contest that Tomahawk has met its burden of offering a legitimate, nondiscriminatory reason for the asserted adverse employment actions. Accordingly, the Court turns next to pretext.

### iii. Pretext

Wolff asserts, and Tomahawk does not dispute, that Tomahawk stopped giving Wolff work assignments within days of Wolff's January 20, 2021 emails challenging Sommer's purported CDC guidance allowing Wolff's travel and reporting his concerns. Further, discussions around the terms of Wolff's termination began at least by February 22, 2021, only a month after Wolff's January report, and he was terminated from his employment on March 25, 2021, two months after his report. As with his discrimination claim, Wolff cites the temporal proximity between his January emails and the process of his termination, his performance evaluation in which he received a bonus and salary increase and was not criticized for certain incidents now raised by Tomahawk, and the explanation by Weiss for why Wolff was being

terminated that included no interpersonal problems or conflicts with supervisors. Viewed in the light most favorable to Wolff, the Court finds sufficient evidence to preclude summary judgment on pretext. *See Chuang*, 255 F.3d at 1127 ("[A] plaintiff can prove pretext . . . by showing that the employer's proffered explanation is unworthy of credence because it is . . . not believable." (quotation marks omitted)).

### 4. Common Law Wrongful Termination

Wolff's Fifth claim alleges that Tomahawk committed the common law tort of wrongful discharge by terminating Wolff's employment. Because the Court allows Wolff to proceed on his whistleblower claims under ORS §§ 659A.199 and 659.030(1)(f), and his disability discrimination claim under ORS § 659A.112, Wolff's wrongful discharge claim is precluded by the availability of adequate statutory remedies. *See Walker v. State by & through Or. Travel Info. Council*, 367 Or. 761, 779 (2021) (explaining that "common law wrongful discharge is an interstitial tort: The tort may only be invoked when another claim does not provide a plaintiff with an adequate remedy"). Thus, the Court grants summary judgment to Tomahawk on Wolff's wrongful discharge claim.

## B. Motion to Amend Complaint

On November 21, 2022, Wolff moved to amend his complaint. He sought to add specific dollar amount requests in his third, fourth, and fifth claims that were inadvertently left out of his Second Amended Complaint and to add a new sixth claim. His proposed new sixth claim would allege retaliation for reporting safety violations under ORS § 654.062. Wolff did not propose adding any new facts to his proposed Third Amended Complaint.

Before the Court ruled on Wolff's motion to amend, on July 19, 2023, Wolff filed an amended motion to amend his complaint further. In this motion, Wolff failed to satisfy Local Rule 15-1(b) because he did not include as an exhibit a copy of the proposed amended complaint

with changes marked in redline or otherwise delineated. The Court denied Wolff's motions to amend the complaint without prejudice. On July 24, 2023, Wolff filed a renewed amended motion to amend his complaint. He continues to propose the changes from his original November 2022 motion, plus he seeks to add new facts relating to his first claim for relief, breach of contract, and he wishes to add a claim for money damages for his first claim for relief in addition to his request for injunctive relief. Wolff argues that after the Court lifted the stay of discovery in January 2023, he learned additional facts in discovery that he now wishes to add to his first breach of contract claim.

In opposing Wolff's original motion,[8] Tomahawk argued that Wolff should not be permitted to add claims unless he was required to remove claims that Tomahawk asserted were baseless. Tomahawk asserted that Wolff's disability claims and breach of contract claim are baseless. In this Opinion and Order, however, the Court addresses the merits of both claims and rejects Tomahawk's contentions. Thus, the Court finds this argument unpersuasive.

Tomahawk also argued that Wolff already had two opportunities to amend his complaint and that Wolff's original motion to amend was filed too close to the parties' deadline to file dispositive motions. Tomahawk asserted that it would be unable to articulate its motion for summary judgment without knowing what claims were in the complaint. The Court rejects this argument. Tomahawk filed its motion for summary judgment, which the Court has evaluated. Tomahawk is not prejudiced and may file another motion against Wolff's new claim if Tomahawk believes one is warranted, which Tomahawk appears to have done in its second motion for summary judgment. *See* ECF 164. Tomahawk argues in that motion that if the Court

---

[8] In opposing Wolff's amended motion to amend, Tomahawk raises no new arguments and relies on its earlier briefing.

grants Wolff's motion to amend, Tomahawk's second motion for summary judgment applies to Wolff's new claim. The Court grants Wolff's motion to amend.

## C. Motion to Compel

Wolff moves to compel Tomahawk to produce documents responsive to Wolff's Document Request Nos. 18-28 from his Second Request for Production. Tomahawk objects, arguing that these requests are a "litigation tactic" considering the "outsized" attorney's fees awarded to Formtec in the arbitration. The fees payable from Spherical to Formtec from their arbitration, however, are not relevant to whether Wolff has requested documents that Tomahawk should produce in this litigation.

Tomahawk generally argues that the requested documents are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. These arguments assert that the requested documents are not relevant because Wolff cannot show that: (1) he properly provided written notice of his claim to particular confidential information as required under the 2010 NDA; (2) his breach of contract claim is not barred by the statute of limitations; and (3) certain products and innovations are Wolff's confidential information.

In his filings on the motion amend and a supplemental filing relating to his motion to extend the case deadlines, Wolff disputes Tomahawk's contentions. Wolff disputes that he has to provide written notice under the 2010 NDA if he imparts information orally at Tomahawk with multiple witnesses. Wolff also argues that there is no penalty or negative consequence under the 2010 NDA to failing to provide notice in writing. Regarding the statute of limitations, he argues that the continuing violations doctrine applies to his breach of contract claims. He also contends that the statute of limitations does not apply to his request for injunctive relief. Wolff further argues that he needs discovery to determine whether Tomahawk began manufacturing certain products or otherwise began using Wolff's confidential information within the limitations

PAGE 39 – OPINION AND ORDER

period. He also asserts that there is significant evidence that Tomahawk is exploiting Wolff's confidential information, including within the limitations period. In a supplemental filing, Wolff offers the declaration of a former Tomahawk employee describing the use of Wolff's innovations.

These disputes involve issues of fact and law, and are more appropriate for resolution by summary judgment or trial, not through a motion to compel. The Court thus considers the objections asserted to the document requests and not general legal challenges to the sufficiency of Wolff's claims or evidence.

Wolff issued his requests for production on February 27, 2023. Tomahawk responded on March 29, 2023, asserting specific and general objections. The parties began to confer. After providing keyword searches for email and electronic drawings (CAD documents), counsel for Wolff pressed counsel for Tomahawk for production of documents. Tomahawk responded on May 31, 2023, by issuing a "supplemental" response that raised additional objections, and by offering to perform the keyword searches if Wolff paid about $15,000 toward Tomahawk's discovery costs.

As for Tomahawk's supplemental objections, it is well settled that "failure to object to discovery requests within the time required constitutes a waiver of any objection." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992). Thus, "if a party fails to file *timely* objections to discovery requests, such a failure constitutes a waiver of any objections which a party might have to the requests[,]" and "the court will not consider any objections that were not asserted in the responding party's *original* discovery responses." *Ramirez v. County of Los Angeles*, 231 F.R.D. 407, 410 (C.D. Cal. 2005) (cleaned up) (first emphasis in original, second emphasis added). The requirement to supplement production and

responses to interrogatories is not to supplement *objections*, but to supplement *production* or *answers* in order to ensure that accurate and current discovery continues to be provided. *See* Fed. R. Civ. P. 26(e)(1) (requiring supplementation of an interrogatory response or document production if the information has not otherwise been made known during discovery or in writing); 37(c)(1) (providing that a failure to supplement may result in the party not being "allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial"); *see also* Fed. R. Civ. P. 26(e) Advisory Committee's Notes to 1970, 1993, and 2000 amendments (explaining purpose of supplementation under Rule 26(e)). The Court thus rejects Tomahawk's supplemental objections.

Although it appears the parties reached some agreements relating to the scope of production, keywords, and other issues, Wolff's motion is based on his requests as written. The Court thus considers the written requests and Tomahawk's original objections.

### 1.  RFP Nos. 18-24

RFP No. 18 requests "all information referring or relating to gradient breather plates." RFP No. 19 requests "all information referring or relating to hour meters." RFP No. 20 requests "all information referring or relating to the purchase and use of CorrosionX on tooling." RFP No. 21 requests "all information referring or relating to specifications for center shafts on 26-style forming machines." RFP No. 22 requests "all information referring or relating to Wabco Ceramic valves (now called Bosch valves)." RFP No. 23 requests "all information referring or relating to Soft-Fill/Soft-Choice." RFP No. 24 requests "all information referring or relating to Tomahawk-manufactured Interleaver machines."

Along with boiler plate objections asserting privilege, vagueness, ambiguity, and undue burden, Tomahawk objected that these requests were overly broad because they sought "all

information" without being limited in time or scope. Tomahawk "invite[d]" Wolff to "narrow the scope of his request[s]."

Tomahawk does not provide any specific argument or evidence of undue burden. The Court agrees, however, that the requests as written are vague and broad in scope. Wolff asserts that he invented these products or innovations, but offers no temporal scope for his document requests. For example, Wolff purportedly invented in September 2018 a solution allowing "hour meters" to be installed in a Programmable Logic Controller. It is unknown, however, whether he is seeking documents after his purported invention or whether he is seeking to determine what documents Tomahawk has relating to "hour meters" before Wolff's invention, and for what duration, or both. Wolff fails to explain how every mention of "hour meters" throughout all of Tomahawk's history is relevant, but some discussions are relevant. The same is true for the requests relating to the other parts purportedly invented by Wolff.

The Court directs the parties to confer on a reasonable temporal scope for Wolff's Request Nos. 18-24. If the parties cannot agree, each party may file a supplemental brief of no more than five pages explaining their proposed scope. The supplemental briefs are due within 14 days of this Opinion and Order.

### 2. RFP No. 25

RFP No. 25 requests all part numbers for a list of six categories of parts. Tomahawk asserted the boiler plate objections that the request was unduly burdensome, vague, broad, and ambiguous. Tomahawk also objected that the request sought irrelevant information and was not reasonably calculated to discover admissible information.

Wolff alleges that his confidential information was used to create these six categories of parts. Tomahawk may disagree, but that does not make the requested information irrelevant. Tomahawk does not specifically explain how producing the part numbers for these six categories

PAGE 42 – OPINION AND ORDER

of parts is unduly burdensome, nor is this request vague or ambiguous. The Court grants this portion of Wolff's motion to compel.

### 3. RFP No. 26

RFP No. 26 requests all sales information for a list of seven categories of parts. This is the same list as RFP No. 25, except there are two separate "Soft-Choice" categories. Along with boiler plate objections asserting privilege, vagueness, ambiguity, and undue burden, Tomahawk objected that this request was overly broad because it sought "all information" without being limited in time or scope. Tomahawk also objected that the request sought confidential business information, sought irrelevant information, and was not reasonably calculated to discover admissible information.

The Court rejects Tomahawk's relevancy objection for the same reasons discussed regarding RFP No. 25. Addressing Tomahawk's objection that the request calls for confidential information, there is a protective order already in place. The Court notes, however, that it is a one-tier protective order. To the extent that any nonprivileged, responsive information required to be produced under the Court's order should be designated "Attorney's Eyes Only," the parties have leave to file a stipulated two-tier protective order, or Tomahawk may move for entry of a two-tier protective order.

Regarding Tomahawk's objection that the request is overbroad, it does not request "all information," but only all *sales* information. Wolff argues that he requires sales information to understand the profits made using his alleged confidential information, which is relevant to his claims. Wolff, however, does not require *all* sales information to understand the profits made from the sales of the identified parts. The Court orders Tomahawk to produce nonprivileged sales information sufficient to identify profits made for each category of parts identified in RFP No. 26.

### 4. RFP No. 27

RFP No. 27 requests the transcripts from the arbitration for three specific witnesses. Tomahawk objected that the information already is in the possession, custody, or control of Wolff or is equally accessible to Wolff because they are part of the arbitration record and available to Wolff at no cost. Wolff did not dispute this point. The Court denies Wolff's request because the transcripts from the arbitration are as accessible to Wolff as they are to Tomahawk.

### 5. RFP No. 28

RFP No. 28 requests "all correspondence between defendant and plaintiff." Along with boiler plate objections asserting vagueness, ambiguity, and undue burden, Tomahawk objected that this request was overly broad because it sought "all information" without being limited in time or scope. Tomahawk "invite[d]" Wolff to "narrow the scope of his request."

This request is overly broad. Wolff and Tomahawk have had a relationship for decades. Wolff has not proposed any narrower construction of this request and thus the Court denies compelling production of documents in response to RFP No. 28, without prejudice to Wolff offering a narrower scope to this request.

## D. Motion to Extend Case Deadlines

Wolff moves to extend all case deadlines by 60 days. Wolff argues that he requires documents that are the subject of the pending motion to compel before he can complete key depositions. Tomahawk objects, arguing that the issues here have already been decided by the arbitrator. The Court overrules Tomahawk's objection, rejects its argument that the issues in this case have already been decided by the arbitrator in a manner that is preclusive here. The Court grants Wolff's motion. The Court extends the deadlines as follows:

> (1) Discovery shall be completed by October 31, 2023, all pleadings under Rules 7(a) and 15 are due by that date, and all claims, remedies, and parties shall be joined by that date;

PAGE 44 – OPINION AND ORDER

(2) dispositive motions are due by December 1, 2023; and (3) the Court will set the remainder of the deadlines, including a trial date, after the deadline for dispositive motions.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Tomahawk's Motion for Summary Judgment (ECF 98). The Court also GRANTS Wolff's Amended Motion for Leave to File Amended Complaint (ECF 148). The Court GRANTS IN PART AND DENIES IN PART Wolff's Motion to Compel Discovery (ECF 135). The Court GRANTS Wolff's Motion to Extend Deadlines (ECF 141).

**IT IS SO ORDERED**.

DATED this 29th day of August, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge