# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**JAMES B. WOLFF**,

        Plaintiff,

    v.

**TOMAHAWK MANUFACTURING**,

        Defendant.

Case No. 3:21-cv-880-SI

**TENTATIVE OPINION AND ORDER ON DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES**

Stephen Healy, LAW OFFICE OF STEPHEN HEALY, 9450 SW Gemini Drive, PMB 79802, Beaverton, OR 97008, and Sean Darshan Healy, LAW OFFICES OF STEPHEN HEALY, 1390 N. McDowell Blvd., Suite G, Petaluma, CA 94952. Of Attorneys for Plaintiff James B. Wolff.

David W. Silke and Eliza Whitworth, GORDON REES SCULLY MANSUKHANI LLP, 701 Fifth Avenue, Suite 2100, Seattle, WA 98104; Aaron T. Olejniczak, ANDRUS INTELLECTUAL PROPERTY LAW, LLP, 790 N Water Street, Suite 2200, Milwaukee, WI 53202; Steven L. Levitt and Trevor M. Gomberg, LEVITT LLP, 129 Front Street, Mineola, New York 11501. Of Attorneys for Defendant Tomahawk Manufacturing.

**Michael H. Simon, District Judge.**

Plaintiff James B. Wolff ("Wolff") sues his former employer, Defendant Tomahawk

Manufacturing ("Tomahawk"). Before the Court is Tomahawk's motion to exclude Wolff's

expert witnesses under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.* ("*Daubert*"), 509 U.S. 579 (1993), and its progeny. In preparation for

discussion at the upcoming final pretrial conference, the Court tentatively grants in part and denies in part Tomahawk's motion.

## LEGAL STANDARDS

### A.  Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, as interpreted by *Daubert* and its progeny. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular . . . field." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995). Rule 702 "contemplates a broad conception of expert qualifications" and is "intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Thus, a witness may be qualified as an expert upon demonstrating at least a "*minimal foundation* of knowledge, skill, and experience." *Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1016 (9th Cir. 2004) (emphasis in *Hangarter*) (quoting *Thomas*, 42 F.3d at 1269).

PAGE 2 – TENTATIVE OPINION AND ORDER ON DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES

When determining the admissibility of expert testimony, a district court's role under Rule 702 is not to be a "fact finder" but a "gatekeeper." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010)). To fulfill its role as gatekeeper, a district court must "ensure that the testimony is both relevant and reliable" before it deems such testimony admissible. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (cleaned up). A court's gatekeeping role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702). By acting as a gatekeeper for all proffered expert testimony, a court "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Courts "must ensure that the proposed expert testimony is relevant to the task at hand," which is sometimes referred to as the "fit" requirement. *Daubert II*, 43 F.3d at 1315 (quotation marks omitted). Although the "[t]he relevancy bar is low," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014), to be sufficiently relevant, the expert opinion evidence must "logically advance[] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315; *see also Primiano*, 598 F.3d at 565 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). Rule 702 also requires opinion evidence to be "helpful" to the trier of fact, which is another way of describing a "relevance inquiry." *Tekoh v. County of Los Angeles*, 75 F.4th 1264, 1265 (9th Cir. 2023). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotation marks omitted). Further, "[u]nder Rule 702, expert

testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading." *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009). "Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014).

Turning to the reliability requirement, "[t]he question of reliability probes whether the reasoning or methodology underlying the testimony" is valid. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (quotation marks omitted). To aid a court's evaluation of reliability, the Supreme Court in *Daubert* "identified four factors that may bear on the analysis: (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Id.* (citing *Daubert*, 509 U.S. at 593-94).

"Concerning the reliability of non-scientific testimony," however, "the '*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it.'" *Hangarter*, 373 F.3d at 1017 (emphasis in *Hangarter*) (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (2000)). The Supreme Court also confirmed that the *Daubert* factors are "meant to be helpful, not definitive," and "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tires*, 526 U.S. at 150, 151. "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

"[E]xpert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. "It is the proponent of the expert who has the burden of proving admissibility." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Admissibility of the expert's proposed testimony must be established by a preponderance of the evidence in accordance with Rule 104(a). *See Daubert*, 509 U.S. at 592 n.10. The party presenting the expert must show that the expert's findings are based on sound principles and, if applicable, that they are capable of independent validation. *Daubert II*, 43 F.3d at 1316.

## B. Royalty Calculation[1]

"A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer based on the factors in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970)."[2] *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1319

---

[1] The Court applies the law for calculating royalties under patent law because "[i]t seems generally accepted that 'the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement.'" *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) (quoting *Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957).

[2] The *Georgia-Pacific* factors include:

> (1) royalties the patentee has received for licensing the patent to others;
> (2) rates paid by the licensee for the use of comparable patents; (3) the
> nature and scope of the license (exclusive or nonexclusive, restricted or
> nonrestricted by territory or product type); (4) any established policies or
> marketing programs by the licensor to maintain its patent monopoly by not
> licensing others to use the invention or granting licenses under special
> conditions to maintain the monopoly; (5) the commercial relationship
> between the licensor and licensee, such as whether they are competitors;
> (6) the effect of selling the patented specialty in promoting sales of other

(Fed. Cir. 2010). It is not enough merely to "discuss[ ]" the *Georgia-Pacific* factors; the expert must "explain how [he or] she calculated [the proffered] royalty rate using these factors." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1349 (Fed. Cir. 2018). Although *Georgia-Pacific* was a patent infringement case, its factors have been applied in trade secret misappropriation cases. *See Atl. Inertial Sys. Inc. v. Condor Pac. Indus. of Cal., Inc.*, 2015 WL 3825318, at *10-11 (C.D. Cal. June 18, 2015) (listing the *Georgia-Pacific* factors in a trade secret misappropriation case, but also listing other factors); *Veritas Operating Corp. v. Microsoft Corp.*, 2008 WL 7404617, at *5 (W.D. Wash. Feb. 26, 2008) (applying *Georgia-Pacific* factors in trade secret misappropriation case).

"No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). "[W]here multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). "When the accused infringing products have both patented and

---

products of the licensee; (7) the duration of the patent and license term; (8) the established profitability of the product made under the patent, including its commercial success and current popularity; (9) the utility and advantages of the patent property over old modes or devices; (10) the nature of the patented invention and the benefits to those who have used the invention; (11) the extent to which the infringer has used the invention and the value of that use; (12) the portion of profit or of the selling price that may be customary in that particular business to allow for use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as opposed to its non-patented elements; (14) the opinion testimony of qualified experts; and (15) the results of a hypothetical negotiation between the licensor and licensee.

*Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 n.3 (Fed. Cir. 2011).

unpatented features, measuring this value requires a determination of the value added by such features." *Id.* Thus, "a patentee may assess damages based on the entire market value of the accused product *only where* the patented feature creates the basis for consumer demand or substantially creates the value of the component parts." *Virnetx*, 767 F.3d at 1326 (emphasis in original) (cleaned up). This is known as the "entire-market-value" rule. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

The entire-market-value rule "allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Id.* (cleaned up). A plaintiff must provide tangible and unspeculative evidence apportioning the defendant's profits between protected and unprotected features *unless* the plaintiff satisfies the entire-market-value rule. *Id.* The entire-market-value rule also may apply in the context of trade secret misappropriation. *See, e.g.*, *In re Avaya Inc.*, 602 B.R. 445, 459 (S.D.N.Y. 2019) ("The entire-market-value rule may allow for a damages award of up to all of the profits derived by a trade-secret misappropriator from any infringing products making use of the misappropriated content." (citing patent cases)); *MSC Software Corp. v. Altair Eng'g, Inc.*, 2015 WL 13273227, at *15 (E.D. Mich. Nov. 9, 2015), *supplemented*, 2015 WL 13359781 (E.D. Mich. Nov. 22, 2015) ("The hidden and unknown trade secret may not literally be what the customer demands, but in a credible EMVR case, the product's known functionality or physical property that is <u>enabled</u> by the hidden trade secret could very well be the basis of the customer's demand for the product." (emphasis in original)). Finally, "when a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Vectura Ltd v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020).

## PLAINTIFF'S EXPERT WITNESSES

### A.  Elisabeth Wolff

Tomahawk challenges the expert opinion on damages offered by Wolff's daughter, Elisabeth Wolff ("Ms. Wolff"). ECF 395-3 (unsealed), 400-2 (sealed). Tomahawk argues that Ms. Wolff is unqualified to serve as a damages expert and that her opinion is unreliable. Tomahawk adds that Ms. Wolff's bias as Wolff's daughter is an additional ground for finding her expert opinion to be unreliable.

#### 1.  Qualification

Ms. Wolff graduated from Portland State University with an undergraduate degree in biology. She did not take any business or accounting classes in college but after graduating took an accounting course from a local accounting firm, EBS Associates, Inc. ("EBS"). The course lasted ten weeks at approximately one hour per week. Ms. Wolff does not know whether EBS was accredited. Ms. Wolff did not list her accounting course on her resume.

Ms. Wolff's resume begins by listing a generic job title of "office manager, executive assistant, human resources, bookkeeper." It then identifies her skills and expertise before describing her job experience. Her most recent resume states that she is currently employed at Sound Equine Options. At her deposition, however, she testified that she stopped working for Sound Equine Options in October 2024 and currently works at Mickelberry Gardens, where she has worked since November 2024. Her resume does not list Mickelberry Gardens, even though she included her resume with her expert report in this case on December 31, 2024. During her deposition, Ms. Wolff stated that she works for Mickelberry Gardens as an executive assistant and office administrator. She added that in that position, she handles accounts receivables and accounts payables and performs some of the business's bank reconciliations.

Ms. Wolff testified at deposition that EBS did not teach her how to value a business. She has never valued a business, does not know the methodologies for valuing a business, and has never heard of valuing a business using a discounted cash flow method. She also explained that in her current position she valued part of an income stream of a business after her employer lost a client.

Ms. Wolff also testified that she has never before calculated a reasonable royalty and is unfamiliar with the *Georgia-Pacific* factors. She explained that she believes that a reasonable royalty would be achieved by the parties discussing and agreeing upon one, but if they did not agree, she was unfamiliar with any accepted methodology for calculating a reasonable royalty.

Ms. Wolff has never served as an expert witness before. She asserted at deposition that she believed she was qualified to render an expert damages opinion based on her 13 years of work experience. Defense counsel asked about the "top contributions" of experience that Ms. Wolff noted on her resume, asking if she used any of the skills she listed when she prepared her expert report. She replied that she did not use any of those identified skills in preparing her expert report. She explained her general financial understanding and experience was the basis for her expert report.

In response to Tomahawk's motion to exclude, Wolff argues that Ms. Wolff is qualified to serve as an expert witness based on her past job experience. He states that Ms. Wolff has evaluated financial statements and profit and loss statements, and she has valued an income stream of a company. Wolff argues that these experiences qualify Ms. Wolff to value the "income owed to Plaintiff" from his trade secrets claim and that Tomahawk's challenges go to the weight, not the admissibility, of Ms. Wolff's testimony.

The Court disagrees with Wolff and finds that he must show that Ms. Wolff has at least a minimal foundation of *relevant* knowledge, skill, or experience. *See Hangarter*, 373 F.3d at

1016. Ms. Wolff's knowledge, skill, and experience in business do not meet a minimum threshold to qualify her as an expert to opine on damages in this case. She has no experience in valuing a business or a royalty. She has only minimal general accounting or bookkeeping experience. More importantly, she is unfamiliar with the concepts underlying business valuation. As discussed below, she did not use any recognized knowledge, skill, or experience in valuation methodology or accounting in her report. She simply concluded that 100 percent of all gross sales should be disgorged because of Tomahawk's "theft of the technology."

Alternatively, Ms. Wolff states that the specific royalty figure used in the FOT Agreement, which is not part of this case, should be applied to the gross sales numbers that she was asked to assume by Wolff's counsel.[3] That, however, is merely arithmetic. It does not

---

[3] "FOT" refers to "fiber orientation technology." ECF 305-1 at 1. To avoid having to seal this Opinion and Order, the Court is not stating the specific royalty figure contained in the FOT Agreement. The FOT Agreement is an agreement between Spherical IP, LLC ("Spherical"), a business affiliated with Wolff, and Formtec, LLC ("Formtec"), a business affiliated with Tomahawk. In 2011, Wolff formed Spherical and Robert Tournour, President of Tomahawk, formed Formtec, to "exploit" Wolff's "inventions relating to any use of a venturi effect using spherical geometry, and any fiber orientation." *See, e.g.*, ECF 294 at 3 (Decl. of James B. Wolff, ¶ 11, dated January 29, 2024); ECF 305-1 at 1 (FOT Agreement). The FOT Agreement assigns all rights, title, and interest of Spherical regarding those inventions to Formtec. Wolff contends that the FOT Agreement covers only meat-forming products because of the requirement of "fiber orientation." *See* ECF 294 at 3 (¶ 11). Thus, Wolff asserts, the products at issue in this case (water nozzles, shower heads, "soft choice/soft fill," and gradient breather plates), are not covered by the FOT Agreement and are technology owned by Wolff. *See, e.g.*, ECF 205 at 4-6; 206 at 3-5; 303 at 6, 8, 10; 305 at 5, 7; 326 at 3. Tomahawk responds that at least some of this technology is covered by the FOT Agreement and, if not, that Wolff failed to follow the requirements in a 2010 Non-Disclosure Agreement ("2010 NDA") between Wolff and Tomahawk to invoke its protections or the disputed technology otherwise does not qualify for protection. *See, e.g.*, ECF 170 at 5, 11; 225 at 12, 14. Spherical and Formtec went to arbitration over a dispute about the technology covered in the FOT Agreement. In an earlier Opinion and Order, the Court held that Wolff's claim in this case alleging breach of the 2010 NDA is not subject to arbitration because Wolff was not a signatory to the FOT Agreement. *See Wolff v. Tomahawk Mfg.*, 2022 WL 377926, *10-11 (D. Or. Feb. 8, 2022), *aff'd*, 2022 WL 17749271 (9th Cir. Dec. 19, 2022). In resolving the parties' cross motions for summary judgment, the Court evaluated, among other things, the parties' arguments about whether the disputed technology in this case was covered by the FOT Agreement as a matter of law because technology covered by the FOT Agreement is subject to arbitration and is not part of this federal lawsuit. *See, e.g., Wolff*

PAGE 10 – TENTATIVE OPINION AND ORDER ON DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES

require expert analysis.[4] The Court thus excludes Ms. Wolff from testifying as an expert based

on her lack of relevant qualifications and the fact that her testimony would not be helpful to the

jury. But even if she were a qualified expert, the Court still would exclude her expert testimony

as unreliable for the reasons discussed next.

### 2. Reliability

In her report, Ms. Wolff opines that 100 percent of Tomahawk's gross sales on "soft

choice/soft fill" products should be paid to Wolff as damages. Alternatively, Ms. Wolff contends

that the royalty figure from the FOT Agreement would apply to those gross sales. In her report,

---

*v. Tomahawk Mfg.*, 2024 WL 3540845, at *6-8 (D. Or. July 24, 2024). If the technology at issue in this case would have been the same as the technology covered under the FOT Agreement, that technology would have been transferred by Spherical to Formtec under the FOT Agreement and the parties' dispute would have been resolved in the arbitration. Further, Wolff repeatedly has represented that the technology at issue in this case is different from the technology covered by the FOT Agreement. *See, e.g.*, ECF 29 at 5 ("The NDA relates to improvements to machinery, equipment and tooling manufactured by Tomahawk, not to the technology which is the subject of the FOT Agreement."); 191 at 3 ("[I]t it is the non-FOT Confidential Information that is the current subject of this case."); 469 at 9 (conceding Tomahawk's Motion in Limine No. 9, seeking to preclude Wolff from arguing that the technology covered by the FOT Agreement is part of this federal trial).

[4] Ms. Wolff was provided a spreadsheet in an editable format by Plaintiff's former counsel and sales information from one of Plaintiff's other expert witnesses, Charles Sweat. She transferred the sales numbers onto the spreadsheet and performed basic arithmetic, assuming either 100% of sales or the royalty number from the FOT Agreement. Experts performing only basic arithmetic without any analysis, opinion, or data synthesis, however, do not provide any opinion that is helpful to the jury and are regularly excluded by courts. *See, e.g.*, *United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972) (affirming exclusion of an accounting expert who "would do no more than make basic arithmetical computations with figures supplied to him by counsel" because it would be "expert testimony concerning matters clearly within the realm of jurors' comprehension"); *Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 379 (S.D.N.Y. 2023) (quoting *FPP, LLC v. Xaxis US, LLC*, 2017 WL 11456572, at *1-2 (S.D.N.Y. Feb. 13, 2017) ("Courts regularly exclude expert testimony where the expert 'engages in arithmetic, not expert analysis.'" (gathering cases)); *Think20 Labs LLC v. Perkinelmer Health Scis., Inc.*, 2023 WL 9005633, at *4 (C.D. Cal. Nov. 30, 2023) ("The remainder of Dr. Fisher's opinion is simple arithmetic for which no expertise is required.").

Ms. Wolff offers no reliable methodology for how she came up with either conclusion, nor did she provide a reasoned explanation at her deposition.

Regarding the 100 percent figure, Ms. Wolff testified at deposition that she did not have "a good answer" for why she selected 100 percent versus any other percentage. She stated that she chose 100 percent because of the purported "theft" of Wolff's technology. She did not explain, however, why the alleged misappropriation of Wolff's technology would result in a royalty of 100 percent of Tomahawk's gross sales. For example, she did not explain why there would be no consideration for Tomahawk's contribution to the products (resulting in less than 100 percent), or Tomahawk's costs in manufacturing or marketing the product (taking the percentage from profits as generally is done with royalties, versus gross sales).

For the lower royalty percentage, Ms. Wolff explained at deposition that she simply applied the royalty figure from the FOT Agreement. She stated she believed the same technology was at issue in this case. But that is inaccurate. As explained in footnote 3, *supra*, the technology covered by the FOT Agreement was subject to an arbitration and is not part of this case. Thus, Ms. Wolff's underlying premise is without support. She offers no explanation for why it was reasonable to apply the same royalty percentage to a hypothetical royalty between Wolff and Tomahawk that was negotiated between Formtec and Spherical for different technology under different circumstances.

Ms. Wolff offered no methodology or reasoning in her report or deposition. She did not discuss any of the *Georgia-Pacific* factors. Regardless of whether it was the *Georgia-Pacific* factors, or other factors such as those listed in *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974),[5] Ms. Wolff needed to provide some discussion of *how*

---

[5] The Fifth Circuit in *University Computing* explained that in a trade secrets case:

*and why* she reached her royalty determination beyond simply using the royalty figures from the

FOT Agreement.

As explained by the Federal Circuit in the patent infringement context:

> After a discussion of each of the *Georgia-Pacific* factors, including
> the benefits of the patented technology, sales and profitability, and
> the competitive relationship of the parties, Exmark's expert
> concluded with little explanation that Exmark and Briggs would
> have agreed to a 5% reasonable royalty rate on the sales of the
> accused lawn mowers as the value for the improved baffle.
> Nowhere in her report, however, did she tie the relevant *Georgia-
> Pacific* factors to the 5% royalty rate or explain how she calculated
> a 5% royalty rate using these factors. To be admissible, expert
> testimony opining on a reasonable royalty must sufficiently tie the
> expert testimony on damages to the facts of the case. If the
> patentee fails to tie the theory to the facts of the case, the testimony
> must be excluded.

*Exmark Mfg.*, 879 F.3d at 1349 (cleaned up).

"[T]he reliability analysis applies to all aspects of an expert's testimony: the

methodology, the facts underlying the expert's opinion, the link between the facts and the

conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). Ms. Wolff did

not discuss any factors or provide a methodology for why she selected her royalty figures.

Indeed, all she did was apply simple arithmetic calculations. That is fatal to her expert report.[6]

---

> In calculating what a fair licensing price would have been had the parties
> agreed, the trier of fact should consider such factors as the resulting and
> foreseeable changes in the parties' competitive posture; that prices past
> purchasers or licensees may have paid; the total value of the secret to the
> plaintiff, including the plaintiff's development costs and the importance of
> the secret to the plaintiff's business; the nature and extent of the use the
> defendant intended for the secret; and finally whatever other unique factors
> in the particular case which might have affected the parties' agreement,
> such as the ready availability of alternative processes.

504 F.2d at 539.

[6] As noted, Ms. Wolff gave as her only explanation that she "arrived" at 100 percent
disgorgement based on the alleged "theft" of Wolff's technology. As discussed, this is not a

Wolff also argues that Ms. Wolff's opinion is reliable because of the "entire-market-value rule." He contends that he will prove at trial that his confidential technology is the basis for the entire (or vast majority of) customer demand of the "soft choice/soft fill" products, and thus he is entitled to 100 percent of the market value of the product.

The problem with Wolff's argument that Ms. Wolff's opinion is reliable based on the entire-market-value rule is that there is no evidence that Ms. Wolff considered this doctrine. Ms. Wolff did not apportion Tomahawk's profits or gross sales by protected and unprotected features, which generally is required in assessing a reasonable royalty. Ms. Wolff also did not give any deposition testimony or provide any statements in her report indicating that she applied the entire-market-value rule exception. She did not provide any support that her opinion is based on facts, methodology, assumptions, or any consideration that Wolff's technology created the basis for the customer demand or substantially created the value of the product. During her deposition, she stated she did not have a good answer for why she chose 100 percent and then simply kept repeating that she selected that royalty figure simply because of "theft of the product." Defense counsel gave her an opportunity to explain her reasoning and she never provided any other explanation or detail. Wolff's *post hoc* argument that Ms. Wolff's opinion is based on the entire-market-value rule cannot fill in the gaps for her deficient expert report. Because Ms. Wolff did not apportion the royalty, cite or discuss the entire-market-value rule, or provide any reasoning or methodology that explains her royalty calculation or can support an

---

reliable methodology for calculating a reasonable royalty. In the alternative, she took the lower royalty figure from the FOT Agreement based on her assumption that the technology was the same as in the FOT Agreement. Again, this is not a reliable methodology, particularly because it is based on an incorrect assumption—the technology about which she was opining could not be covered by the FOT Agreement and be recoverable in this federal lawsuit. Thus, her explanations are insufficient to "tie [her] expert testimony on damages to the facts of the case." *See Exmark*, 879 F.3d a 1349.

inference that she applied the entire-market-value rule, her opinion is unreliable. For these reasons, the Court excludes the proffered opinion testimony from Elisabeth Wolff under Rule 702.[7]

## B. Langston Murray

Tomahawk challenges the damages opinion of Langston Murray ("Murray"). ECF 457-2 (unsealed), 424-4 (sealed). Tomahawk argues that Murray is unqualified to render an expert opinion on damages in this case and that his opinion is unreliable.

### 1. Qualification

Murray received a Master of Business Administration ("MBA") degree in December 2022, with a focus in project management. He has worked for two years at Sandia National Laboratories ("Sandia") as a Business Operations Analyst. Before that, he worked as an intern at Sandia. At his undergraduate college, he believes he may have taken at most one economics class, but he does not recall if it was a micro or macro economics class and he does not know the difference between the two. He could not correctly identify what the acronyms "GAAP" (Generally Accepted Accounting Principles) or "LLC" (limited liability company) mean. He also did not know that an ownership interest in an LLC offers protection to the owner from the debts and obligations of the LLC.

Murray has never valued a business.[8] He states that he understands some of the valuation concepts "to an extent," but he has never used a cost approach, income approach, market

---

[7] Because the Court grants Tomahawk's motion to exclude expert testimony from Ms. Wolff on the grounds that she is unqualified and her opinion is unreliable, the Court declines to reach Tomahawk's argument relating to bias.

[8] At first, Murray testified that he had valued a business, but on further questioning he clarified that he only valued a business in terms of what that business would spend, meaning its budget process. That is not the same as valuing a business in the context of expert damages valuation testimony.

PAGE 15 – TENTATIVE OPINION AND ORDER ON DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES

approach, or discounted cash flow approach to valuation. He also did not know the steps in or elements of the "buildup method" for valuing a business. He has never calculated a royalty before and had never heard of the *Georgia-Pacific* factors.

At Sandia, Murray works as a financial analyst. He manages a portion of an annual budget of about $15 million for the human resources department. He monitors the spending of the "managers and admins," raises any budget variances to the attention of others, proposes reductions and other changes to get the budget back on track, and works with others in his department to propose budget allocations.

Considering Murray's knowledge, education, and experience, he is not qualified to render an opinion on damages in this case. He does not have the requisite training, knowledge, or experience in valuing a business or calculating a royalty. As discussed below, he did not use any business experience or training to calculate the royalty that he used. He merely applied the percentage and down payment figure from the FOT Agreement to Tomahawk's gross sales. Murray, however, provided no explanation for why the relationship between the signing entities in the FOT Agreement, on the one hand, and the parties in this lawsuit, on the other, makes the royalty stated in that agreement a reliable basis to find a reasonable royalty between Wolff and Tomahawk here. Nor did Murray provide any explanation for why a down payment would apply in the context of calculating a reasonable royalty (unlike the sale of technology that occurred through the FOT Agreement) and why gross sales instead of profits would be appropriate. Even if he were qualified, however, as discussed next, his opinion is unreliable.

## 2. Reliability

In his report, Murray opines that the down payment and royalty terms from the FOT Agreement are reasonable to apply to Tomahawk's gross sales of the "soft choice/soft fill" products at issue. He then applies these arithmetic calculations to sales figures he was told to

assume by Wolff's counsel to reach his conclusions. Murray's only explanation in his report for applying the FOT Agreement terms is that "[a] reasonable royalty can be based upon the prior dealings of the parties."

Murray testified at deposition, however, that he did not know the names of the members of Spherical, one of the parties to the FOT Agreement. Murray also did not know the names of the members of Formtec, the other party to the FOT Agreement. He also did not know who owned Tomahawk or how Formtec and Tomahawk were related. He simply accepted the characterization that Tomahawk and Formtec were "sister" companies, but he could not recall where he learned about that corporate connection. He also was unaware of any principle or rule of business permitting an expert to treat related companies as the "same" entity. He provided no reasoned explanation for why the royalty agreed to between Formtec and Spherical for one set of products should be applied to a different set of products between Tomahawk and Wolff. Murray explained only that he considered Wolff and Spherical to be "closer to one" because Wolff was the owner of Spherical. But Murray also testified that he did not know the ownership structure of Spherical. In general, Murray appeared confused about the corporate structure of Spherical, Formtec, and Tomahawk and he had not done any research into those entities before forming his conclusion.

As noted, Tomahawk and Wolff are not parties to the FOT Agreement. That is why this case was not subject to the arbitration between Formtec and Spherical, the parties to that agreement. Wolff cannot disclaim being a party to the FOT Agreement to avoid arbitration and then embrace its terms as a "party" to accept a comparable royalty, at least without any reasonable analysis. As noted, Murray engaged in no independent investigation into the corporate structure of Formtec or Spherical, nor did he engage in any analysis as to why the terms of an agreement between Formtec and Spherical should be the same as a hypothetical

reasonable royalty between Wolff and Tomahawk. He also testified that he did not know how Spherical and Formtec reached the royalty number contained in the FOT Agreement and made no reasoned application to "soft choice/soft fill" products. Thus, the foundational aspect of his opinion is unreliable and not specifically tied to the facts of this case.

Murray also testified that he assumed that the technology he was valuing was the same technology that was covered by the FOT Agreement. As with Ms. Wolff, however, this was a fundamental error that underpinned Murray's valuation. It also renders his opinion unreliable. Additionally, like Ms. Wolff, Murray used gross sales numbers without explanation. He did not research a reasonable royalty for this type of technology. He did not research royalties for patented versus unpatented technology. He did nothing other than apply the FOT Agreement royalty to Tomahawk's sales figures he calculated from the numbers given to him. For these reasons, the Court excludes the proffered opinion testimony from Langston Murray under Rule 702.

**C.  Samuel Gannon**

Tomahawk challenges the technical expert opinion of former Tomahawk employee Samuel Gannon ("Gannon") (ECF 457-3, unsealed; 424-8, sealed) on multiple grounds. Tomahawk argues that his opinion is confusing because he defines "soft choice/soft fill" differently than does Wolff's other technical expert, Charles Sweat ("Sweat"), another former employee of Tomahawk. Tomahawk also argues that Gannon's opinion is unreliable for several reasons. Finally, Tomahawk argues that Gannon is unqualified to render an expert technical opinion in this case.

Gannon's expert report describes that the technology in "soft choice" and "soft fill" is used in the food forming industry, although it also has other applications. The most notable attribute of the technology is reducing pressure exerted on the food-forming equipment,

PAGE 18 – TENTATIVE OPINION AND ORDER ON DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES

particularly through the profile or the shape of the holes in the fill plates and breather plates, some of which cause a Venturi effect. Gannon attached multiple drawings to his report and the "Soft Fill" trademark that he states was abandoned by Tomahawk.

At deposition, Gannon was asked what he would look for to determine if a part was "soft choice/soft fill." He responded that he would primarily look at the tooling, and then he would look at the encoder settings of the programming. For the tooling, he would look at the breather plate and the fill plate to check their profile and their part numbers to see if "soft fill" or "soft choice" was on their drawings.

Tomahawk challenges Gannon's methodology on multiple grounds. Wolff does not specifically respond to any argument raised by Tomahawk. He simply asserts generally that Gannon is qualified because he worked at Tomahawk on meat-forming products for a national fast-food chain and then quotes Gannon's expert report. Tomahawk, however, challenges Gannon's conclusions as *unreliable*. Wolff's failure to respond to any of Tomahawk's reliability challenges is a concession of Tomahawk's arguments. *See, e.g.*, *Stewart v. Bos. Sci. Corp.*, 2016 WL 2939516, at *12 (S.D. W.Va. May 19, 2016) ("The plaintiffs fail to respond to this argument, and I presume that the plaintiffs concede that [the expert challenged under *Daubert*] will not offer such an opinion at trial. I decline to raise counterarguments on their behalf."). Even if Wolff did not concede these arguments, the Court agrees with Tomahawk.

As Tomahawk asserts, Gannon's opinion is unreliable because he provided no methodology, testing, or reasoned basis for his conclusions. For example, he did not test to see if the combination of tooling and timing he contends is necessary for "soft choice/soft fill" reduced pressure in any product as compared to any other product. He also did not compare the pressure of soft fill, standard fill, and multi-flow products. He further did not conduct any testing for his

conclusion in this case regarding the profile necessary for "soft choice/soft fill" products. He simply noted the flow simulation he did for the arbitration, but that was in a different context.

Gannon also could not provide any reasoned methodology for determining when a part used "soft choice/soft fill" technology. During his deposition, Gannon explained that he would look at the part's timing and tooling. But he could not recall how to test or program the timing. For the tooling, meaning the interaction and orientation of the breather plates and fill plates and their orifices, he could not describe those with any certainty. For example, he did not know whether an angled fill plate or gradient breather plate would indicate the use of "soft choice/soft fill." When counsel for Tomahawk tried to get Gannon to identify a specific method for determining when a part was using "soft choice/soft fill," Gannon said that he would check the drawing to see if it stated, "soft choice" or "soft fill." He then added that a part could be Wolff's "soft choice/soft fill" technology even if the drawing did not have that identification, and that drawings before a certain date might not include Wolff's technology even if they stated, "soft choice/soft fill." He also was unsure whether creating a Venturi effect was required for "soft choice/soft fill," even though that was the focus of his flow simulation test in the arbitration— whether the underlying shape created a Venturi effect. When asked at deposition, he responded that he would rely on his previous experience working for four years at Tomahawk. Ultimately, when counsel for Tomahawk tried to summarize a list of factors for determining whether a product used "soft choice/soft fill" technology based on Gannon's testimony,[9] Gannon responded that he was unsure whether those were all the factors, but they were based on Gannon's

---

[9] Tomahawk's counsel summarized Gannon's testimony as including the following factors: (1) whether the pressure is lowered in the machine; (2) the timing encoder settings; (3) breather plate; (4) fill plate; and (5) assessing the fill plate orifice to determine whether it creates a Venturi effect.

PAGE 20 – TENTATIVE OPINION AND ORDER ON DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES

experience and understanding. When Tomahawk's counsel asked if there may be more factors, Gannon responded, "I'm not sure. Ask Mr. Wolff. . . . As I stated, this is part of his technology and understanding. I do not know all of Mr. Wolff's technology or understanding of his development."

The Court agrees with Wolff that Gannon is generally qualified. He is a mechanical engineer. He worked for four years at Tomahawk, first as a project engineer and then as an engineering lead. But he cannot issue an expert opinion simply on his own *ipse dixit*. *Pomona*, 750 F.3d at 1049 ("It is where expert opinion is 'connected to existing data only by the *ipse dixit* of the expert' that there may be 'too great an analytical gap between the data and the opinion preferred' to support inclusion of the testimony." (quoting *Joiner*, 522 U.S. at 146)). When pushed for evidence or proof supporting his statements, Gannon generally responded that he was relying on his experience at Tomahawk. But when an expert is relying on experience, the expert still must render an opinion "based on sufficient facts or data" that "is the product of reliable principles and methods." Fed. R. Evid. 702(a)-(b). Thus, the conclusions expressed in Gannon's opinion are unreliable. For these reasons, the Court excludes the proffered opinion testimony from Samuel Gannon under Rule 702.[10]

### D.  Charles (Chuck) Sweat

Tomahawk challenges the technical expert opinion of Charles Sweat. ECF 457-4 (unsealed); 424-10 (sealed). Tomahawk argues that Sweat's testimony must be excluded because it is inconsistent with Gannon's testimony and would be confusing to a jury. Because the Court has excluded Gannon's testimony, the Court rejects Tomahawk's argument based on

---

[10] Because the Court concludes that Gannon's opinion is unreliable for the reasons discussed, the Court declines to reach Tomahawk's remaining arguments.

inconsistency. Tomahawk also argues that Sweat is not qualified to render an expert opinion and that his opinion is unreliable.

### 1. Qualification

Sweat worked for 19 years in the meat-forming industry. He held management-level positions in machine-servicing departments, including at Tomahawk, where he supervised Wolff. Tomahawk highlights that Sweat is not an engineer, but relevant work experience can qualify an expert.[11] *See, e.g.*, *Kumho Tire*, 526 U.S. at 152 (noting that an expert can be qualified based on "professional studies or personal experience"). The Court rejects Tomahawk's motion to exclude Sweat for lack of expert qualification.[12]

### 2. Reliability[13]

Sweat's report describes that for two Tomahawk machines, the F-19 and the TH-400, the changes designed by Wolff improved the functioning of those machines. Sweat explains that part of the improvements came from incorporating "soft choice/soft fill" technology. He then describes how the "soft choice/soft fill" technology works. He explains that "soft choice/soft fill" involves: (1) timing; (2) specific holes of the fill plate, including a 45-degree angle; and (3) a gradient breather plate with added holes, more at the front. He notes that any one factor reduces pressure and all three make a significant reduction in pressure. He describes his background in

---

[11] The Court rejects Tomahawk's characterization that Sweat "could not hold a job in the protein industry." Sweat's first three jobs lasted approximately six, five, and five years, respectively.

[12] Tomahawk also contends that Sweat failed to review patents and other relevant materials and thus is unqualified based on knowledge, but the Court considers that to be a challenge to reliability, based on Sweat failing to issue an opinion based on sufficient facts or data.

[13] Although Wolff does not provide much more in response to this aspect of the motion against Sweat than he does in response to the motion against Gannon, the Court finds that Wolff provides just enough to avoid a finding that he conceded this aspect of Tomahawk's motion.

discovering problems with these machines in 2007-08 and suggesting to Wolff and others that they improve the machines. Years later, when Sweat worked at Tomahawk, he again mentioned the problems to Wolff, who informed Sweat that Wolff had designed improvements and put them in a notebook that he gave to Robert Tournour of Tomahawk.[14] Wolff and Sweat retrieved the notebook and obtained permission from Tournour to develop the improvements designed by Wolff.

Tomahawk argues that Sweat's opinion is unreliable because he did not engage in testing other than looking at pressure gauges on the machines to see the lower pressure in using the new plates versus the other plates. Tomahawk argues that factors other than the different style plates could cause the reduced pressure. This, however, goes to the weight and not admissibility of Sweat's testimony. Unlike Gannon, Sweat did test the pressure changes when he was working on developing the new technology.

Tomahawk also argues that because Sweat did not review the patents of a competitor, which Tomahawk appears to contend invalidates Wolff's contentions that he developed the technology, Sweat's opinion is unreliable and not based on adequate facts and data. Sweat, however, was shown the patents during his deposition. He testified that the patents involved standard breather plates and not gradient breather plates. This challenge also goes to the weight and not the admissibility of his testimony.

Finally, Tomahawk argues that Sweat is biased because he is a longtime friend of Wolff's, and this renders his opinion unreliable. As Wolff argues, however, bias generally is not a valid basis to exclude expert testimony. *United States v. Abonce-Barrera*, 257 F.3d 959, 965

---

[14] There may be a hearsay issue if Wolff seeks to elicit what he said to Sweat. Now is not the time, however, to resolve that question.

(9th Cir.2001) ("Generally, evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury. Further, Abonce-Barrera had the opportunity to cross-examine [the expert] fully about any biases, and [the expert's] credibility as an expert was impeached by defendant's expert . . . ."). The Court agrees with Wolff and denies Tomahawk's motion to exclude Sweat's expert testimony.

**E.  Brian Kearns, M.D.**

Tomahawk moves to exclude Wolff's treating physician, Dr. Brian Kearns ("Kearns") from testifying as a treating medical expert. Tomahawk contends that Wolff failed to produce a sufficient report regarding Dr. Kearns under Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure. In its reply, Tomahawk asserts that Wolff also failed to disclose Dr. Kearns as an expert witness in Wolff's pretrial witness list and statement. *See* ECF 431.

Wolff responds that on March 7, 2025, he made the following disclosure under Rule 26(a)(2)(C):

> Brian Kearns ("Dr. Kearns") is a Hematology specialist and treating physician of Wolff. Dr. Kearn's testimony is relevant but not limited to Plaintiff's Third Claim for Relief, Disability Discrimination (ORS 659A.112). Dr. Kearns performed multiple test protocols on February 23-26, 2011, at the request of Dr. Leng. Such tests include a 12-lead electrocardiogram, CT pulmonary angiogram, continuous telemetric monitoring, lower extremity duplex ultrasound, and a nocturnal oximetry study.
>
> Dr. Kearns will testify to his diagnosis and treatment of Wolff based on those test results. That is, that he diagnosed Wolff with Pulmonary Embolus, Presumed Hypercoagulable Disorder with Recurrent Tromboembolic Disease, Hyponatremia, Remote History of Tobacco Abuse (currently in remission) and Elevated Troponin, Presumed Secondary to Right Ventricular Heart Strain. Wolff was prescribed enoxaparin (Lovenox), Warfarin, Acetaminophen, Ibuprofen, and supplemental oxygen to treat his conditions. Attached hereto is Exhibit B, relevant Providence St Vincent Medical Records from February 23, 2011 to February 27, 2011.

ECF 441 at 16-17.

The Court rejects Tomahawk's argument that this disclosure fails to comply with Rule 26(a)(2)(C). The disclosure provides sufficient information from which Tomahawk can ascertain the subject matter on which Dr. Kearns will opine and a summary of the facts and opinions to which he is expected to testify, *to wit*, Dr. Kearns's diagnoses of Wolff, the medications he prescribed, the tests he performed, and the treatment he recommended. The Court also finds no unfair prejudice or surprise to Tomahawk in Dr. Kearns testifying to this information because it was included in the March 2025 disclosure and described again in Wolff's response to Tomahawk's *Daubert* motion. Further, Dr. Kearns *was* listed on Wolff's witness list and statements. *See* ECF 431 at 4-5. The Court denies Tomahawk's motion to exclude Dr. Kearns's expert testimony.

**F.  Mith Leng, M.D.**

Dr. Mith Leng treated Wolff from approximately June 9, 2011 through July 6, 2015. Tomahawk makes many of the same arguments against the testimony of Dr. Leng as it does against Wolff's other treating physician, Dr. Kearns. In Tomahawk's reply brief, however, Tomahawk raises the additional argument that Wolff *failed* to list Dr. Leng as a trial witness in Wolff's trial witness list and statement. *See* ECF 431. Thus, Tomahawk argues, Wolff failed to comply with the Court's Trial Management Order. ECF 354. Tomahawk also filed a motion in limine to exclude Dr. Leng's testimony. *See* ECF 444 at 5-6 (MIL No. 3).

The Court rejects Tomahawk's *Daubert* motion to exclude the testimony of Dr. Leng for the same reasons the Court rejected Tomahawk's *Daubert* challenge to Dr. Kearns. The March

2025 disclosure described Dr. Leng's testimony relating to his diagnoses, prescriptions, and treatment of Wolff.[15]

The Court, however, grants Tomahawk's motion in limine (MIL No. 3) to exclude Dr. Leng's testimony, as discussed in the Court's separate Order on Motions in Limine. The Court's Trial Management Order (ECF 354) expressly requires parties to disclose every lay and expert witness whom that party intends to call to testify at trial in that party's case-in-chief. That a party may have disclosed a witness earlier in some other disclosure does not excuse the requirement to disclose a trial witness in the required pretrial filings. The Court thus excludes the testimony of Dr. Leng based on Wolff's failure to list Dr. Leng in Wolff's witness list (ECF 431) as required in the Court's Trial Management Order (ECF 354).

## CONCLUSION

In preparation for discussion at the upcoming final pretrial conference, the Court provides this tentative Opinion and Order to exclude under Rule 702 of the Federal Rules of Evidence opinion testimony from the following expert witnesses proffered by Plaintiff: (1) Elisabeth

---

[15] This disclosure stated:

> Mith Leng, M.D. ("Dr. Leng") was a treating physician for Plaintiff, James Wolff ("Wolff") from approximately June 9, 2011 to July 6, 2015. Dr. Leng's testimony is relevant but not limited to Plaintiff's Third Claim for Relief, Disability Discrimination (ORS 659A.112). Dr. Leng will testify to the existence and treatment of Wolff's disability; which includes hypercoagulability, Deep Venous Thrombosis, Pulmonary Embolus. Dr. Leng is expected to testify that Wolff has a strong family history of thrombosis and that he began treatment because Wolff's family members had hypercoagulability with high factor VIII levels, and that he had also been told he has the same. Dr. Leng is expected to testify about his treatment of Wolff's disabilities, including but not limited to prescriptions for anticoagulation and referrals to Hematology (i.e. Dr. Brian Kearns). Attached to this disclosure is Exhibit A, James B. Wolff's Kaiser Medical Records from February 1, 2011 to January 1, 2017, reflecting Dr. Leng's diagnosis and treatment of Wolff.

Wolff; (2) Langston Murray; and (3) Samuel Gannon. The Court also tentatively excludes all testimony from Dr. Mith Leng based on Plaintiff's failure to comply with the Court's Trial Management Order. ECF 354. The Court will allow expert testimony from Charles Sweat and Dr. Brian Kearns. To this extent, the Court tentatively GRANTS IN PART and DENIES IN PART Defendant's *Daubert* Motion to Exclude the Opinions and Testimony of Plaintiff's Experts. ECF 422.

        **IT IS SO ORDERED**.

        DATED this ____ day of June, 2025.

[*Tentative Opinion and Order*]_____
Michael H. Simon
United States District Judge